Exhibit E

Filed 9/7/07  O'Sullivan v. City of San Diego CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VALERIE O'SULLIVAN, | D047382 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. GIC826918) |
| CITY OF SAN DIEGO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, William C. Pate, Judge.  Affirmed.

Defendant The City of San Diego (City) appeals a judgment awarding declaratory and injunctive relief to plaintiff Valerie O'Sullivan in her action to enforce the provisions of a 1931 trust grant by the Legislature, as trustor, to City, as trustee, of certain state tide and submerged lands adjacent to La Jolla (now known as the Children's Pool).  On appeal, City contends: (1) O'Sullivan's action was barred by the California Tort Claims Act (Gov. Code, § 810 et seq.) because she did not present a claim to City before filing

her complaint against it; (2) her action was barred by the separation of powers doctrine;

(3) the trial court erred by interpreting the terms of the 1931 trust; (4) the trial court erred

by admitting certain evidence offered by O'Sullivan; (5) O'Sullivan's action was barred

because she did not name an indispensable party as a defendant; and (6) the trial court

erred by awarding O'Sullivan attorney fees pursuant to Code of Civil Procedure section

1021.5.[1]  Because we conclude City has not carried its burden on appeal to show the trial

court prejudicially erred, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[2]

On June 21, 1930, Ellen Browning Scripps requested permission from City to

construct (at her expense) a concrete breakwater in the Pacific Ocean adjacent to La Jolla

to create a bathing pool.[3]  On June 26, H. N. Savage, a hydraulic engineer, submitted to

City drawings for construction of Scripps's proposed breakwater.  On June 30, the City

Council passed a resolution granting Scripps permission to construct the concrete

breakwater.[4]  In September, the California Attorney General confirmed to Savage that

---

[1]    All further statutory references are to the Code of Civil Procedure unless otherwise
specified.

[2]    Our description of the factual background in this case is largely based on the 31-
page statement of decision issued by the trial court on April 26, 2005.

[3]    On or about this date, Scripps also sought permission to construct the breakwater
from the United States War Department, the State of California Department of Public
Works, and City's park and playground boards.

[4]    Thereafter, City's park department and the United States War Department
approved construction of the breakwater.

only the Legislature could authorize construction of the breakwater, but until that legislative act could be obtained he (the Attorney General) would not take legal action to prevent construction of the bathing pool breakwater.

In September, construction of the 300-foot concrete breakwater began.[5] It was completed in February 1931. On June 1, Scripps gave the breakwater and the resultant ocean water bathing pool to City. On June 11, the City Council adopted a resolution expressing its thanks to Scripps for her gift.

On June 15, the Governor signed an act of the Legislature (Stats. 1931, ch. 937, effective as of August 14) (the Trust), granting certain tide and submerged state lands (apparently consisting of the Children's Pool area) to City "to be forever held by [City] and its successors in trust for the uses and purposes and upon the express conditions following, to wit: [¶] (a) That said lands shall be devoted exclusively to public park, bathing pool for children, parkway, highway, playground and recreational purposes, and to such other uses as may be incident to, or convenient for the full enjoyment of, such purposes . . . ."[6] For over 60 years thereafter, the Children's Pool remained open for its use and enjoyment by the people of City and others.

---

[5]    The breakwater was to extend from a bluff into the ocean in a sweeping curve along a natural low barrier reef. Its top was to be 12 feet above mean sea level.

[6]    The act also provided: "(b) The absolute right to fish in the waters of the Pacific [O]cean over said tidelands or submerged lands, with the right of convenient access to said waters over said lands for said purpose is hereby reserved to the people of the State of California."

In 1992, harbor seals apparently first became a concern in the area, leading to the City Council's February 1993 ordinance creating a marine mammal reserve (Reserve) at Seal Rock, located about 100 yards from the Children's Pool, for a five-year period.[7] That ordinance made the Reserve off limits to swimmers, divers, and tourists.[8]  In November, the California State Lands Commission (SLC) sent a letter to City's natural resources manager notifying her that the Reserve would violate the specific provisions of the Trust if public recreational uses were banned.[9]

On October 1, 1997, the City Manager sent a report to City's natural resources committee regarding closure of the Children's Pool since September 4 as a result of high fecal coliform counts.[10]  Subsequent testing showed that water contamination was primarily from seal feces.  The City Manager's report also noted the increase in the

---

[7]    In 1933, the Legislature granted to City in trust all remaining tide and submerged state lands adjacent to City (other than the Children's Pool, which was previously granted to City pursuant to the Trust), thereby presumably giving City responsibility, as trustee, over Seal Rock.  (Stats. 1933, ch. 688.)

[8]    As the trial court found, however, no part of the Reserve was located within the Trust lands (i.e., the Children's Pool area).

[9]    However, because, as noted above, the area of the Reserve did not include the Children's Pool area, the SLC erred by stating prohibition of public recreational uses in the Reserve would violate the terms of the Trust.  In January 1994, the SLC sent City a letter effectively conceding the area of the Reserve did not include the Children's Pool area granted in trust to City in 1931.

[10]    On March 21, 2003, the County of San Diego Department of Health (DEH) changed the status of the Children's Pool from "closed" to "advisory" because its water contamination was not caused by human sources.

number of harbor seals in the area, which may have been caused by the establishment of the nearby Reserve and barriers erected by City lifeguards at the Children's Pool beach separating the public from seals that haul-out onto the sand.  It also noted that because public health was potentially at risk, the federal Marine Mammal Protection Act (16 U.S.C. § 1361 et seq.) (MMPA) allowed City to take noninjurious action to reduce or eliminate use of the Children's Pool by seals.

In December, the National Marine Fisheries Service (NMFS) sent a report to City advising it that the number of seals hauling out at the Children's Pool beach was increasing and that seals apparently preferred the Children's Pool beach over the Reserve for hauling-out.  It noted that before establishment of the Reserve by City no seals or other animals were hauling out at the Children's Pool beach.  It also stated the seals at the Children's Pool were "acclimating" to humans and the effectiveness of the Reserve as a seal sanctuary was questionable.  Because the harbor seal population locally and statewide was healthy and increasing, the NMFS believed termination of the Reserve would have no adverse effect on seals.

In February 1998, the City Manager sent a report to City's natural resources committee on the closure of the Children's Pool.  It noted that before 1994 the water quality at the Children's Pool met safe standards except on rare occasions.  To reduce the contamination caused by seal feces, it recommended that the barriers be removed in the hope that seals would be less likely to use the Children's Pool beach if there were more human interaction.  Also, it recommended a consultant be hired to develop a plan to open the sluiceways in the breakwater.  It was believed opening the sluiceways would increase

5

the amount of water in the Children's Pool, thereby diluting the concentration of feces in the water and reducing the size of the beach to discourage seals from using it.  In May, the City Manager sent another report stating that removal of the barriers did not have the desired effect of reducing the seal population and recommending a return of the barriers separating seals from the public.  It also stated that opening the sluiceways was feasible, but three-fourths of the beach sand would have to be removed to return it to its 1931 condition.  Based on that report, the committee recommended to the City Council that action be taken to remove the sand and open the sluiceways.

In August 1998, City was notified by the Center for Disease Control (CDC) that seals can transmit diseases to humans.

In December, City requested the NMFS's authorization to remove sand from the beach, which could be considered incidental harassment of seals.  City represented that the Children's Pool had been constructed to provide a sheltered swimming area for children.  Because of gradual sand accumulation, the shoreline of the Children's Pool had advanced nearly to the end of the breakwater, resulting in very little protected area for recreational swimming.  Its requested sand excavation would return the Children's Pool to its early 1940's condition.

However, on March 29, 1999, the City Council voted not to dredge the sand and not to "shoo" the seals, but to instead install a rope barrier to separate the seals and the public and refer the issues to committee for further review.

On October 19, the NMFS advised City it did not favor closure of public beaches to the general public because of harbor seals colonizing those beaches.  The NMFS also

disagreed with City's shared-use policy regarding the Children's Pool. It believed City should decide if the Children's Pool should be used by humans or seals, but not both.

On November 1, the City Council voted to make the Reserve permanent with a review in five years.

On November 4, the City Attorney sent a letter to the SLC inquiring whether it considered the closure of the Children's Pool or its usage for viewing seals to violate the terms of the Trust. In August 2000, the SLC responded, stating a small temporary seal reserve would not violate the general 1933 trust (but did not address the specific question of whether it would violate the Trust for the Children's Pool).

In February 2000, the NMFS notified City it was considering designating the Children's Pool as a harbor seal haul-out and rookery.[11] In March, the California Fish and Game Commission advised City that City did not have authority to create a seal reserve on public trust tidelands.

In February 2003, the NMFS advised City that although City could not intentionally harass seals at the Children's Pool, it could undertake actions that might temporarily displace them (e.g., the proposed dredging project to improve water quality).

In March, the California Coastal Commission notified City that a coastal permit was required for the rope barrier at the Children's Pool beach that had been in place for four years and appeared to be permanent.

---

[11]    The record on appeal does not contain a copy of any final action by the NMFS so designating the Children's Pool.

In June 2004, the City Manager sent a report to City's natural resources committee on the issue of seals at the Children's Pool, setting forth a plan to restore the Children's Pool to an unpolluted and safe condition.  The plan primarily focused on dredging a substantial portion of the sand at the beach at an estimated cost of $250,000 to $500,000.[12]  The committee referred the City Manager's report to the City Council without a recommendation.

In August, City posted new signs at the Children's Pool, stating the rope barrier was a guideline to avoid disturbing the seals and that swimming was not recommended because of excessive bacteria levels.

On September 14, the City Council considered the Children's Pool issues.  James Lecky of the NMFS advised it that harbor seals were a healthy species, increasing in number, and were not endangered or threatened as a species.  In fact, the increase in the seal population was causing problems along the entire California coast, damaging property, and limiting public access to beaches.  Lecky stated that City, pursuant to section 109(h) of the MMPA (16 U.S.C. § 1361 et seq.) could move animals out of an area if they are a public nuisance or causing a public health hazard.[13]  His position was

---

[12]    It was also estimated that about an additional $50,000 would be required every three to five years for future maintenance dredging.

[13]    Section 109(h) of the MMPA was originally enacted in 1981 as an amendment to the MMPA and its current version is codified at 16 U.S.C. § 1379(h), which provides in relevant part: "(1) Nothing in this title . . . shall prevent a . . . local government official or employee . . . from taking, in the course of his or her duties as an official [or] employee . . . a marine mammal in a humane manner (including euthanasia) if such taking is for -- [¶] . . . [¶] (B) the protection of the public health and welfare, or [¶] (C) the nonlethal

that the issue of seals at the Children's Pool was a local issue for City to decide.  The City Council adopted a resolution directing the City Manager to initiate design and permit applications for the sand removal project with the goal of opening the Children's Pool for year-round use by humans.  It also directed the City Manager to evaluate opening of the sluiceways as an alternative method to remove the sand and cause tidal flushing.  It also directed that the rope barriers and signs be removed to allow public access to the Children's Pool and new signs be installed to state that public access is permitted, but seal harassment is a violation of the MMPA.

Since September 14, 2004, City has not taken any meaningful steps to return the Children's Pool to an unpolluted and safe condition for human use.

On March 12, 2004, O'Sullivan filed a complaint against City, asserting she brought the action as a private attorney general and alleging causes of action for breach of trust and breach of fiduciary duties.  Her complaint sought declaratory relief, concluding City had breached its trust and fiduciary obligations under the Trust, and injunctive relief, requiring City to observe the terms of the Trust.  After the trial court subsequently concluded the State of California must be joined as an indispensable party to her action, O'Sullivan filed a first amended complaint adding the State as a defendant.  On June 9, 2005, the State filed a stipulation, agreeing to be bound by the judgment entered by the trial court.

---

removal of nuisance animals . . . ."  (Pub. L. No. 97-58, § 4(a) (Oct. 9, 1981), 95 Stat. 986, 16 U.S.C. § 1379(h).)

In July and August, a bench trial was conducted in this action. On August 26, the trial court issued its 31-page statement of decision, making findings of fact substantially as discussed above and concluding City was in breach of the Trust and its fiduciary duties as trustee of the Trust. The court concluded the legislative intent of the Trust was clear, stating:

> "When the one-plus acre [i.e., the Children's Pool] was entrusted [by the Legislature] to the City, it consisted of a breakwater and appurtenances that created a sheltered area of Pacific Ocean shoreline. This sheltered area was created so that children could safely swim in the ocean without being subjected to crashing waves, undertow and rip currents, all of which pose a danger to children and neophyte swimmers. The Trust was intended to convey to the City an artificial ocean water pool suitable for the use of children. As the recipient of the Trust and the Pool, it became the obligation of the City to maintain the Trust property in a manner suitable for its intended uses and purposes.

> "Reference to the wording of the Trust further demonstrates the legislative intent. [Recites relevant portions of the Trust language quoted above.] Recognizing that a bathing pool for children existed on the land when the Trust was created and that the land was situated adjacent to a public park, and would be an extension of same, the legislative intent was clear. The entrusted land *shall* be used *exclusively* for a public park which includes a children's pool, and that the purpose of that use shall be recreational.

> "The City contends that the Trust should be read broadly and the Legislature must have vested the City with discretion as fee owner and trustee in its management of the Trust to determine the uses that are most compatible with changing conditions and public needs. The City asserts that extrinsic evidence, including the survey of the Trust boundaries and the historical information related to Ellen Browning Scripps'[s] gift, confirms that the Legislature intended a broad reading of the Trust in which the Trust permits the use [of the Children's Pool] by both humans and seals. Other than [that] bald assertion, the City provides no evidence in support of its contention. Reading the Trust 'broadly' or 'narrowly' does not change the wording of the Trust, which is controlling.

10

"A local entity that is the recipient of trust property must use the property in compliance with the terms of the Trust.  The City is a trustee of the property and as such ' "assumes the same burdens and is subject to the same regulations that appertain to other trustees of such trusts.'  [*City of Long Beach v. Morse* (1947) 31 Cal.2d 254, 257.]  The Trust is specific.  It requires the Trust lands to be used for a children's pool.  'Children's pool' is listed in the conjunctive with the other permitted purposes and uses set forth in the 1931 grant.  Any discretionary use by the City must be 'incident to, or convenient for the full enjoyment of, such *purposes* [plural].'  If a use of the property is inconsistent with any of the *purposes*, it is not a permitted use.

"The Trust is to be used exclusively for a public park and children's pool.  The presence or absence of marine mammals, or other animals for that matter, does not change the use of the beach and tidelands specified by the Trust grant.  The use by the City of the Children's Pool as a habitat, animal sanctuary, zoo or seal watching facility that precludes its being used as a bathing pool for children would be outside the scope of the Trust."

In concluding City breached the terms of the Trust, the trial court stated:

"A comparison of photographs of the Pool when first constructed and today[] well demonstrates that the City has failed to maintain the trust property in a condition similar to when the property was conveyed.  Photos demonstrate that the Pool originally was a pool of water sheltered by the breakwater and adjacent to a relatively small strip of sand beach.  Today the beach extends out almost to the end of the breakwater.  In effect, the breakwater no longer serves to protect swimmers and bathers in the water, but rather the sand beach has, over the years, filled in most of the Pool.  [Citations.]  In reality, Children's Pool is no longer a safe pool of ocean water for children to use.

"There also exists another safety issue at Children's Pool, and that is pollution.  The evidence is [uncontradicted] that the water inside the breakwater is polluted and the public has been advised, from 1997 to the present, not to enter the water at Children's Pool because it poses a health risk.  The evidence is also [uncontradicted] that the beach itself is a repository for sufficient amounts of seal feces to

11

potentially pose a health hazard to persons, and particularly children, using the beach at Children's Pool.

"In its present condition, the land granted by the 1931 Trust is not suitable for the uses enumerated in the grant. Because of the unhealthy condition of the sand and water, the Children's Pool area is not suitable for use as a public park, bathing pool for children or a recreational area."

The court further stated:

"As the number of seals increased at Children's Pool, and with the constantly polluted condition of the Pool, the number of swimmers using the Pool since the early 1990's has decreased significantly. Public use of the Children's Pool has been severely restricted because of the presence of the seals and the resulting pollution.

"The next biggest cause of actual or constructive closure of the Children's Pool was the City's decision to erect a rope barrier cutting off public access to the Pool. On March 29, 1999, the City Council rejected the City Manager's recommendation to dredge the Pool and restore the Pool to the uses set forth in the Grant, and instead voted to rope off the Pool. In doing so, the City breached its obligations under the Trust, as trustee of the Children's Pool. . . . The rope remained up from March 1999 until September 17, 2004.

"Besides the official barrier established by the City to deny public access to the Children's Pool, the general condition of the Pool area, with seal feces in the sand, the occasional dead seal rotting on the beach until washed out to sea by a high tide, and the presence of warning signs, all served to deter the public, beneficiaries of the trust grant, from using the beach. To this day, numerous signs are posted in and about the area of the Children's Pool, warning the public that bacteria levels exceed safety standards and that swimming is allowed but not recommended. [Citation.] All of these factors, when taken together, conclusively establish that practically, as well as constructively, access to the beach has been denied to the intended beneficiaries of the trust grant, including children, swimmers, fishermen and the public generally."

Rejecting City's argument that the MMPA precluded it from removing seals from their

natural habitat, the court stated:

12

"City has been repeatedly advised by its City Manager and NMFS that the City can take appropriate action to remediate the safety and health situation at Children's Pool without violating the MMPA. [¶] . . . Exceptions exist under § 109(h) [of the MMPA], which permit such taking, even without a permit from the [United States] Department of Commerce, in the case of damage to public or private property, or threats to public health or safety by the animals or by non-lethal measures, should the marine mammals constitute a nuisance. The City knew as early as 1997 that under these exceptions it could deter the seals at the Children's Pool. [Citation.] The City voted to take no action to protect the Children's Pool."

In concluding City breached its fiduciary duties under the Trust, the trial court stated: "[T]he evidence is that the City has taken no steps to manage the property so as to preserve the Children's Pool for the purpose and uses for which [it] was constructed and granted to the City as trustee for the people of California." It further stated:

"The City has failed to preserve and protect the tidelands subject to the 1931 grant, to wit: the Children's Pool. [¶] There is no evidence the City has ever removed the sand build-up in the Pool since it has 'managed' the trust area. Likewise, since the Pool water became unsafe for human use in 1997, the City has taken no steps to eliminate the pollution in the Pool. There is no evidence before this court that removing the sand build-up or reducing the pollution level of the Pool water is impossible, or unreasonably difficult or expensive. To the contrary, the City Manager has recommended on numerous occasions that the City undertake these very steps of reasonable management, which the City has failed to do.

"Therefore, the court concludes that the 1931 Grant requires, at a minimum, the Children's Pool be reasonably available for the purposes and uses specified by the State of California in the Grant. This requires the City to manage and maintain the granted lands for the use of the people of California, the beneficiaries of the Grant. This includes swimming, fishing and related recreational pursuits. The Pool has not been available for such uses since 1997. The City has failed to restore the property for such uses despite the fact it has had the means and ability to do so. The City has breached its obligations as trustee under the 1931 Trust."

13

On October 4, the trial court entered judgment for O'Sullivan, stating:

> "1.  Plaintiff [i.e., O'Sullivan, as private attorney general under section 1021.5,] shall have judgment against Defendant [City] on her claim of breach of trust.
>
> "2.  Plaintiff shall have judgment against Defendant [City] on her claim for breach of fiduciary duty.
>
> "3.  Plaintiff shall have judgment against Defendant [City] on her request for declaratory relief as set forth in [the trial court's statement of decision]; and the Court orders the following injunctive relief:
>
> "4.  Defendant [City] is ordered to employ all reasonable means to restore the Children's Pool to its 1941 condition by removing the sand build-up and further to reduce the level of water contamination in the Children's Pool to levels certified by the County of San Diego as being safe for humans.
>
> "5.  The Court will maintain jurisdiction to oversee compliance with this order.  This order shall be fully complied with no later than six (6) months after the date this order is issued.  The City is directed to file a report with the Court, no later than sixty (60) days following entry of this order, setting forth what steps it has undertaken and intends to undertake to comply with this order."[14]

O'Sullivan subsequently filed a motion for an award of attorney fees under section 1021.5.  City opposed her motion.  On November 23, the trial court issued a postjudgment order granting O'Sullivan's motion and awarding her $468,906 in reasonable attorney fees.[15]

---

[14]     The trial court further stated in its statement of decision that "[n]othing contained in this order shall be construed as requiring the City to violate any law, rule or regulation of any federal, state or county government."

[15]     On December 19, the trial court issued a postjudgment order also awarding O'Sullivan $10,941.13 in costs, which City apparently does not challenge on appeal.

City timely filed notices of appeal of the judgment and postjudgment order awarding O'Sullivan attorney fees.

## DISCUSSION

### I

### *Claims Act*

City contends O'Sullivan's action is barred by the California Tort Claims Act (Gov. Code, § 810 et seq.) (Claims Act) because she did not present a claim to City before filing her complaint against it.

### A

City's answer to O'Sullivan's complaint alleged the affirmative defense that the action was barred by failure to comply with the claim presentation requirements of the Claims Act.  The parties stipulated that O'Sullivan did not present a claim for damages to City before filing her complaint.  City again argued that affirmative defense in its trial brief, stating: "Because [O'Sullivan] admits that she did not file a claim [with City], *any damage award is barred*."  (Italics added.)  Although the parties do not cite to the record showing the trial court expressly ruled on that defense, the judgment in O'Sullivan's favor shows the trial court implicitly considered and rejected City's defense that O'Sullivan's action was barred by her failure to present a claim to City before filing her complaint.

### B

The Claims Act generally requires that "all *claims for money or damages* against local public entities" be presented to those entities before filing a lawsuit for money or damages.  (Gov. Code, § 905, italics added.)  "A claim relating to *a cause of action* for

15

. . . injury to person or to personal property . . . shall be presented . . . not later than six months after the accrual of the cause of action. . . ."  (Gov. Code, § 911.2, italics added.) Government Code section 945.4 provides: "[*N*]*o suit for money or damages* may be brought against a public entity *on a cause of action* for which a claim is required to be presented . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board . . . ."  (Italics added.)

One court noted: "Where a petition for writ of mandate may seek either monetary damages or other extraordinary relief, failure to file a claim is *fatal to the recovery of money damages.*  [Citation.]"  (*Tapia v. County of San Bernardino* (1994) 29 Cal.App.4th 375, 383, italics added.)  However, the Claims Act does *not* apply to actions for declaratory, injunctive, specific, or other nonmonetary relief.  (*Minsky v. City of Los Angeles* (1974) 11 Cal.3d 113, 117, 121 [interpreting Claims Act]; *Branciforte Heights, LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 929-932 [same]; *Hart v. County of Alameda* (1999) 76 Cal.App.4th 766, 782 [same]; *Snipes v. City of Bakersfield* (1983) 145 Cal.App.3d 861, 869-870 [same]; *Otis v. City of Los Angeles* (1942) 52 Cal.App.2d 605, 612 [interpreting similar claims provision in city charter].)  There is a split of authority whether a plaintiff can recover money damages if those damages are merely incidental to the primary, nonmonetary relief sought in an action.  (Compare *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 762 [summarizing cases holding incidental money damages are recoverable despite failure to present a claim under the Claims Act]; *Snipes*, at p. 870 ["[A]n action for specific relief does not lose its exempt

status [under the Claims Act] solely because incidental money damages are sought."];

*Eureka Teacher's Assn. v. Board of Education* (1988) 202 Cal.App.3d 469, 475-476

[similar]; *Harris v. State Personnel Bd.* (1985) 170 Cal.App.3d 639, 643 [same],

disapproved on another ground in *Coleman v. Department of Personnel Administration*

(1991) 52 Cal.3d 1102, 1123, fn. 8; *Loehr v.Ventura County Community College Dist.*

(1983) 147 Cal.App.3d 1071, 1081 [same]; *Los Angeles Brick etc. Co. v. City of Los*

*Angeles* (1943) 60 Cal.App.2d 478, 486 [incidental money damages are recoverable

despite failure to present a claim before filing lawsuit]; *Ingram v. City of Gridley* (1950)

100 Cal.App.2d 815, 818 [same]; *People v. City of Los Angeles* (1958) 160 Cal.App.2d

494, 508 [same]; with *TrafficSchoolOnline, Inc. v. Clarke* (2003) 112 Cal.App.4th 736,

741-742 [concluding Claims Act contains no exception for incidental damages];

*California School Employees Assn. v. Governing Bd. of South Orange County*

*Community College Dist.* (2004) 124 Cal.App.4th 574, 592 (CSEA) [agreeing with

*TrafficSchoolOnline, Inc.*]; *Canova v. Trustees of Imperial Irrigation Dist. Employee*

*Pension Plan* (2007) 150 Cal.App.4th 1487, 1497 ["[T]he government claim requirement

applies to any monetary claim even if it is merely incidental to other relief sought."].)

## C

City argues that because O'Sullivan did not present to it *a claim for money or*

*damages* before filing her lawsuit, her *entire* action is barred by the Claims Act.  City

notes that although her complaint sought declaratory and injunctive relief, it also

contained allegations that arguably could be construed as requesting monetary damages.

It notes her complaint alleged City's joint use policy at the Children's Pool beach allowed

seals to occupy it, damaging public and private property and causing pollution that endangered public health and welfare.  The complaint sought relief, including a declaration that City breached the Trust and its fiduciary duties thereunder and was "responsible . . . for all damages which flow from its breaches."

Assuming arguendo that O'Sullivan's complaint sought money damages in addition to the other nonmonetary relief, we nevertheless conclude the Claims Act did *not* bar her causes of action to the extent they sought nonmonetary relief.  The Claims Act generally operates to bar only claims for money or damages, and not claims for nonmonetary relief, if claims for those money damages are not presented to City before a lawsuit is filed.  Government Code section 945.4 provides: "[*N*]*o suit for money or damages* may be brought against a public entity *on a cause of action* for which a claim is required to be presented . . . ."  (Italics added.)  Therefore, we focus on the relief requested on each cause of action in a complaint to determine whether the Claims Act's presentation requirements apply.  If a cause of action is alleged for which the plaintiff seeks primarily nonmonetary relief, the Claims Act is *not* applicable to recovery of that nonmonetary relief and the plaintiff's cause of action is *not* barred by the plaintiff's failure to present that nonmonetary claim or a related monetary claim to the governmental entity.[16]  Accordingly, the action may proceed to the extent nonmonetary relief is sought,

---

[16]    Because the declaratory and injunctive relief sought by O'Sullivan in this case is the primary relief sought in her complaint, we do not address, or decide, whether the Claims Act precludes nonmonetary relief merely incidental to money damages sought by her.  (Cf. *Hart v. County of Alameda, supra,* 76 Cal.App.4th at pp. 782-783 [Claims Act applies if nonmonetary relief is merely incidental to monetary relief sought].)

although monetary relief may be barred by a failure to timely present a claim for monetary relief to the public entity.

This principle was applied in two recent cases. In *CSEA*, *supra*, 124 Cal.App.4th 574, the petitioners filed a petition for writ of mandate to compel the defendant district to award classified status and lost wages to three employees. (*Id*. at p. 581.) The trial court rejected the entire petition, concluding in part that the requested relief was barred by the individual petitioners' failure to comply with the Claims Act. (*Id*. at pp. 581-582.) On appeal, *CSEA* concluded the Claims Act applied to bar the petitioners' claims for lost wages and other monetary relief (*id*. at pp. 589-593) but also concluded the individual petitioners were entitled to classified employee status under Education Code section 88003. (*CSEA*, *supra*, at pp. 580, 582-589.) Therefore, it reversed the trial court's judgment denying the petition and directed the trial court to: "(1) issue a writ of mandate ordering the District to reclassify petitioners pursuant to Education Code section 88003 and (2) deny monetary relief requested by the petitioners." (*CSEA*, *supra*, at p. 593.) In so doing, *CSEA* stated: "Because the failure [of petitioners] to provide notice [under the Claims Act] does not affect [their] claim for reclassification under [Education Code] section 88003, we reverse the judgment." (*CSEA*, at p. 580, italics added.) Therefore, *CSEA* applied the principle that *nonmonetary* relief generally is *not* barred by the Claims Act because of a failure to present a claim for money or damages before a lawsuit is filed.

More recently, in *Canova v. Trustees of Imperial Irrigation Dist. Employee Pension Plan*, *supra*, 150 Cal.App.4th 1487, the trial court granted the employer's motion for summary judgment based on the employees' failure to comply with the claims

19

presentation requirements of the Claims Act. (*Id*. at p. 1490.) The employees filed a complaint seeking a writ of mandate or, alternatively, alleging breach of contract and impairment of contract. (*Id*. at pp. 1491-1492.) Although we concluded mandamus relief was unavailable to invalidate changes made to the retirement plan because the employees had an adequate monetary remedy and were required to timely present a claim therefor, we nevertheless concluded mandamus relief *may* be available to invalidate the employer's termination of the defined benefit plan and compel the employer to perform its contractual duties under the plan because that claim did *not* seek money or damages requiring pre-lawsuit presentation under the Claims Act. (*Id*. at pp. 1492-1493.) We stated:

> "[W]e agree that declaratory or injunctive relief are not available and that mandamus cannot be used to invalidate the Rate Amendment or compel recalculation of the equity adjustment because Plaintiffs had an adequate remedy at law via money damages and they were required to file a timely claim [under the Claims Act]. Mandamus, however, may be appropriate to attempt to invalidate the rollover and compel Defendants to change the retirement plan back to the [defined benefit plan]. *This claim is not one for money or damages and did not require the filing of a government claim. Accordingly, summary judgment of the entire action based on Plaintiffs' failure to comply with the Claims Act was improper.*" (*Id*. at pp. 1492-1493, italics added.)

We later explained:

> "While the claims for recalculation of the Rate Amendment and equity adjustment seek monetary relief and are barred based on Plaintiffs' failure to file a timely claim [under the Claims Act], we reject Defendants' argument that barring monetary relief, there is nothing left of Plaintiffs' case. Plaintiffs alleged that the termination of the Pension Plan and creation of the Contribution Plan were unreasonable and violated Defendants['] ministerial duty under the Contract Clause of the California Constitution. As an alternative

theory, Plaintiffs sought a writ of mandate declaring the rollover into the Contribution Plan invalid and an order that Defendants perform their contractual duties under the [defined benefit] Pension Plan.

"Assuming that the trial court agrees with Plaintiffs' assertions and declares the rollover invalid, Plaintiffs would be entitled to an order directing Defendants to comply with the terms of the Pension Plan. While such relief, if granted, may ultimately result in money being transferred between the two systems, such relief does not render the request a claim for money or damages that requires the filing of a government claim [under the Claims Act]. [Citation.]" (*Id.* at pp. 1497-1498.)

We concluded: "Plaintiffs' request to invalidate the rollover and compel Defendants to change the retirement plan back to the Pension Plan was not one for money or damages. Thus, they were not required to comply with the Claims Act to obtain mandamus relief on this claim and summary judgment of the *entire* action based on Plaintiffs' failure to comply with the Claims Act was improper." (*Id.* at p. 1498.)  Therefore, in *Canova* we applied the principle that *nonmonetary* relief generally is *not* barred by the Claims Act based on a failure to present a claim for money or damages before a lawsuit is filed.

Applying that principle to this case, we conclude the *nonmonetary* relief (i.e., declaratory and injunctive relief) sought in O'Sullivan's complaint was *not* barred by the Claims Act because of her failure to present a claim to City for money or damages before the complaint was filed.  Although any monetary damages sought in addition to the nonmonetary relief primarily sought in her complaint may be barred by failure to present a claim to City, the Claims Act generally does not apply to claims for nonmonetary relief and therefore her causes of action were not barred by the Claims Act to the extent they sought nonmonetary relief.  O'Sullivan's *entire* action was *not* barred by her failure to

present her purported claim(s) for money or damages to City before filing her complaint.[17]  We conclude the Claims Act did not bar the trial court from awarding declaratory and injunctive relief to O'Sullivan.[18]

## II

### Separation of Powers

City contends the separation of powers doctrine barred O'Sullivan's action.  Citing *Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152 (*Friends*), City argues that because O'Sullivan's action requested relief from the trial court that would interfere with City's legislative function, her action is barred by the separation of powers doctrine.

The separation of powers doctrine is based on constitutional principles.  Article III, section 3 of the California Constitution provides: "The powers of state government are legislative, executive, and judicial.  Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."  In *Manduley v. Superior Court* (2002) 27 Cal.4th 537, the Supreme Court stated: "[T]he

---

[17]     City's position on appeal appears inconsistent with its position at trial.  City's trial brief argued: "Because [O'Sullivan] admits that she did not file a claim [with City], *any damage award is barred*."  (Italics added.)  Therefore, City apparently did *not* argue to the trial court that the Claims Act barred *all* relief requested by O'Sullivan, including her claims for declaratory and injunctive relief.

[18]     Assuming arguendo O'Sullivan's complaint sought, in part, monetary damages, the judgment awarded her only declaratory and injunctive relief and not any monetary damages.  The absence of an award of monetary relief adds weight to our conclusion that nonmonetary relief was the primary (if not sole) relief requested by O'Sullivan.

primary purpose of the separation of powers doctrine 'is to prevent the combination in the hands of a single person or group of the basic or fundamental powers of government.' [Citation.]"  (*Id*. at p. 557, quoting *Parker v. Riley* (1941) 18 Cal.2d 83, 89.)  Although, under our state Constitution and the separation of powers doctrine, questions of public policy are primarily for the Legislature (see, e.g., *California Oregon Power Co. v. Superior Court* (1955) 45 Cal.2d 858, 871), the separation of powers doctrine "recognizes that the three branches of government are interdependent, and it permits actions of one branch that may 'significantly affect those of another branch.' [Citation.]"  (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 298.)  In particular, the doctrine of separation of powers "has not been interpreted as requiring the rigid classification of all the incidental activities of government, with the result that once a technique or method of procedure is associated with a particular branch of the government, it can never be used thereafter by another."  (*Parker*, at p. 90.)  The doctrine "is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch."  (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 117.)

In *Friends*, the plaintiffs sought injunctive relief requiring the defendant city to abate the alleged nuisance resulting from the city's inaction in response to complaints regarding traffic conditions on a street.  (*Friends*, *supra*, 20 Cal.App.4th at pp. 157-158.) The plaintiffs sought injunctive relief requiring the city to reduce traffic speed and volume on that street.  (*Ibid*.)  The trial court sustained the city's demurrer without leave to amend, stating: " 'The routing of traffic on city streets is basically a legislative

function.  To the extent that traffic is rerouted from H Street, it must be routed onto another street or highway.  The selection among alternatives is a legislative act.' "  (*Id*. at p. 158.)  *Friends* affirmed the trial court's judgment for the city because the traffic changes sought by the plaintiff were matters of public policy for the legislative branch (i.e., the city), which were beyond the power of the judicial branch.  (*Id*. at pp. 164-166.)

Unlike the relief sought in *Friends* involving matters of public policy, in this case O'Sullivan's complaint sought injunctive relief requiring City to abide by the terms of the Trust and cure its alleged breaches of the Trust.  As the trustee of the Trust, City " 'assume[d] the same burdens and is subject to the same regulations that appertain to other trustees of such trusts.' "  (*City of Long Beach v. Morse*, *supra*, 31 Cal.2d at p. 257.) City, as trustee, is bound by the terms of the Trust and is not free to ignore its provisions based on political or public policy considerations.  Because *Friends* did not involve the enforcement of trust provisions against a trustee, it is inapposite to this case.  *Friends*'s application of the separation of powers doctrine to its circumstances does not persuade us that the doctrine applies to the circumstances in this case.

Neither the relief requested in O'Sullivan's complaint nor the relief awarded by the trial court's judgment involved a matter of public policy within the exclusive province of the legislative branch (i.e., City).[19]  Rather, her complaint requested judicial relief based

---

[19]    In City's reply brief, it unpersuasively argues: "The trial court's judgment requiring dredging, which in turn will force the seals to leave Children's Pool Beach, imposes not only new duties on the City, but it also rescinds a carefully balanced legislative policy on the use and enjoyment of [the Children's Pool]."

on City's alleged breach of the Trust and its fiduciary duties under the Trust. City's duties as trustee of the Trust are *not* defined by any legislative or public policy determination by City, but rather by the Trust's terms imposed by the Legislature, which appropriately were the subject of judicial determination. To the extent City's actions or inaction breached its duties as trustee of the Trust (as found by the trial court), City's legislative or public policy decisions regarding the Trust or the Children's Pool do not preclude judicial action compelling it to abide by the terms of the Trust. In deciding the issues raised by O'Sullivan's complaint and awarding the relief set forth in its judgment, the trial court exercised *judicial*, not legislative, functions.[20] (Cf. *California Oregon Power Co. v. Superior Court*, *supra*, 45 Cal.2d at p. 871.)

## III

### *Interpretation of the Trust*

City contends the trial court erred in interpreting the Trust's language regarding the uses permitted for the Children's Pool. It argues the Trust's language is clear and unambiguous that, as City euphemistically defines the issue, viewing of seals is a recreational purpose and thus a permitted use.

---

[20]    Assuming arguendo the trial court *incidentally* duplicated a function generally viewed as within the province of the Legislature (e.g., consideration of public policy) in reaching its decision, we nevertheless would conclude the separation of powers doctrine did not bar its exercise of that function or its judgment. (*Younger v. Superior Court*, *supra*, 21 Cal.3d at p. 117.)

A

The trial court's judgment and statement of decision in this case contain both findings of fact and conclusions of law.  "We review the trial court's findings of fact to determine whether they are supported by substantial evidence.  [Citation.]  To the extent the trial court drew conclusions of law based upon its findings of fact, we review those conclusions of law de novo.  [Citation.]"  (*Westfour Corp. v. California First Bank* (1992) 3 Cal.App.4th 1554, 1558.)

"Under [the substantial evidence standard of review], we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]  [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact.  Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment.  Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. . . .  [Citations.]"  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631.)  To be substantial, the evidence must be of ponderable legal significance, reasonable in nature, credible, and of solid value.  (*Id*. at p. 631; *Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100.)  However, substantial evidence is not synonymous with *any* evidence.  (*Oregel*, *supra*, at p. 1100; *Toyota Motor*

*Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871.)  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.)

We generally apply an independent, or de novo, standard of review to the trial court's conclusions of law regarding interpretation of the Trust.  In interpreting the language of the Trust, its meaning depends on the expressed intent of the Legislature, as trustor of the Trust.  Interpretation of a trustor's intent is not unlike interpretation of the intent of parties to a contract.  "The precise meaning of any contract . . . depends upon the parties' expressed intent, using an objective standard.  [Citations.]  When there is ambiguity in the contract language, extrinsic evidence may be considered to ascertain a meaning to which the instrument's language is reasonably susceptible.  [Citation.] . . . [¶] We review the agreement and the extrinsic evidence de novo, even if the evidence is susceptible to multiple interpretations, unless the interpretation depends upon credibility.  [Citation.]  If it does, we must accept any reasonable interpretation adopted by the trial court.  [Citation.]"[21]  (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 21-22, fns. omitted.)  If the trial court's decision was not based on the credibility of conflicting evidence, we exercise de novo review, rather than substantial evidence review, in interpreting a trust or other written agreement.  (*Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 57.)  "[W]here . . . the extrinsic evidence is not in

---

[21]    However, extrinsic evidence is not admissible to give an agreement a meaning to which it is not reasonably susceptible.  (*Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453.)

conflict, construction of the [trust or] agreement is a question of law for our independent review.  [Citation.]"  (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 556; *Schaefer's Ambulance Service v. County of San Bernardino* (1998) 68 Cal.App.4th 581, 586 ["[T]o the extent the evidence is not in conflict, we construe the instrument, and we resolve any conflicting inferences, ourselves."].)  "[W]here the evidence is undisputed and the parties draw conflicting inferences, we will independently draw inferences and interpret the [trust]."  (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71.)  In contrast, "[i]f the parol evidence is in conflict, requiring resolution of credibility issues, we would be guided by the substantial evidence test.  [Citation.]"  (*Appleton*, at p. 556.)

Alternatively stated: "When the competent parol [or extrinsic] evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence.  [Citation.]  However, when no parol evidence is introduced (requiring construction of the instrument solely based on its own language) or when the competent parol evidence is not conflicting, construction of the instrument is a question of law, and the appellate court will independently construe the writing.  [Citation.]"  (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166.)

Because the Trust was created in 1931 by an act of the Legislature, as trustor, we also apply general principles of statutory construction in interpreting the language of the Trust.  Like the rules for interpretation of trusts and contracts, the rules for interpretation of a statute require us to interpret the Legislature's *intent*.  (*Freedom Newspapers, Inc. v.*

*Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826.) "Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]" (*People v. Valladoli* (1996) 13 Cal.4th 590, 597.) "If the language is clear and unambiguous[,] there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . . [Citations.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) "However, the literal meaning of a statute must be in accord with its purpose." (*TrafficSchoolOnline, Inc. v. Clarke*, *supra*, 112 Cal.App.4th at p. 740.)  In *Lungren*, *supra*, 45 Cal.3d 727, the Supreme Court stated:

> "[T]he 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute.  The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]  Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute.  The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.  [Citations.] . . .  [I]f a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (*Lungren,* at p. 735.)

"When the statutory language is ambiguous, the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes.  [Citations.]" (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1152.)  "When the language is susceptible of more than one reasonable interpretation, . . . we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public

policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.  [Citations.]"  (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008.)

"[W]e may affirm a trial court judgment on any [correct] basis presented by the record whether or not relied upon by the trial court.  [Citation.]"  (*Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 252, fn. 1.)  "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion."  (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.)

## B

City contends that because the language of the Trust is clear and unambiguous, its plain meaning should govern and the extrinsic evidence admitted by the trial court was unnecessary to determine the intent of the Legislature, as trustor, in enacting the Trust. City then argues the Trust's plain language permits use of the Children's Pool for "recreational purposes," which include viewing seals by citizens.  Furthermore, it argues the resultant education that children receive by viewing the seals is a proper incidental use under the terms of the Trust.  Accordingly, City argues its practice of allowing joint use by seals and humans is permitted by the plain language of the Trust.

Although City couches its argument that viewing seals is a recreational or incidental use of the Children's Pool and therefore permitted by the terms of the Trust,

there is nothing in the trial court's judgment that prevents viewing the Children's Pool area.  Rather, the issue is whether the City is authorized to maintain the Children's Pool area in a manner that encourages occupation by seals and prevents concurrent safe use by children.

The Trust provides that the Legislature, as trustor, granted the Children's Pool to City, as trustee, to be held "in trust for the uses and purposes and upon the express conditions following, to wit:  [¶]  (a)  That said lands shall be devoted exclusively to public park, bathing pool for children, parkway, highway, playground and recreational purposes, and to such other uses as may be incident to, or convenient for the full enjoyment of, such purposes . . . ."  The trial court admitted extrinsic evidence regarding the legislative and other history around the time the Trust was enacted by the Legislature in 1931.  In so doing, the court presumably concluded the language of the Trust was ambiguous and extrinsic evidence was appropriate to determine the intent of the Legislature, as trustor.  After considering that extrinsic evidence, the trial court concluded the Trust property (i.e., the Children's Pool) was to be "used exclusively for a public park and children's pool."  The court explained: "Recognizing that a bathing pool for children existed on the land when the Trust was created and that the land was situated adjacent to a public park, and would be an extension of same, the legislative intent was clear.  The entrusted land *shall* be used *exclusively* for a public park which includes a children's pool, and that the purpose of that use shall be recreational."  Accordingly, the court concluded: "The use by the City of the Children's Pool as a habitat, animal sanctuary, zoo or seal

31

watching facility that precludes its being used as a bathing pool for children would be outside the scope of the Trust."

We conclude the trial court properly considered extrinsic evidence in determining the Legislature's intent in enacting the Trust. Although both parties appear to agree the Trust's language (i.e., "bathing pool for children") is unambiguous to the extent it provides for use of the Children's Pool for swimming by children, City argues, and O'Sullivan disagrees, the remainder of the Trust's language was also unambiguous and also plainly allows use of the Children's Pool for the "recreational" use of viewing seals. Because the term "recreational purposes" within the meaning of the Trust is ambiguous regarding whether the purported "recreational" use of viewing seals is a use permitted by the Trust, we conclude the trial court properly admitted and considered extrinsic evidence on that issue. "When the language is susceptible of more than one reasonable interpretation, . . . we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]" (*People v. Woodhead*, *supra*, 43 Cal.3d at p. 1007.)

Because the trial court apparently made no determinations of credibility regarding that extrinsic evidence, we review the Trust and the extrinsic evidence de novo, even if that evidence may have been susceptible to multiple interpretations or reasonable inferences. (*Golden West Baseball Co. v. City of Anaheim*, *supra*, 25 Cal.App.4th at pp. 21-22; *Mayer v. C.W. Driver*, *supra*, 98 Cal.App.4th at p. 57; *Appleton v. Waessil*, *supra*, 27 Cal.App.4th at p. 556; *Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1166;

*Schaefer's Ambulance Service v. County of San Bernardino*, *supra*, 68 Cal.App.4th at

p. 586 ["[T]o the extent the evidence is not in conflict, we construe the instrument, and

we resolve any conflicting inferences, ourselves."].)  "[W]here the evidence is undisputed

and the parties draw conflicting inferences, we will independently draw inferences and

interpret the [trust]."  (*City of El Cajon v. El Cajon Police Officers' Assn.*, *supra*, 49

Cal.App.4th at p. 71.)

Independently considering the Trust's language in the context of the extrinsic

evidence admitted by the trial court, we conclude the trial court correctly concluded the

Trust shall be used for a public park and children's pool, and encouraging occupation by

seals so they could be viewed was *not* a use permitted by the terms of the Trust.  It is

undisputed that at the time of enactment of the Trust in 1931 there was in existence a

concrete breakwater recently constructed by Scripps for the purpose of creating a bathing

pool for children.  By enactment of the Trust in 1931, the ostensible object of the

Legislature's grant of the Children's Pool to City, as trustee, was to establish a children's

pool to be owned and maintained by City, as trustee of the Trust.  There is no evidence in

the record that viewing seals was another ostensible object of the Legislature.

Accordingly, the legislative history, as shown by the extrinsic evidence, supports the

conclusion that the Legislature intended the Trust property (i.e., the Children's Pool) be

used for a public park and children's pool and not for creating an area to attract seals for

viewing.  Contrary to City's apparent assertion, an interpretation of the Trust's language

permitting "recreational" uses to preclude the use of the Children's Pool for viewing seals

does not render that Trust language mere surplusage.  (Cf. *In re Marriage of Hobdy*

33

(2004) 123 Cal.App.4th 360, 366 [interpretations of statutes that render words surplusage are to be avoided].)  Rather, we, like the trial court, conclude that on enactment of the Trust in 1931 the Legislature intended the term "recreational purposes" to consist of the "recreational" use of the Children's Pool for a public park and bathing pool for children.[22]

Although City cites recent opinions of the SLC and the California Attorney General that would support an interpretation of the Trust to permit joint use by seals and humans, we decline to defer to those opinions.[23]  Those opinions were not based on any long-standing administrative construction of the Trust regarding the permissible uses of the Children's Pool.  On the contrary, it is implicit in those opinions that neither the SLC nor the California Attorney General had expressly addressed the specific issue in this case for over 70 years since enactment of the Trust (i.e., from 1931 through 2005).  As the California Supreme Court stated:

> "Because the [administrative] policy at issue here is not a formally adopted regulation, and the Board does not claim that its . . . policy constitutes a long-standing administrative construction of . . . [the

---

[22]    Assuming arguendo the trial court made determinations of credibility in considering the extrinsic evidence regarding interpretation of the Trust's language, we would apply the substantial evidence standard of review to those determinations.  City does not cite, and we have not found, anything in the record that would persuade us to reach a contrary conclusion had we applied that standard of review to those determinations.

[23]    Although it appears the *substance* of the SLC's March 4, 2005 letter was *not* admitted in evidence (rather only the fax cover sheet for that letter was admitted in evidence for purposes of proving notice to City), we assume arguendo the trial court considered the entire letter and declined to defer to it.  As we explain, we also decline to defer to that opinion.

statute], *we need not defer* to any administrative understanding of the meaning of those [statutory] provisions. *We determine independently* [the meaning of those statutory provisions]." (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 322, italics added, superseded by statute as noted in *Milhous v. Franchise Tax Bd.* (2005) 131 Cal.App.4th 1260, 1266.)

Alternatively stated, "when, as here, the agency does not have a long-standing interpretation of the statute and has not adopted a formal regulation interpreting the statute, the courts may simply disregard the opinion offered by the agency. [Citation.]" (*State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442, 451 (*Nee*).)

A governmental agency does not have the authority to alter or amend a statute or enlarge or impair its scope. (*Nee, supra,* 140 Cal.App.4th at p. 451; *Morris v. Williams* (1967) 67 Cal.2d 733, 748; *First Industrial Loan Co. v. Daugherty* (1945) 26 Cal.2d 545, 550.) "The ultimate interpretation of a statute is an exercise of the judicial power." (*Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321, 326.) Accordingly, "a tentative administrative interpretation [of a statute] makes no pretense at finality and it is the duty of this court, when such a question of law is properly presented, to state the true meaning of the statute finally and conclusively, even though this requires the overthrow of an earlier erroneous administrative construction. [Citations.]" (*Ibid.*) Therefore, in this case because the proper interpretation of the Trust is a question of law for our independent determination, we are not bound by the opinion of the SLC or the California Attorney General on that question. (*Agnew v. State Bd. of Equalization*, *supra*, 21 Cal.4th at p. 322.)

Furthermore, because the SLC has not issued a formal regulation or had a long-standing opinion on the question of joint use by seals and children of the Children's Pool (having apparently first expressly addressed it in a March 4, 2005 letter by its staff counsel interpreting the Trust), we do not defer to its opinion.  Likewise, because the California Attorney General apparently did not express any opinion on this issue until its June 9, 2005 stipulation to be bound by the judgment of the court, we do not defer to its opinion.  (*Agnew v. State Bd. of Equalization*, *supra*, 21 Cal.4th at p. 322; *Nee*, *supra*, 140 Cal.App.4th at p. 451.)  The cases cited by City do not persuade us to defer to the opinion of the SLC or the California Attorney General.  (See *Citicorp North America, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1418; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [because questions regarding the legal meaning of a statute lie "within the constitutional domain of the courts," an agency's interpretation of a statute "commands a commensurably lesser degree of judicial deference."].)

Finally, to the extent City argues that encouraging seal use of the Children's Pool so they may be viewed is an "incidental" use permitted by the terms of the Trust, we are unpersuaded.[24]  To the extent an incidental use interferes with or prohibits an express purpose of a trust, it is not a permitted use.  In any event, viewing seals cannot reasonably be considered to be a use related to, and therefore incidental to, the use of the Children's

---

[24]     As quoted above, the Trust permits "such other uses as may be *incident to*, or convenient for the full enjoyment of, such purposes [that were expressly listed in the Trust (e.g., bathing pool for children)].)  (Italics added.)

Pool for a public park and bathing pool for children.  Use of the Children's Pool by seals for viewing purposes is *not* an incidental use permitted by the terms of the Trust.

## IV

### *Admission of Evidence*

City contends the trial court erred by admitting certain evidence offered by O'Sullivan.

### A

City cites certain evidence it argues was improperly admitted by the trial court, including:

> 1.  The "Savage Report," consisting of historical reports, architectural and/or engineering drawings, permit applications, correspondence, and other documents that were originated about the time the concrete breakwater was constructed in 1930 and 1931. City argues it was improperly admitted under the "ancient documents" exception to the hearsay exclusionary rule.

> 2.  Evidence of the health hazards posed by pollution at the Children's Pool, including: (a) prior statements made by Clay Clifton, a DEH employee, at a City Council meeting; (b) a 1998 report on potential sources of E.coli found at the Children's Pool prepared by Virginia Polytechnic Institute and State University; (c) a 1998 faxed note from a DEH employee to a City employee reporting that a CDC official stated tuberculosis and Giardia could be transmitted to humans through seal feces; (d) a 1998 two-page report by a City employee summarizing research (apparently conducted by DEH) of scientific articles and other expert sources on whether humans can contract diseases from seal feces; (e) a graph showing the levels of fecal coliform at the Children's Pool during 1997 and 1998; and (f) information posted on DEH's public website regarding diseases that can be caused by bacteria, viruses, and protozoa.  City argues that some or all of that evidence should have been excluded as improper expert opinion, lacking a proper foundation, and/or inadmissible hearsay.

37

> 3.  Statements made by James Lecky, the NMFS's assistant regional administrator, at the September 14, 2004 City Council meeting at which he expressed the NMFS's position on seals at the Children's Pool.  City argues that evidence should have been excluded as improper expert opinion, lacking a proper foundation, and/or inadmissible hearsay.

However, City does not argue, or present any substantive analysis showing, those purported evidentiary errors by the trial court were prejudicial and require reversal of the judgment.

B

Because a trial court's decision is presumed to be correct, it is the appellant's burden on appeal to show the court prejudicially erred.  (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631-632.)  To succeed on appeal, an appellant not only must show the trial court erred, but also that the purported error was prejudicial (i.e., requires reversal of the judgment).  (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610; *In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.)  "Where any error is relied on for a reversal it is not sufficient for appellant to point to the error and rest there."  (*Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77.)  To require reversal of a judgment, an appellant generally must show "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

We conclude City, by not contending, or at most only summarily contending, the purported evidentiary errors were prejudicial, has *waived* on appeal any contention of

38

prejudice for those purported errors. City's opening brief does not contain any substantive argument or analysis showing the purported evidentiary errors were prejudicial. "Where a point is merely asserted by counsel without any [substantive] argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783, overruled on another ground in *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3.) "Issues do not have a life of their own: if they are not raised or supported by [substantive] argument or citation to authority, we consider the issues waived." (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99.) Accordingly, we deem any argument by City regarding prejudice to be waived by its failure to provide any substantive argument or analysis on that issue. (*Ibid*.; *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary."]; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 [contention was deemed waived because "[a]ppellant did not formulate a coherent legal argument nor did she cite any supporting authority"]; *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1301, fn. 2 ["The dearth of true legal analysis in her appellate briefs amounts to a waiver of the [contention] and we treat it as such."].)

In any event, assuming arguendo City has not waived that contention on appeal, we nevertheless conclude it has *not carried its burden on appeal* because it has not presented a persuasive substantive analysis showing it was prejudiced by the purported error (i.e., absent the purported error it is reasonably probable it would have received a

more favorable judgment).  (*People v. Watson*, *supra*, 46 Cal.2d at p. 836; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801 ["Although the *Watson* standard is most frequently applied in criminal cases, it applies in civil cases as well."].)  There is no presumption that error, if committed, is prejudicial.  (§ 475; *Cassim*, at p. 802.)  Accordingly, it is City's burden on appeal to show the purported evidentiary errors were prejudicial.  (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069; *In re Marriage of McLaughlin, supra,* 82 Cal.App.4th 327, 337.)  However, City "makes little effort to show prejudice.  The conclusory claims [it] does tender [in its opening brief] do not persuade [us].  Accordingly, we find the [purported improprieties] harmless."  (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105.)  "[O]ur duty to examine the entire cause [for prejudicial error] arises when and only when the appellant has fulfilled his duty to tender a proper prejudice argument.  Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice.  [Citations.]"  (*Id*. at p. 106.)

City's opening brief argues summarily: "An alternative reason that the trial court's judgment should be reversed is because of the number of evidentiary errors that infected the final judgment."[25]  Regarding the "Savage Report" admitted by the trial court, City

---

[25]    To the extent City attempts to cure that deficiency in its opening brief by providing a substantive discussion of prejudice in its reply brief, we disregard that discussion as untimely presented, depriving O'Sullivan of an opportunity to answer it. (*Elite Show Services, Inc. v. Staffpro, Inc.* (2004) 119 Cal.App.4th 263, 270; *Bay World Trading, Ltd. v. Nebraska Beef, Inc.* (2002) 101 Cal.App.4th 135, 138, fn. 3; *Heiner v.*

only argues summarily: "It was prejudicial error for the trial court to admit such evidence . . . ."  Regarding the health hazard evidence admitted by the court, City omits any argument the evidence was prejudicial.  Regarding Lecky's statements admitted by the court, City only argues summarily those statements were prejudicial.[26]  Those summary arguments do not set forth a sufficient substantive analysis to persuade us on the issue of prejudice.  Therefore, not only has City waived any contention that the purported evidentiary errors were prejudicial, but it also has not carried its burden on appeal to show those purported errors were prejudicial.[27]

---

*Kmart Corp.* (2000) 84 Cal.App.4th 335, 351; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894-895, fn. 10 [points raised in the reply brief for the first time will not be considered unless good reason for that delay is shown]; *Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 [withholding of a point until the reply brief deprives the respondent of an opportunity to answer it]; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764; *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11; *Hibernia Sav. and Loan Soc. v. Farnham* (1908) 153 Cal. 578, 584.)

[26]    City's opening brief implied that admission of Lesky's statements was prejudicial, summarily arguing: "The prejudice to the City [of admission of Lesky's statements] was compounded by the fact that the trial court sustained O'Sullivan's objections [to certain evidence offered by City]."

[27]    In any event, were we to consider the issue of prejudice, we would conclude it is not reasonably probable City would have received a more favorable result had there not been the purported evidentiary errors.  (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

V

*Department of Commerce as an Indispensable Party*

City contends O'Sullivan's action was barred because she did not name the United States Department of Commerce (DOC) as an indispensable party/defendant. Citing the MMPA and the federal trial court case of *Florida Marine Contractors v. Williams* (M.D.Fla. 2005) 378 F.Supp.2d 1353 (*Florida*), City argues the DOC was required to be named as an indispensable party to O'Sullivan's action because the DOC (or its subordinate agency, the NMFS) has authority to enforce the MMPA.

The MMPA, enacted in 1972, imposes "a moratorium on the taking . . . of marine mammals" during which time no permits may be issued for the taking of marine mammals other than pursuant to exceptions specifically set forth in the MMPA. (16 U.S.C. § 1371(a).) Furthermore, subject to those exceptions, the MMPA generally makes it unlawful for any person to take any marine mammal. (16 U.S.C. § 1372(a).) "The term 'take' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." (16 U.S.C. § 1362(13).) The MMPA defines "harassment" as "any act of pursuit, torment, or annoyance which -- [¶] (i) has the potential to injure a marine mammal or marine mammal stock in the wild; or [¶] (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." (16 U.S.C. § 1362(18)(A).) One of the specific exceptions to the moratorium on the taking of marine mammals generally provides:

> "[T]he provisions of this chapter shall not apply to the use of
> measures -- [¶] . . . [¶] (iii) by any person, to deter a marine mammal
> from endangering personal safety; or [¶]  (iv) by a government
> employee, to deter a marine mammal from damaging public
> property, [¶] so long as such measures do not result in the death or
> serious injury of a marine mammal."  (16 U.S.C. § 1371(a)(4)(A).)

Similarly, the "section 109(h)" exception, as quoted above, provides the MMPA does not

prevent a local government official or employee from "taking" a marine mammal in a

humane manner if such taking is for "the protection of the public health and welfare" *or*

"the nonlethal removal of nuisance animals."  (16 U.S.C. § 1379(h)(1).)

At the September 14, 2004 City Council meeting, Lecky, on behalf of the NMFS,

stated that City, pursuant to section 109(h) of the MMPA, could move animals (e.g.,

seals) out of an area if they are a public nuisance or causing a public health hazard.  His

position was that the issue of seals at the Children's Pool was a local issue for City to

decide.  In its statement of decision, the trial court rejected City's argument that the

MMPA precluded the relief sought by O'Sullivan, stating:

> "City has been repeatedly advised by its City Manager and NMFS
> that the City can take appropriate action to remediate the safety and
> health situation at Children's Pool without violating the MMPA.  [¶]
> . . . Exceptions exist under § 109(h) [of the MMPA], which permit
> such taking, even without a permit from the [United States]
> Department of Commerce, in the case of damage to public or private
> property, or threats to public health or safety by the animals or by
> non-lethal measures, should the marine mammals constitute a
> nuisance.  The City knew as early as 1997 that under these
> exceptions it could deter the seals at the Children's Pool.  [Citation.]
> The City voted to take no action to protect the Children's Pool."

City assumes arguendo that the trial court correctly ruled section 109(h)'s

exception to the general prohibitions of the MMPA would not preclude the relief sought

by O'Sullivan.  Nevertheless, City argues the DOC or the NMFS was an indispensable party under section 389, subdivision (a), which requires joinder of a person as a party to an action if either: (1) in the person's absence complete relief cannot be accorded; or (2) that person claims an interest in the subject of the action and disposition of the action will impair or impede the person's ability to protect that interest.[28]  Because *Florida* supports City's position that the DOC or the NMFS has jurisdiction over marine mammals at the Children's Pool, City argues the DOC or the NMFS was an indispensable party to the instant action.  City summarily argues: "In light of the compelling federal interests impacted by all of O'Sullivan's causes of action seeking removal of the seals, O'Sullivan's failure to name the federal government as a defendant requires reversal."

We are unpersuaded by City's argument that the DOC or the NMFS was an indispensable party to O'Sullivan's action.  *Florida* is factually and legally inapposite to the instant case.  As City concedes, that case addressed a different legal issue under the MMPA, i.e., whether the MMPA's provisions applied to protect marine mammals located in the inland waterways of a state.  (*Florida*, *supra*, 378 F.Supp.2d at pp. 1355, 1360.) *Florida* simply concluded they did.  (*Id*. at p. 1360.)  In this case, the Children's Pool does not involve any inland waterways of California or an issue of the applicability of the

---

[28]    Section 389, subdivision (a) provides: "A person . . . shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent

MMPA.  Furthermore, *Florida* did not involve either the interpretation or application of the section 109(h) exception to the MMPA's general provisions.  *Florida* is inapposite and does not provide support for City's contention.

We, like the trial court and the parties, assume marine mammals located at the Children's Pool are *generally* subject to the MMPA.  However, the evidence admitted at trial supports a reasonable inference that the section 109(h) exception to the MMPA (i.e., 16 U.S.C. s1379(h)) and a similar exception under title 16 United States Code section 1371(a)(4)(A) apply to allow the relief sought by O'Sullivan and awarded by the trial court.  Because feces from the substantial number of seals at the Children's Pool result in high levels of water pollution, it can reasonably be concluded there is damage to public property and danger to the health and safety of persons at the Children's Pool within the meaning of those exceptions.  Considering those circumstances, the trial court could reasonably conclude those exceptions to the MMPA applied and did not preclude its injunction against City requiring City to, in effect, remediate those problems by restoring the Children's Pool to its 1941 condition.  Although the DOC or the NMFS presumably have a general oversight interest under the MMPA in the treatment of seals at the Children's Pool, we conclude neither the DOC nor the NMFS was an *indispensable* party to this action under section 389.  Because exceptions under title 16 United States Code sections 1371(a)(4)(A) and 1379(h) applied in this case, complete relief *could* be, and was, ordered by the trial court in the absence of the DOC and the NMFS as parties to the

---

obligations by reason of his claimed interest.  If he has not been so joined, the court shall order that he be made a party."

action.  (§ 389, subd. (a)(1).)  Also, neither the DOC nor the NMFS claimed an interest relating to the subject matter of O'Sullivan's action.  (§ 389, subd. (a)(2).)  Furthermore, the trial court explicitly stated that its order shall not be construed as requiring the City to violate any law, rule or regulation of the federal government; the court also retained jurisdiction to monitor compliance with the order.[29]  City has not carried its appellate burden to show otherwise.  O'Sullivan's action was not barred by her failure to name the DOC or the NMFS as a party to the action.

## VI

### *Award of Attorney Fees*

City contends the trial court erred by awarding O'Sullivan attorney fees pursuant to section 1021.5.

### A

After the trial court entered judgment for O'Sullivan, she filed a motion for an award of attorney fees under section 1021.5, arguing she had enforced an important right affecting the public interest and the other requirements for the award were satisfied.  City opposed her motion.  On November 23, the trial court issued a postjudgment order granting O'Sullivan's motion and awarding her $468,906 in reasonable attorney fees.  The court stated:

---

[29]    The trial court's retention of jurisdiction to monitor compliance with its order presumably will insure compliance with applicable federal laws and provide flexibility in the means of compliance in the most efficient manner to effectuate its purpose.  With retained jurisdiction, either party is enabled to return to the trial court and present issues that neither the parties nor the court anticipated on the date of the order.

"The first two prongs of section 1021.5 have been satisfied (a significant benefit has been conferred on the general public and the necessity of private enforcement is such as to make an award of fees appropriate).  The Final Statement of Decision states at p. 31 that it was entered '. . . in order to protect the rights of the people of California to the full use and enjoyment of a unique asset, the Children's Pool.'  The City's argument that [O'Sullivan's] action was unnecessary for enforcement of the terms of the [T]rust because of the City Council's 9/14/04 Resolution fails in light of the Court's final factual finding at p. 18 of the Final Statement of Decision, which states: 'The City has not undertaken any meaningful steps to return the Children's Pool to an unpolluted, safe and usable state since the meeting of September 14, 2004.' [Citation.]  The third prong (that fees should not be paid out of the recovery) is inapplicable as no monetary recovery was ordered."

## B

"An important exception to the American rule that litigants are to bear their own attorney fees is found in section 1021.5."  (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565, fn. omitted.)  Section 1021.5 provides:

"Upon motion, a court may award attorneys' fees to *a successful party* against one or more opposing parties in any action which has resulted in the *enforcement of an important right affecting the public interest if*: (a) *a significant benefit*, whether pecuniary or nonpecuniary, *has been conferred on the general public or a large class of persons*, (b) *the necessity and financial burden of private enforcement* . . . are such as to *make the award appropriate*, and (c) such fees should not in the interest of justice be paid out of the recovery, if any.  With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities . . . ."  (Italics added.)

Section 1021.5 represents the codification of the private attorney general doctrine of attorney fees developed in prior case law, which recognized that privately instituted lawsuits were often necessary to effect fundamental public policies based in constitutional or statutory provisions.  (*Graham*, at p. 565; *Maria P. v. Riles* (1987) 43

Cal.3d 1281, 1288-1289.)  "[T]he fundamental objective of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases."  (*Maria P.*, at p. 1289.)  "The trial court is to assess the litigation realistically and determine from a practical perspective whether [the statutory] criteria have been met."  (*Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505, 511.)

"We will uphold the trial court's decision to award attorney fees under section 1021.5 unless the court has abused its discretion.  [Citation.]"[30]  (*Graham v. DaimlerChrysler Corp.*, *supra*, 34 Cal.4th at p. 578.)  " 'Whether a party has met the requirements for an award of fees and the reasonable amount of such an award are questions best decided by the trial court in the first instance.  [Citations.]  That court, utilizing its traditional equitable discretion, must realistically assess the litigation and determine from a practical perspective whether the statutory criteria have been met. [Citation.]  Its decision will be reversed only if there has been a prejudicial abuse of discretion.  [Citation.]  To make such a determination we must review the entire record, paying particular attention to the trial court's stated reasons in denying or awarding fess and whether it applied the proper standards of law in reaching its decision.' [Citation.]"

---

[30]    Citing *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, City argues we must apply an independent standard of review.  However, that case was effectively overruled by *Graham v. DaimlerChrysler Corp.*, *supra*, 34 Cal.4th at page 578.  Accordingly, we are required to apply the abuse of discretion standard in reviewing the trial court's decision to award attorney fees to O'Sullivan pursuant to section 1021.5.

(*Crawford v. Board of Education* (1988) 200 Cal.App.3d 1397, 1405-1406.) " 'Although [section] 1021.5 is phrased in permissive terms (the court "may" award), the discretion to deny fees to a party that meets its terms is quite limited. . . .' [Citations.]" (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1344.) Therefore, the private attorney general doctrine requires a full fee award unless special circumstances would render the award unjust. (*Ibid*.) Furthermore, if the requirements of section 1021.5 are satisfied, a party acting as a private attorney general is entitled to an award of attorney fees both at trial and on appeal. (*Lyons*, at p. 1356.)

C

We are unpersuaded by City's argument that the trial court erred in awarding O'Sullivan attorney fees under section 1021.5. Although City apparently concedes O'Sullivan was "a successful party" in her action against it, it argues she did not confer a significant benefit on the general public or a large class of persons. (§ 1021.5.) In support of its position, City argues the trial court's injunctive relief will not, in fact, confer a significant benefit on the public, but instead will actually result in a significant loss of a public benefit (i.e., the opportunity of persons to view seals at the Children's Pool). However, the trial court expressly rejected that assertion, finding that a significant benefit *had* been conferred on the general public by O'Sullivan's action because she obtained injunctive relief that protected " 'the rights of the people of California to the full use and enjoyment of a unique asset, the Children's Pool.' " We conclude the trial court did not abuse its discretion by concluding the injunctive relief obtained by O'Sullivan conferred a significant benefit on the general public by requiring City to restore the

49

Children's Pool to its 1941 condition, thereby making it both available and safe for swimming by children and others.  Although one effect of that required restoration may be to discourage seals from hauling out and thereby reducing the number of, or eliminating, seals at the Children's Pool that people can view, that purported "negative" impact does not outweigh or countervail the significant public benefit obtained by O'Sullivan in enforcing the terms of the Trust, which, as discussed above, is a public trust requiring that the Children's Pool be used for a public park and bathing pool for children.

City also argues O'Sullivan's action was unnecessary because the City Council at its September 14, 2004 meeting passed a resolution adopting a plan to dredge the Children's Pool to improve its water quality.  However, in awarding O'Sullivan attorney fees, the trial court rejected that argument, stating: "The City's argument that [O'Sullivan's] action was unnecessary for enforcement of the terms of the [T]rust because of the City Council's 9/14/04 Resolution fails in light of the Court's final factual finding at p. 18 of the Final Statement of Decision, which states: 'The City has not undertaken any meaningful steps to return the Children's Pool to an unpolluted, safe and usable state since the meeting of September 14, 2004.' "  City does not cite any evidence in the record showing the trial court erred by finding City did not take any meaningful action following that September 14, 2004 resolution.  Therefore, the trial court did not abuse its discretion by concluding O'Sullivan's action against City was, in fact, necessary to enforce the terms of the Trust.

City also argues an attorney fee award to O'Sullivan is precluded because she did not name the State of California, or the SLC, as a party to her action until the trial court

ordered her to do so.  Citing *Schwartz v. City of Rosemead* (1984) 155 Cal.App.3d 547 (*Schwartz*), City argues O'Sullivan, by failing to timely notify the State of California of her action pursuant to section 388, cannot be awarded attorney fees as a private attorney general.  In effect, City argues O'Sullivan's action did not meet the "necessity" requirement of section 1021.5 because, had she timely notified the State of California of her action, the State alone could, and would, have pursued the action against City.

In *Schwartz*, the trial court denied section 1021.5 attorney fees to a plaintiff, a private individual, who successfully prosecuted an action and obtained an injunction against the defendant city requiring it to comply with the provisions of the California Environmental Quality Act (CEQA).  (*Schwarz*, *supra*, 155 Cal.App.3d at pp. 550, 553-554.)  In denying attorney fees, the trial court reasoned that the plaintiff did not prosecute the action in a representative capacity on behalf of any group of persons, but rather to prevent a threat of significant damage and depreciation to his own private property.  (*Id*. at pp. 553, 559.)  On appeal, *Schwartz* upheld that reason for denying a section 1021.5 award to the plaintiff, noting his petition characterized the city's proposed cogeneration plant as a *private* nuisance that should be enjoined.  (*Id*. at p. 559.)  *Schwartz* further stated that, in any event, the plaintiff failed to convince it that "the result he achieved was more than merely incidental to his purely private purpose in seeking to have the cogeneration plant moved to a more desirable location away from his property line."  (*Ibid*.)  Accordingly, *Schwartz* concluded the trial court did not abuse its discretion in denying the plaintiff's request for section 1021.5 attorney fees on that basis.

In dicta, *Schwartz* addressed the issue whether an alternative ground not cited by the trial court could also support the denial of section 1021.5 attorney fees. (*Schwartz*, *supra*, 155 Cal.App.3d at pp. 560-561.) In *Schwartz*, the plaintiff did not under former section 389.6 timely serve the California Attorney General with a copy of his petition for mandate relief against the city. (*Id*. at pp. 560-561.) Because the plaintiff served the Attorney General with his petition only four days before the hearing (and without any accompanying responsive papers), the Attorney General did not have an opportunity to review the petition before the hearing. (*Ibid*.) *Schwartz* stated:

> "[Plaintiff's] failure to comply with the statutory requirements of serving a copy of his pleading to the Attorney General within 10 days of filing effectively precluded the Attorney General from exercising an informed decision regarding intervention in this action. If the Attorney General had been promptly notified of [plaintiff's] action and had decided to intervene, [plaintiff] may not have been required to pursue his lawsuit to the extent he ultimately did. The service of pleadings on the Attorney General has the effect of informing that office of the action and permits the Attorney General to lend its power, prestige, and resources to secure compliance with CEQA and other environmental laws, perhaps without the necessity of prolonged litigation. If the Attorney General is properly served and elects not to intervene, then a plaintiff's pursuit of a lawsuit becomes presumptively 'necessary' [under section 1021.5]."
> (*Schwartz*, at p. 561.)

Therefore, *Schwartz* concluded the trial court's denial of section 1021.5 attorney fees was "also justified on grounds that he failed to serve the Attorney General with a copy of the pleadings within 10 days of the filing of his action as required by . . . section 389.6 [citation]; thus, he failed to meet the third requirement of section 1021.5 [i.e., necessity of action]." (*Schwartz*, at p. 560.)

We are unpersuaded by City's argument that *Schwartz* and section 388 (the successor statute to former section 389.6) require denial of section 1021.5 attorney fees in the circumstances of this case.  Section 388 provides:

> "In an action brought by a party for relief of any nature other than solely for money damages where a pleading alleges facts or issues concerning alleged pollution or adverse environmental effects which could affect the public generally, the party filing the pleading shall furnish a copy to the Attorney General of the State of California. The copy shall be furnished by the party filing the pleading within 10 days after filing."

Assuming arguendo O'Sullivan was required to, and did not, timely deliver a copy of her complaint to the Attorney General pursuant to section 388, we nevertheless conclude neither that statute nor *Schwartz* precludes O'Sullivan from obtaining an award of attorney fees under section 1021.5 in the circumstances of this case.

First, O'Sullivan's noncompliance with section 388 apparently had no prejudicial effect on the State of California's opportunity to intervene prior to trial in this action.  In fact, as noted above, after the trial court concluded the State of California must be joined as an indispensable party to her action, O'Sullivan filed a first amended complaint adding the State as a defendant.  On June 9, 2005, the State filed a stipulation, agreeing to be bound by the judgment to be entered by the trial court.  In so doing, the State apparently conceded it had no particular interest or position regarding the outcome and did not want to be actively involved in the action.  Therefore, although section 388's provisions may not have been technically followed, the State ultimately did receive a copy of the complaint and, unlike in *Schwartz*, was added as a defendant in the action and presumably made an informed decision in stipulating to the judgment and not actively

53

intervening in the action. Therefore, the purpose of section 388 appears to have been substantially satisfied in the circumstances in this case.

Second, *Schwartz*'s discussion of the effect of noncompliance with former section 389.6 in the context of a request for section 1021.5 attorney fees clearly was dicta. Because *Schwartz* already upheld the trial court's decision based on the trial court's express reasoning (i.e., plaintiff filed his action for a private purpose), the additional discussion of former section 389.6 was unnecessary to its opinion and disposition of the appeal. Accordingly, we need not follow its reasoning regarding the application of former section 389.6 in section 1021.5 attorney fee cases. In any event, we decline to apply *Schwartz*'s reasoning in the circumstances of this case. Because the State was, in fact, added as a party and decided not to actively participate in the action, it is apparent that O'Sullivan's private action was, in fact, necessary within the meaning of section 1021.5 to obtain injunctive relief requiring City to comply with the terms of the Trust, a public trust. Accordingly, under section 1021.5 "*the necessity and financial burden of private enforcement . . .* are such as to *make the award* [of attorney fees] *appropriate.*" (Italics added.)

Finally, City summarily argues the trial court erred by awarding O'Sullivan attorney fees because her "fee records were too vague to support the award requested," claiming a cursory review of those records clearly shows the trial court abused its discretion in awarding her attorney fees. Because City does not cite to the record and does not present any substantive factual or legal analysis to support its argument, we consider that argument waived on appeal. (Cal. Rules of Court, rule 8.204(a)(1)(C);

*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246; *People v. Ham*, *supra*, 7 Cal.App.3d at p. 783; *Jones v. Superior Court*, *supra*, 26 Cal.App.4th at p. 99; *Landry v. Berryessa Union School Dist.*, *supra*, 39 Cal.App.4th at pp. 699-700; *Ochoa v. Pacific Gas & Electric Co.*, *supra*, 61 Cal.App.4th at p. 1488, fn. 3; *Colores v. Board of Trustees*, *supra*, 105 Cal.App.4th at p. 1301, fn. 2.)  In any event, our independent review of the record does not show the trial court abused its discretion in awarding section 1021.5 attorney fees to O'Sullivan.

DISPOSITION

The judgment is affirmed.  O'Sullivan is entitled to costs on appeal.


                                                _____

                                                     McDONALD, J.

WE CONCUR:

_____

              HUFFMAN, Acting P. J.

_____

                    IRION, J.

Exhibit F

**THE COMMITTEE ON NATURAL RESOURCES AND CULTURE
OF THE CITY COUNCIL OF THE CITY OF SAN DIEGO**

**ACTIONS FOR
WEDNESDAY, NOVEMBER 15, 2006, AT 2:00 P.M.**

**COUNCIL COMMITTEE ROOM (12TH FLOOR), CITY ADMINISTRATION
BUILDING
202 C STREET, SAN DIEGO, CALIFORNIA**

For information, contact Mary Ann Kempczenski, Council Committee Consultant
202 C Street, 3rd Floor, San Diego, CA 92101
Email: MKempczenski@sandiego.gov
_____

NON-AGENDA PUBLIC COMMENT : None.

COMMITTEE COMMENT: None.

CITY ATTORNEY, IBA, AND MAYORAL STAFF COMMENT: None.

CONSENT AGENDA:

Approval of the Record of Action Items for October 11, 2006.

        ACTION:     Motion by Councilmember Atkins, second by
Councilmember Faulconer, to approve.

        VOTE:     4-0;   Frye-yea, Faulconer-yea, Atkins-yea, Hueso-yea

ITEM-1:      Report from the Water Department regarding Grants from the Bureau of
Reclamation for the Mapping Interface ENHANCEMENT TO URBAN
VEGETATION SATELLITE IMAGERY CITYWIDE

       (See Water Department November 6, 2006, Executive Summary Sheet)

        ACTION:     Motion by Councilmember Faulconer, second by
                Councilmember Hueso, to approve.

        VOTE: 4-0;   Frye-yea, Faulconer-yea, Atkins-yea, Hueso-yea

ITEM-2:      Report from the Metropolitan WASTEWATER DEPARTMENT
regarding:
A.  The First Amendment to the Master Power Purchase and
     Sale Agreement with San Diego Gas & Electric
B.  Emerson Process Management, Inc., Amendment No. 1 for COMNET
     Maintenance Service Agreement
    (1A: See Metropolitan Wastewater Department July 18, 2006, Executive

**ACTIONS**
**Committee on Natural Resources and Culture**
**November 15, 2006**
**- 2 -**
_____

Summary Sheet; 1B: Metropolitan Wastewater Department October 6, 2006, Executive Summary Sheet)

ACTION:    Motion by Councilmember Faulconer, second by Councilmember Hueso, to approve Item 1A.

VOTE:    4-0;    Frye-yea, Faulconer-yea, Atkins-yea, Hueso-yea

ACTION:    Motion by Councilmember Hueso, second by Councilmember Faulconer, to approve Item 1B.

VOTE:    3-0;    Frye-yea, Faulconer-yea, Atkins-not present, Hueso-yea

DISCUSSION AGENDA

ITEM-3:    Early Placement of the Rope Barrier at CHILDREN'S POOL (Change from January 1, 2007, to December 15, 2006)

(See City Attorney's November 13, 2006, Memorandum of Law)

ACTION:    Motion by Councilmember Faulconer, second by Councilmember Hueso, to place the rope barrier up from December 15, 2006, to May 15, 2007, and pursue a donation from the Sierra Club for the rope barrier.

VOTE:    4-0;    Frye-yea, Faulconer-yea, Atkins-not present, Hueso-yea

ITEM-4:    Report from the City Attorney's Office regarding MISSION BAY PARK SURVEY (City Charter Section 55.1)

(See City Attorney's November 13, 2006, Memorandum of Law; Michael Boyle's April 4, 2006, memorandum)

ACTION:    Motion by Councilmember Faulconer, second by Councilmember Hueso, to forward this item to the full City Council for action.

VOTE:    4-0;    Frye-yea, Faulconer-yea, Atkins-not present, Hueso-yea

**ACTIONS**
**Committee on Natural Resources and Culture**
**November 15, 2006**
**- 3 -**
_____

ITEM-5:            Informational report from the Mayor on WATER, SEWER AND STORM
                   DRAIN MONTHLY BILLINGS

                   (See Water Department Summary Sheet on Stormdrain Monthly Billing
                    Report; Sewer Monthly Billing November 15, 2006, PowerPoint)

                   ACTION:      Motion by Councilmember Hueso, second by
                   Councilmember Frye, to forward this item to the full City Council, for
                   action to return to Bi-Monthly Billings for Water, Sewer and Storm Drain.

                   VOTE:        4-0;     Frye-yea, Faulconer-yea, Atkins-not present,
                   Hueso-yea

ITEM-6:            Informational Report from the Mayor on CANYON LANDS

                   (See Report to the City Council No. 06-168)

                   ACTION:      Motion by Councilmember Atkins, second by
                   Councilmember Faulconer, to refer this item back to the Mayor's Office to
                   evaluate the Environmental Growth Funds in terms of the budget and to
                   consider the allocation of these funds for the purpose of dedicating canyons
                   for protection from development, and work towards funding additional
                   resources through a grant program to fund this project.  Refer this item also
                   to the Independent Budget Analyst to evaluate if the Environmental Growth
                   Funds can be used for this purpose.

                   VOTE:        4-0;     Frye-yea, Faulconer-yea, Atkins-yea, Hueso-yea

                                         Donna Frye
                                         Chair

Exhibit G



RECEIVED

SEP 2 8 2005

CALIFORNIA
COASTAL COMMISSION
SAN DIEGO COAST DISTRICT

DATE:      September 20, 2005

FROM:      Samir Mahmalji, Project Manager, City Of San Diego

TO:        Attendees

SUBJECT:   September 16, 2005 Meeting Minutes

RE:        La Jolla Children's Pool, held at the National Oceanic & Atmospheric
           Administration (NOAA)/National Marine Fisheries Service (NFMS) offices in
           Long Beach

**ATTENDANCE:**

Samir Mahmalji, City of San Diego, Parks & Recreation, Project Manager, (619) 236-7342
April Penera, City of San Diego, Parks & Recreation, Deputy Director, (619) 525-8265
Shannon Thomas, City of San Diego, Deputy City Attorney, (619) 533-5824
Jim Lecky, NOAA, NMFS, National Director Protected Resources, (301) 713-2332
Rick Hawkins, NOAA, NMFS, OLE, (562) 980-4052
Otha Easley, NOAA, NMFS, OLE, Acting SAC, (562) 980-4050
Scott Hill, NOAA, NMFS, SWR, (562) 980-4029
Rod McInnis, NOAA, NMFS, Regional Administrator, South West Region, (562) 980-4005
Michelle Zweto, NOAA, NMFS, OLE, (619) 525-8265

A meeting was held on September 16, 2005, between the City of San Diego (City) and
NOAA/NMFS to discuss the appropriate actions that are needed to return the La Jolla Children's
Pool to the year 1941 configuration in order to comply with the court order in the O'Sullivan
case. Specifically, the City needed to determine what appropriate permits are required from
NOAA/NMFS to excavate the sand from the Children's Pool.

**DISCUSSION**

April Penera, Deputy Director of Park & Recreation Department, gave a presentation on the La
Jolla Children's Pool situation including the latest Court Judgment. She further explained that
the Judge has ordered the City to return 60 days (from August 26, 2005), with a plan and
schedule showing how the City intends to accomplish the task in 6 months (from August 26,
2005).

April explained it was the City's goal to meet with NOAA/NMFS regarding the dispensation of
the seals first, since the other agencies in the past have deferred the seal issue to them as the
enforcer of the Marine Mammal Protection Act (MMPA), prior to meeting with the other

resource agencies. She then intends to meet with the California Coastal Commission, State Department of Fish & Game, U.S. Fish and Wildlife Service, U.S. Army Corp of Engineers and the San Diego Regional Water Quality Board with respect to all the other agency concerns regarding the project. The City would then take the information from this meeting (these Meeting Minutes) to the other permitting agencies and discuss their conditions. The City would then tailor the project around the concerns of the permitting agencies to ensure regulatory compliance and to show the Judge the City's good faith effort to speed the process along.

Samir Mahmalji (Park & Recreation) explained that City Staff met with a contractor to determine the means and methods of work, including the amount of material to be excavated and the type of equipment expected to be used. A copy of the plan, profile & equipment to be used was distributed to the group. Details are as follows:

- The proposed project scope is to excavate approximately 3,000 cubic yards of sand from the Children's Pool and place the sand just west of the breakwater in a beach sandy area (not the rock area) that is above the Mean High High Water Line. The City hired a biologist to locate the area for dumping and provide a technical report on the impact for review. After the sand is deemed clean via testing, and it is dumped as noted, the City intends to have the current wash the sand to sea where the current could redistribute the sand by natural means. However, it was noted that if the sand relocation became an issue, the City could haul the material off site. The City does not want the issue of where to dump the excess sand to be detrimental to the timeline. The amount of material to be excavated is between 250 cubic yards to 500 cubic yards a day. The actual amount will depend on the tide and the start and finish time of the work.
- The City intends to perform the work during the day, no night work is planned.
- The City also intends to start work sometime between 7 a.m. and 9 a.m., preferably when the seals are out foraging.
- The City will build up a berm with sand along the waters edge. This will allow the work to commence without current/water infiltration. It also will likely keep the seals confined from hauling out up high along the beach toward the lifeguard tower and restrooms. However, the City acknowledged that if seals continued to lie out on the beach by between 8 a.m. to 9 a.m., they intended to take action to flush them into the water. The City would like assistance from NOAA/NMFS on how to accomplish this safely (for humans and the seals).
- The City intends to have 24 hour security.
- The City feels the work will take about 4 to 6 weeks to complete once the area is set up.
- Staging will occur on the beach.
- Fueling and such will be properly contained with Best Management Practices monitored by the City.
- Coordination with the Lifeguards for life and rescue will be done.

Additional items noted to NOAA/NMFS by the City included discussions about the existing sluiceways. There are four sluiceways in the breakwater that, in the past, have been plugged. The original field engineer's notes stated that when the sluiceways were open, the wave action was strong and that when they were closed, it was noticed that the beach area filled in with sand. The notes state that the beach users liked having more beach, so they remained closed for some

time. It is unknown why they were permanently closed, except that there are unsubstantiated rumors that a child was drowned by getting stuck in them. They have since been buried with sand. By opening the sluiceways, there is some logic that the beach area and sand removal can naturally balance out and preclude the need for future excavation actions. However, the City would have to analyze the safety issues that arise from this action. Therefore, it will likely be looked at as a Phase II project. This will likely not affect NOAA/NMFS if seals are no longer hauling out on the beach. The City will keep them advised.

April also noted that the determination of the type of environmental document the City needs to prepare for the project for compliance with the California Environmental Quality Act (CEQA) is underway. She noted that the Development Services Department (DSD), who is a department in the City independent of her office and who handles the drafting of CEQA documents, called NOAA about a month ago for information and was told the area is an "official rockery." Lecky and McInnis both noted the statute does not have a definition for an official rockery. April stated that is what she explained to the DSD staff based upon Lecky's past testimony at City Council; however, NOAA is the guiding agency and it is really up to NOAA to tell staff the correct information. McInnis asked that calls on this project be referred to Cathy Campbell of his office to ensure accurate information is being given on the matter. Cathy can be reached at (562)980-4060. April asked NOAA what permits are required and what their issues are with the proposed project.

Jim Lecky stated that NOAA's position is that the City can authorize themselves, under Section 109(h) of the Marine Mammal Protection Act, to remove the seals and excavate the sand for the following reasons:

- Health & water quality issues
- Safety of animals and humans
- Court order requires the City to return the beach to human use under the Trust
- Restore the beach for swimming purposes

Jim added that no permits are required under 109(h) and asked for the City to formally send a letter to NOAA/MNFS notifying NOAA/NMFS that the City intends to exercise its authority under 109(h), and seeking NOAA's/NMFS's technical assistance. Jim stated that they will officially acknowledge the City's letter and offer to provide technical assistance in dealing with the seals.

Jim stated that a permit is not necessary (see above) but the City could request a permit of them. If the City took the permit application approach, approval would take NOAA/NMFS 6-9 months (to process).

Jim Lecky stated that City officials (not the public) can harass the seals before, during and after construction operations under the 109(h) rule. However, if the sand removal operation is going to be done close to the pupping season (starts in January and ends around May), the harassment will need to start in October or November.

Rick Hawkins from NOAA/MNFS asked what would happen if a seal gets trapped behind the sand berm that is proposed to be constructed during the construction operation. Samir stated that it is hoped that the berm will deter the seals from going up high onto the beach. However, the contractor is going to have at least one and maybe two security guards at the site full time and they would call the designated City Official when necessary to get the seal back to the water.

Rod McInnis from NOAA/NMFS asked if the excavated sand that is going to be place west of the breakwater is going to be clean sand. Samir indicated that the City will excavate the clean sand first and place it west of the breakwater, or the City might excavate the polluted sand and let it dry for few days so it will be clean sand. A test will be done on the sand by biologists before we place the sand west of the breakwater to insure it is clean sand.

Jim Lecky asked if the City was not able to get permitting from the other agencies within the six months period, what would happen. Shannon Thomas from the City Attorney's Office read the order which states that no state or federal law should be broken. The City will have to state to the judge what the other agencies require as far as permits and time needed to review the permits by October 27, 2005.

Michelle from NOAA/NMFS asked if she can place their sign on the beach. It was decided that the City will ask the Judge on October 27, 2005 if that is appropriate. The City took a sign to show the judge.

Action:
- The City will send a letter to NOAA/NMFS requesting to utilize Section 109(h) of the MMPA
- NOAA/NMFS will respond to the letter ASAP agreeing with our request
- NOAA/NMFS will provide technical assistant to the City in utilizing 109(h)

If there are any conflicts or corrections, please advise our office in writing within five (5) days of receipt of this letter; otherwise, these notes will be deemed correct.


April Penera, P.E.                    Rod McInnis
Deputy Director                       Regional Administrator
Park and Recreation Dept              South West Region
City of San Diego                     NOAA/NMFS



Prepared by:    Samir Mahmalji
Distribution:   All Attendees

Exhibit H

SHANNON THOMAS
DEPUTY CITY ATTORNEY

OFFICE OF

# THE CITY ATTORNEY

CITY OF SAN DIEGO

CIVIL DIVISION
1200 THIRD AVENUE, SUITE 1620
SAN DIEGO, CALIFORNIA 92101-4178
TELEPHONE (619) 236-6220
FAX (619) 236-7215

## MICHAEL J. AGUIRRE
CITY ATTORNEY

September 26, 2005

### VIA FACSIMILE AND U.S. MAIL

Rodney R. McInnis
Regional Administrator
National Marine Fisheries Service
Southwest Region
501 W. Ocean Boulevard, Suite 4200
Long Beach, California 90802-4250

Dear Mr. McInnis:

*Exercise of Local Authority under MMPA Section 109(h)*

It was a pleasure to meet with you and your staff on the 16th. As you know, the City has been ordered by the court in the O'Sullivan litigation (GIC 826918) to return the Children's Pool in La Jolla to its 1941 condition. Specifically, the City was ordered to remove "the sand build-up and further to reduce the level of water contamination in the Pool to levels certified by the County of San Diego as safe for humans." In addition, we were ordered to "maintain the beach sand so that it does not pose a health hazard to humans." The City was ordered to complete this action within six months of the ruling, dated August 26, 2005, and must submit a report to the court by October 27, 2005, detailing how we will accomplish this.

Park and Recreation staff, April Penera and Samir Mahmalji, presented to you and your staff the proposal for sand removal, which is intended to allow for increased circulation of the water, resulting in reduced water contamination. They also explained how the sand would be processed and tested to ensure that the sand returned to the ocean was clean.

The sand removal proposal has the potential to disturb any seals that may be on the beach at the time of the sand removal. The direction from your agency at our meeting was that the City has authority under section 109(h) of the Marine Mammal Protection Act to remove the seals based on the need to protect the public health and welfare, as well as the seals being a nuisance animal. By this letter, the City hereby notifies NOAA and NMFS that we intend to exercise our authority under section 109(h), codified at 16 USC § 1379(h). We will, of course, coordinate our actions with your staff to ensure that any disturbance of the seals is minimized to the extent possible.

Rodney R McInnis                          -2-                        September 26, 2005

Please verify that this is your understanding of our authority, and, as soon as possible, let us
know what further details we need to present to ensure that your agency's concerns are
addressed.

MICHAEL J. AGUIRRE, City Attorney

By Shannon Thomas
Shannon Thomas
Deputy City Attorney

ST:s

Exhibit I

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE

Southwest Region
501 West Ocean Boulevard, Suite 4200
Long Beach, California 90802- 4213

OCT 1 7 2005

In response refer to:
151422.SWR2005PR20267.CBC

April Penera
City Manager's Office
City of San Diego
202 "C" Street
San Diego, California 92101

Dear Ms. Penera:

I am sending this letter in response to the September 26, 2005, letter from Shannon Thomas, Deputy City Attorney of the City of San Diego, notifying the National Marine Fisheries Service (NMFS) that the City of San Diego intends to exercise its authority under section 109(h) of the Marine Mammal Protection Act (MMPA), 16 U.S.C. § 1379(h), to intentionally harass harbor seals at Children's Pool Beach in La Jolla, CA.

Section 109(h) of the MMPA authorizes Federal, State or local governments to intentionally take marine mammals, if the taking is done in a humane manner and is for: (a) the protection or welfare of the mammal; (b) the protection of the public health and welfare; and (c) the nonlethal removal of nuisance animals. This authority is limited to Federal, State or local government officials or employees taking marine mammals in the course of their duties as an official, employee, or designee.

My understanding based on our meeting with you on September 16, 2005, is that the City of San Diego intends to excavate sand from Children's Pool Beach in order to restore the beach for exclusive human use and that the City will be taking further actions as necessary to permanently exclude marine mammals from Children's Pool Beach in order to ensure the beach is safe for human use. NMFS agrees that the MMPA allows the City to restore the beach for exclusive human use provided the City determines one or more of the above provisions of section 109(h) apply and can document the decision. No formal approval or permit is needed in order for the City to take action under section 109(h).

The City will be required to report every six months to the Secretary of Commerce regarding any take of marine mammals carried out under authority of section 109(h). Generally, the report must include a description of: 1) the animal(s) involved; (2) the circumstances surrounding the taking; 3) the method of taking; 4) the name and official position of the official or employee involved; 5) the disposition of the animal, including in cases where the animal has been retained in captivity, a description of the place and means of confinement and the measures taken for its maintenance and care; and 5) such other information that the Secretary may require. See 50 CFR 216.22(b).

If the sand removal operations are expected to occur during harbor seal pupping season (January through April), then NMFS recommends the City consider removing the animals (in compliance with section 109(h)) from the area by November 2005 to ensure they have left the area before the beginning of pupping season.

NMFS appreciates the opportunity to provide guidance regarding the City's responsibility and authority under the MMPA and looks forward to providing technical assistance as the City moves forward with this project.

Sincerely,

Rodney R. McInnis
Regional Administrator

cc: Shannon Thomas, Office of the City Attorney

Exhibit J

Clerk of the Superior Court

AUG 2 5 2005

By: C. LUNT, Deputy

1
2
3
4
5
6
7

8                    SUPERIOR COURT OF CALIFORNIA

9                        COUNTY OF SAN DIEGO

10

11   VALERIE O'SULLIVAN,                    )   CASE NO. GIC 826918
                                            )
12              Plaintiff,                   )   TENTATIVE STATEMENT OF DECISION
                                            )
13        v.                                 )
                                            )
14                                          )
     CITY OF SAN DIEGO, a municipal entity, )
15   and FOES 1 through 500, inclusive,     )
                                            )
16              Defendants.                  )
                                            )
17                                          )
                                            )
18                                          )
                                            )
19   ───────────────────────────────────── )

20        The court, having heard the testimony at trial and the argument of

21   counsel and having considered the pleadings, evidence and declarations filed

22   herein, makes the following factual findings and conclusions of law.

23                            **FACTUAL FINDINGS**

24        On June 21, 1930, Ellen Browning Scripps, through her Attorney in

25   Fact, Dr. J. C. Harper (hereinafter "Harper") wrote the Mayor and City Council

26   of San Diego for permission to construct a "concrete breakwater in the Pacific

27   Ocean at La Jolla." The stated purpose for the breakwater was to "create a

28   Bathing Zone adjacent to the City of San Diego's La Jolla Park and City

                                      -1-

Streets." The letter notes that the breakwater "will be outside the City of San Diego but adjacent to the park and streets." [Exh. 546.] On June 26, 1930, hydraulic engineer H. N. Savage (hereinafter "Savage") also wrote the City of San Diego (hereinafter "the City") on behalf of Ms. Scripps requesting permission to construct the breakwater. He enclosed with his letter plan drawings of the proposed breakwater. In this letter, Savage states the purpose of the breakwater "is to create a bathing pool" and the cost would be "in the vicinity of $50,000." [Exh. 547.] On June 30, 1930, the San Diego City Council passed Resolution No. 54177, granting permission to Ellen Browning Scripps to construct a "concrete breakwater in the Pacific Ocean at La Jolla, California . . ." [Exh. 11.]

Savage was the Engineer-in-Charge of the project and wrote a "Feature History" of the project, a copy of which can be found in the San Diego Public Library. Since there does not appear to be anyone alive who was in a position of authority with regard to the approval and construction of the breakwater feature, Savage's history provides the court with what appears to be the most accurate history of the children's pool project. [Exh. 32.] Based on that history, the following findings are made.

In 1922, Ms. Scripps and Harper invited Savage to determine the "practicality and feasibility of the accomplishment of a bathing pool for children in the Ocean at La Jolla, California." [Id. at 64.] For several months thereafter Mr. Savage conducted "world wide research" and on March 22, 1923, submitted a report to Ms. Scripps. The report contained recommendations for constructing a bathing pool in the ocean in front of the location of the Casa de Manana Hotel.

Several years later, in May 1930, Ms. Scripps' representatives "invited [his] cooperation in the accomplishment of the projected splendid gratuity-bathing pool for children at La Jolla." [Id.] Savage, apparently having accepted the invitation, met on June 6, 1930 with a representative of the United States

War Department preliminary to applying to the War Department for permission "to construct the breakwater feature of the projected bathing pool." [Id.]

On June 20, 1930, Ms. Scripps authorized construction of the pool as a gift to children. Savage's services on the project were also a gratuity to children. The next day, formal application was made to the War Department requesting permission to construct the breakwater feature of the pool. [Id. at 64 – 65.] At the same time, application for permission to construct the pool was made to The State of California, Department of Public Works, and the City of San Diego, Mayor and "Common council," as well as the City's Board of Park Commissioners and Board of Playground Commissioners.

As noted above, permission from the City was granted on June 30, 1930. [Id. at 16.] The Board of Playground Commissioners took no action because the pool was not being constructed on property "under the control of the Playground Commission." However, the President of the Playground Commission stated "the Board will be happy . . . to cooperate with you in the maintenance and construction of same after it is completed, in so far as our jurisdiction will permit." The City Park Department approved the construction on July 22, 1930. [Id. at18.] The War Department issued a construction permit on September 2, 1930. [Id at 19.]

Savage wrote the Attorney General for California, U.S. Webb, to clarify the legal requirements for approval of the pool project by the State of California. In that letter, Savage confirmed his understanding of the position expressed by the Attorney General at a September 4, 1930 meeting. In summary, Savage concluded "that an Act of the California State Legislature alone could legally authorize the gratuitous construction . . . of the breakwater structure necessary to control Pacific Ocean water sufficient to provide a safe bathing pool at the site selected, . . . until an Act of the California State Legislature could be obtained, only the California State Attorney General could initiate the legal steps necessary to prevent the construction of the projected

bathing pool breakwater, and . . . appreciating the gratuitous perpetual non-commercial character of the projected undertaking, . . . it would be entirely proper for the work to be immediately put under construction . . . having in mind the extreme age and failing health of Miss Scripps, and . . . out of . . . unprecedented official constructive cooperation gave me your assurance of further constructive cooperation to the extent you find proper . . . in advancing the accomplishment of an Act of the next Legislature, legally confirming the accomplishment of the gratuity." [Id. at 24.] On September 17, 1930, Attorney General Webb responded to Mr. Savage's letter and stated "approval is expressed to all said by you therein." [Id. at 23.]

With actual or tacit approvals in hand, on September 15, 1930, Ms. Scripps awarded the construction contract to W.M. Ledbetter & Company. Two days later, equipment arrived on site and construction commenced. [Id. at 78.]

According to Savage, "[t]he purpose of the project was to create a safe bathing pool for children, sheltered from the ocean surf and winds." [Id. at 5.] The project itself consisted of a "breakwater three hundred feet long with its top twelve feet above mean sea level. The breakwater extends from a bluff at the edge of the ocean out in a sweeping curve [from north to northeast] along a natural low barrier reef between the pool and the ocean."

"Access to the pool is provided for by the construction of concrete reinforced stairways from the top of the bluff down to the sand beach, also from the top of the bluff down to the wide walkway which extends along the top of the entire breakwater. The inside of the breakwater is terraced making access from the walkway along the entire length of the breakwater inside down to the sand beach."

"The park area on the bluff adjoining the pool was improved by grading and the construction of parapet walls, and curbs. Shrubs have been planted and benches provided." [Id at 4.]

-4-

In addition to the above improvements, a cable was stretched across the open end of the pool, anchored on the far end of the breakwater and the cliff face on shore. Ropes hung from the cable approximately eight (8) feet apart. Drainage was also constructed to divert water from running over and down the face of the bluff and instead into the City's storm drain system. [Id. at 6.]

The construction proceeded relatively smoothly, with some unanticipated delays. The project was essentially completed on February 10, 1931. [Id. at 134.] On June 1, 1931, Ms. Scripps gave the Children's Pool to the City of San Diego. [Exh. 1.] On June 11, 1931, the Common Council of the City adopted Resolution 56609 whereby it "express[ed] to this generous friend of humanity its most cordial thanks, on behalf of the children and citizens generally of the City of San Diego, for the unprecedented tidal bathing pool for the younger generation which has recently been constructed in ocean water on the shores of La Jolla, . . . ." [Exh. 19.]

On June 15, 1931, the Governor of California signed Statute No. 937 of the laws of 1931, which granted to "the city of San Diego, . . . all right, title and interest of the State of California, . . . in and to all that portion of the tide and submerged lands bordering upon and situated below the ordinary high water mark of the Pacific ocean described as follows:

"Beginning at the intersection of the ordinary high water mark of the Pacific ocean with a line bearing S. 87° 40´ W. from the monument marking the intersection of Coast boulevard south and Jenner street as . . . shown on that certain map entitled 'Seaside subdivision number 1712' and filed June 23, 1920 . . . ; thence N. 350´, thence E. 300´, thence S. 185´ more or less to the ordinary high water mark of the Pacific ocean, thence in a generally southwesterly direction along the ordinary high water mark of the Pacific ocean to the point of beginning, all in the Pacific ocean, State of California, to be forever held by the city of San Diego and its successors in trust for the uses and purposes and upon the express conditions following, to wit:

(a)    That said lands shall be devoted exclusively to public park, bathing pool for children, parkway, highway, playground, and recreational purposes, and to such other uses as may be incident to, or convenient for the full enjoyment of, such purposes;

(b)    The absolute right to fish in the waters of the Pacific ocean over said tidelands or submerged lands, with the right of convenient access to said waters over said lands for said purpose is hereby reserved to the people of the State of California."

The grant of the trust became effective August 14, 1931.    On November 21, 1931, the Operating Department of the City prepared a map depicting the land granted to the City by the State of California "for a swimming pool." [Exh. 731.]

In 1933, the Legislature passed and the Governor signed Statute No. 688 of the laws of 1933, that conveyed in trust all of the tidelands of the state bordering the City of San Diego.    The more general grant of land described *permissive* uses of the tidelands, as contrasted with the 1931 grant, which provides for *exclusive* uses of the tidelands within the grant.    Thereafter, for over sixty years, the Children's Pool remained open for the use and enjoyment of the people of San Diego and others.

Based on other evidence received at trial, the following facts are found. In 1980 and 1983, the City of San Diego contracted for repairs to the Children's Pool breakwater.    These repairs included replacing the handrail, improving lifeguard facilities and repairing the breakwater itself. [Exh. 722.]

There is no evidence of any concern about or discussion of seals in the Children's Pool area until July, 1992.    At that time, a representative of Sea World, Jim Antrim, discussed with Barbara Bamburger, a representative of "Friends of the Seals," the creation of a seal reserve in the vicinity of "the rock off Shell Beach (in front of 939 Coast Blvd)" as it was the "focal point of harbor

seal activity concentrated between the months of January and May." [Exh. 238.]

The issue of establishing a Marine Mammal Reserve in the Seal Rock area of La Jolla came before the San Diego Park and Recreation Board in October, 1992. This area was to begin about 100 yards east of the Children's Pool. [Exh. 588.] The Director of the Board recommended posting signs in the Seal Rock area advising it is unlawful to harass or disturb marine mammals and signs to educate the public about marine mammals. He also recommended establishing a volunteer docent program and solicitation of private funds to finance a two-year study of the uses of the Seal Rock area by harbor seals. [Exh. 581.]

The subject of a marine mammal reserve (hereinafter "the Reserve") came before the City Council Committee on Public Facilities and Recreation on November 25, 1992, with a recommendation by the City Manager to essentially adopt the Park and Recreation Board recommendations, with the exception that the Reserve be established for a five-year period. [Exh. 588 at 1.] The City Manager's recommendations were adopted. [Exh. 583.] The water and land within the reserve would be "off-limits to human and pet intrusion." [Exh. 588 at 5.] In making these recommendations, the City recognized that marine mammal populations in the area of Seal Rock, and harbor seals in particular, had increased during the prior ten years. [Id. at 4.] The City Manager was directed to meet with Ms. Bamburger to fix the boundaries of the Reserve. [Exh. 583 at 1.]

A Request for Council Action was sent to the City Attorney on December 3, 1992, recommending a reserve with a fixed boundary beginning 200 feet east of the seaward entrance to the Children's Pool. [Exh. 584, attached map.] The City Attorney approved the request, and the recommendation for the Reserve came before the City Council on February 1, 1993. [Exh. 585.] It passed unanimously after an amendment that extended the boundaries "to include the

compromise area that goes practically to the beach that was presented by Barbara Bamburger. This discreet area shall be in effect for five years on a trial basis and is off limits to swimmers, divers and tourists. Access to the riptide is not affected because the divers can come in and go out through the Children's Pool." [Exh. 586.] The ordinance was formally adopted on February 22, 1993. [Exh. 589.]

On or about October 25, 1993, Jane Sekelsky, Chief, Division of Land Management, State Lands Commission (hereinafter "SLC"), sent a letter to Carl Lind, a private citizen, copied to Robin Stribley, Natural Resources Manager, Park and Recreation District, City of San Diego. The letter concerned the creation of a marine mammal preserve within an area encompassed within a statutory trust grant. The SLC, on behalf of the State of California, expressed its concern that the Reserve may prohibit activities specifically reserved to the people of the State of California. Such activities include "the absolute right to the public use of said tidelands and to fish in the waters thereof, with the right of access to said waters over tidelands for said purpose." [Exh. 67.] The Legislature has vested in the SLC: "All jurisdiction and authority remaining in the State as to tidelands and submerged lands as to which grants have been or may be made," and has given the commission exclusive administration and control of such lands. (Pub. Resources Code § 6301.)

The SLC then followed up with a clarifying letter dated November 15, 1993, addressed to Ms. Stribley and Barbara Bamburger. In that letter, SLC more thoroughly advised the City of its rights and obligations in regard to lands over which it is the trustee. The State stated that "[t]he proposed ordinance is clearly inconsistent with the provisions of Chapter 937, Statutes of 1931. To ban public recreational uses as proposed would violate the specific provisions of the statute and the City's responsibility as Trustee." [Exh. 70.] The court recognizes that the Reserve is situated within the broader tidelands grant of 1933 and not the much more narrowly and specifically worded grant of 1931.

However, the court finds that the letter from the SLC placed the City on notice, as of November 1993, of its legal obligations under the 1931 statutory grant of public trust land.

On November 18, 1993, the California Coastal Commission approved the establishment of the Reserve in the vicinity of Seal Rock. [Exh. 606.] The approval was conditioned on the City obtaining approval of the SLC and the boundaries of the Reserve not including any "sandy beach area." The requirement to obtain SLC approval apparently prompted the City to obtain a legal opinion from the City Attorney and to survey the areas of the Children's Pool grant and the 1933 grant. In a memorandum dated December 17, 1993, the City Attorney opined that the SLC erroneously concluded that the Reserve area was within the 1931 grant, when it was really within the 1933 grant. Since the City surveyed the area and found the Reserve did not lay within the 1931 grant, the City Attorney concluded the designation of "a small preserve for marine mammals is clearly consistent with the uses of tidelands" under the 1933 grant. The issues involving the Reserve are relevant as notice to the City of its rights and obligations under the 1931 grant as contrasted with the 1933 grant.

On January 25, 1994, the SLC, upon further review, concluded the Reserve did not violate the conditions of the 1933 grant, which granted to San Diego trust rights over all "[s]tate owned Public Trust Lands within the Pacific Ocean and the City limits (not already granted-such as the Children's Pool) to the City of San Diego." The SLC distinguished the broad provisions of the 1933 grant and the "restrictive provisions" of the 1931 grant which "impact[s] the area of the Children's Pool." [Exh. 597.]

The California Fish and Game Commission (hereinafter "Fish and Game") declined to take any action in regard to the Reserve. However, in its March 30, 1994 letter to the City, Fish and Game cautioned the City about interfering with "the public's right to fish in State waters." [Exh.598.] On July 25, 1994,

the City Council amended the ordinance establishing the Reserve to comply with the requirements of the Coastal Commission and to permit fishing pursuant to the request of Fish and Game. [Exhs. 599, 600 & 601.]

On September 30, 1996, the City Council accepted donations for improvements to the Children's Pool. [Exh. 608 & 609.]

The Natural Resources and Culture Committee (hereinafter "Natural Resources"), on October 1, 1997, received an informational report from the City Manager about the "Closure of Children's Pool." The report noted that the Pool had been closed to "water contact since September 4, 1997 due to continuously high fecal coliform counts." Obvious forms of contamination had been ruled out and it was believed that the source was harbor seal feces. This had not yet been confirmed, but laboratory tests were being conducted. [Exh. 611.]

The City Manager then discussed the City's lack of understanding of the reasons for "this unusual contamination level." The City did know that "[h]arbor seal populations have steadily increased off the west coast over recent years. This is evidenced at Children's Pool by an increased number of seals using the area." The City noted that a potential cause of the increase in the number of harbor seals at the Children's Pool was the nearby Reserve, which was three years into its five-year trial. Another potential cause was that "for the last year and a half, [City] lifeguards have erected barriers between seals hauled-out on the sand at Children's pool and the public." The barrier was to protect the public "from being bitten by a wild animal" or being fined for disturbing the seals.

The City Manager took the position that "[i]f the high contamination level both proves to be due to seals, and continues, it is the City's intent to find a solution which allows the peaceful co-existence of humans and seals at Children's Pool, to the extent the public health can be protected." He also recognized "[s]ince public health is potentially at risk, the federal Marine Mammal Act allows the City to take non-injurious actions which would reduce

or eliminate seal usage of Children's Pool." He then described various non-injurious methods that could be used and declared that "permanent closure of Children's Pool to the public is not being considered." [Id.]

The following month, on November 18, 1997, representatives of various agencies and organizations met to discuss seals at Children's Pool. Representatives from National Marine Fisheries Service (hereinafter "NMFS"), Fish and Game, Scripps Institute, Sea World, The Zoo, Park and Recreation, Lifeguards, and Council District 1 attended. [Exh. 613.] Apparently the meeting did not result in any action to address the seal situation at Children's Pool.

On December 10, 1997, the NMFS, an agency of the United States Department of Commerce, advised the City that "[w]hen Seal Rock was designated as a temporary reserve in 1994, a small number of harbor seals were utilizing the rock as a haul-out, while no animals were hauling out at Children's Pool Beach (CPB). According to [a] report, in 1996 the maximum number (62) of animals observed hauling out, on the rock occurred in April, while the maximum number (120) of animals observed hauling out at CPB occurred in June. Based on these data it appears that animals are preferring CPB over Seal Rock as their major haul-out site. This trend will most likely continue into the near future as the local seal population continues to increase in size." [Exh. 203.]

NMFS also concluded that the seals at Children's Pool appear to be acclimating to humans and the effectiveness of the Reserve as a seal sanctuary is questionable. "Because, the harbor seal population both locally and statewide is healthy and increasing," removing Seal Rock as a Reserve will have no adverse effect on the seals. [Id.]

In January 1998, Hubbs-Sea World Research Institute published a report of seal activity at the Reserve and Children's Pool. The report was based on photographs taken of each location every 30 minutes from November 1995

1  through September 1997. In most months, the peak count was significantly

2  higher for the Children's Pool than the Reserve. [Exh. 245.]

3      In February, the City Manager updated Natural Resources on the

4  Children's Pool closure. The report confirmed that the contamination was the

5  result of "a seal excrement overload for Children's Pool." For fifteen years

6  before 1994, the water quality in the Children's Pool met safe standards except

7  on rare occasions. The report seemed to reasonably reject scaring away the

8  seals from the beach or Pool, relocating them or physically preventing their

9  entering Children's Pool. The "action plan" proposed was to discontinue

10  placing barricades on the beach in the hope the seals will use the beach less if

11  there were more human interaction and to hire a consultant to develop a plan

12  for opening the sluiceways in the breakwater. It was believed the open

13  sluiceways would increase the amount of water in the Pool and reduce the size

14  of the beach. The increase in water would further dilute the concentration of

15  feces in the water and a smaller beach might discourage some of the seals from

16  hauling out at Children's Pool and thereby reduce the number of seals at the

17  Pool. [Exh. 111.] The Committee approved the Report recommending the

18  hiring of a consultant in regard to re-opening the sluiceways. [Exh. 617.]

19      Prior to the May 6, 1998 meeting of Natural Resources, the City Manager

20  provided another report. This time the City Manager recommended returning

21  the barricades to separate the seals from the public. The removal of the

22  barricades did not have the desired effect of reducing the seal population at the

23  Pool. Also, complaints by public members of interactions between humans and

24  seals were distracting the lifeguards from their public safety duties. For these

25  reasons, the City Manager recommended the barricades be returned to the

26  Pool. [Exh. 112.]

27      The report also concludes that re-opening the sluiceways was feasible,

28  but three-quarters of the sand on the beach would need to be removed, in

order to return the beach to its 1931 configuration. The City Manager

recommended the sand removal. [Id.] The Committee's action was to recommend that the City Council direct the City Manager to apply for a Coastal Development Permit to remove the sand and re-open the sluiceways. [Exh. 619.]

In August, 1998, the City was advised by the Center for Disease Control that seals can transmit diseases to humans. "Some seals can carry tuberculosis and Giardia. Fecal contaminant bacteria and viruses would also be a potential concern." [Exh. 165.]

On December 22, 1998, the City requested authorization from the NMFS to remove sand from the beach. Dredging sand from the beach could constitute an "incidental harassment" of the seals. [Exh. 255.] In justifying its request, the City represented that the breakwater was constructed to provide a sheltered swimming area for children; that the Pool has consistently been a popular attraction with a broad range of users who have come to rely on the Pool for beach recreation and water access; that skin and SCUBA divers depend on the Pool in order to safely enter and exit the water; that the beach behind the breakwater has gradually widened as sand accumulated in the Pool. By 1998, the shoreline at the Pool had advanced to near the end of the breakwater, at the mouth of the Pool. This resulted in very little protected area for recreational swimming. In addition, the swimming area had moved to within a close proximity to dangerous rip currents and their attendant safety concerns. Lifeguard rescues had increased because of this dangerous condition. [Exh. 623.]

The City stated that it could restore the Pool as "a safe swimming area and [achieve] acceptable water quality [at] the Pool by reducing the beach width." The requested excavation would return the Pool to its early 1940's condition, with an enlarged area "available for recreational swimming and a safe region for the public to enjoy away from the dangerous rip currents." [Id.]

1  The recommendation of Natural Resources to remove sand from the
2  Children's Pool came before the City Council on March 22, 1999.    The
3  recommendation received four yeas and four nays, so the matter was tabled
4  until March 29, 1999. [Exh. 627.]  On that date, the City Council voted "to not
5  dredge, not shoo the seals, instead put up a barrier to protect the humans from
6  the seals and the seals from the humans and send it back to the Natural
7  Resources Committee for an indepth (sic) review of all the issues including the
8  legality and how it was left in the will."[1]  Following the vote, the City withdrew
9  its request for a coastal development permit from the California Coastal
10 Commission. [Exh. 88.]  The next day, the rope barrier went up. (Exh. 133.)

11  On August 4, 1999, Natural Resources considered the issue of letting the
12 Reserve designation lapse.    The City Manager, in his July 26 report,
13 recommended letting the Reserve lapse as of its sunset date of September 16,
14 1999.

15  In his report, the City Manager discussed the potential impact on
16 Children's Pool.  He noted that the NMFS was considering whether to declare
17 Children's Pool a "natural haul-out and rookery."  Such a designation would
18 impose a no-human-interference policy at the Children's Pool beach.  NMFS
19 had held off on such a designation because the City was pursuing a "shared-
20 use-by-people-and-seals policy" and was working on a proposal to "address the
21 pollution at the Pool by reducing the size of the beach and thus the available
22 haul-out space for the seals."  Since the City had "abandoned the shared use
23 concept and did not pursue the project to address the pollution, [NMFS]
24 assumes the City plans to maintain Children's Pool beach as a seals-only
25 beach.  Therefore, the Service believes the next logical step would be to manage
26 Children's Pool beach as a permanent harbor seal haul-out and rookery."  The
27 net effect would be that the public could not use the beach set aside for the
28 seals, nor could fishing occur in that area. [Exh. 643.]  Natural Resources

---

[1] Ms. Scripps' gift was made during her lifetime and thus the Children's Pool is not subject to any will provisions.

rejected the City Manager's recommendation and voted to recommend the Reserve be continued for another five-year term. [Exh. 634.] On November 1, 1999, the City Council voted to make the Reserve permanent with a five-year review. [Exh. 642.]

On October 19, 1999, NMFS advised the City that it did not favor public beaches being closed to the general public due to harbor seals expanding their range and colonizing mainland beaches. Further, NMFS did not agree with a shared-use of Children's Pool by humans and seals. NMFS believed the City should decide if the Children's Pool is to be used by humans or seals, not both. [Exh. 205.)

On November 4, 1999, the City Attorney wrote the SLC inquiring whether the SLC considered the closure of the Children's Pool, or usage of the Pool for viewing seals, a violation of the 1931 Grant of Public Trust over the area of the Children's Pool. [Exh. 73.]

In February 2000, the NMFS notified the City that it had decided to manage the Children's Pool as a harbor seal natural haul-out and rookery. NMFS based this decision on their understanding that harbor seals first began hauling-out at Children's Pool in 1995, with ever increasing numbers and the fact that in 1999, for the first time, seal pup births were documented at the Pool. [Exh. 655.]

On March 15, 2000, Fish and Game advised the City that the City did not have the authority to create a seal reserve on public trust tidelands. Fish and Game cited several bases for this opinion, including violation of the State Constitution, preemption by Federal law and State law, and violation of the 1933 trust itself. [Exh. 75.]

On August 15, 2000, the SLC responded to the City's request for an opinion. The SLC stood by their 1994 opinion that a small temporary seal reserve would not violate the 1933 trust and urged the City "to exercise its responsibilities in a flexible, balanced and thoughtful manner." However, the

1   SLC did not address the City's inquiry concerning seals at the Children's Pool.

2   [Exh. 76.]

3   By letter of February 11, 2003, the NMFS advised the City that it could

4   not intentionally harass the seals at Children's Pool in order to remove them.

5   However, it could undertake activities that might temporarily displace the

6   seals. An example would be a dredging project intended to improve the water

7   quality at Children's Pool. [Exh. 668.]

8   On March 13, 2003, the California Coastal Commission advised the City

9   that the rope barrier the City had erected closing off most of the beach at

10  Children's Pool and access to the water at the Pool, needed a Coastal Permit.

11  The Commission was concerned that a supposed temporary situation had been

12  in place for four years and appeared to be permanent. [Exh. 98.]

13  On March 21, the County of San Diego informed the City that with the

14  adoption of AB 411 by the Legislature, the status of the Children's Pool had

15  changed from "closed" to "advisory", since the water contamination was not

16  due to a sewage spill. [Exh. 149.]

17  The City Council on April 1, 2003 considered the request of the Coastal

18  Commission to modify the permanent status of the Reserve. The City Manager

19  recommended that the City accept the permit with the special conditions. The

20  City Council declined to follow the recommendation and did not accept the

21  coastal permit with its special conditions.  The Council directed that the

22  signage and the docent program continue and further directed the City

23  Manager to make a presentation before California's Marine Life Protection

24  Working Group, seeking advice on the "appropriate status for the area." Also,

25  the City Manager was directed to once again return to Natural Resources with

26  a report on "how, in compliance with federal law, to reduce pollution levels and

27  to return the Children's Pool to recreational use for children." [Exh. 672.]

28  On July 29, 2003, the Children's Pool Technical Advisory Committee met

    to discuss ways to accomplish the directive of the City Council, for an

unpolluted Children's Pool and a joint use of the beach at the Pool. The members of the Committee included representatives from the NMFS, Coastal Commission, Fish and Game, County Environmental Health, Hubbs-Sea World, Park and Recreation, lifeguards and other City representatives. They went over most of the proposed "solutions" that had been enumerated over the years. They concluded the most viable options were "1. Dredge the beach in conjunction with floating platforms; 2. Close beach to public use; and 3. Create a new Children's Pool and leave current Children's Pool for seal use." [Exh. 285.]

On June 17, 2004, the City Manager provided Natural Resources with another report on seals at Children's Pool. This report laid out a comprehensive plan for restoring the Children's Pool to an unpolluted and safe condition. The plan was centered on dredging a substantial portion of the sand at the Pool. It was believed this would restore the water quality in the Pool to an acceptable level and relocate the water in the Pool further into the breakwater area away from the open sea and dangerous rip currents. The estimated cost of dredging the Pool ranged from $250,000 to $500,000. Another $50,000 would need to be budgeted annually to pay for anticipated dredging every three to five years. [Exh. 703.]

On June 23, 2004, Natural Resources considered the recommendations of the City Manager. The Committee voted to refer the matter to the full City Council "with no recommendation." [Exh. 696.]

On or about August 13, 2004, the City posted new signs at the Pool explaining that the rope was a "guideline to avoid disturbing the seals" and that swimming was "not recommended" because of excessive bacteria levels. [Exh. 215.]

On September 14, 2004, the City Council once again held hearings on the Children's Pool. Addressing the Council that day was James Lecky of the NMFS. He advised the Council that harbor seals are a healthy species which

are growing in population and not in anyway endangered or threatened as a species. In fact, as the population of harbor seals expands "[t]hey are causing problems . . . up and down the coast in terms of invading harbors, causing property damage and limiting access to beaches that are important for other public uses." He then told the Council: "The tools that are available to the City and other local governments agencies really reside in [Marine Mammal Protection Act] §109(h)." He said "animals can be moved out of an area if they are either presenting a public nuisance or they're causing a public health hazard." It was his position that the seals at Children's Pool were a local issue for the City to resolve. [Exh 129.] At the end of the meeting, the Council voted "to design and permit the sand removal project and open the pool for year-round use. Direct that the opening of the sluiceways in the Children's Pool be evaluated as an alternative method to obtain the sand removal and tidal flushing as part of this effort. Direct that the rope barriers and sign posts be immediately removed to restore public access to the area and that new signs be placed."

The City has not undertaken any meaningful steps to return the Children's Pool to an unpolluted, safe and usable state since the meeting of September 14, 2004.

## CONCLUSIONS

In response to the conditions at Children's Pool, Plaintiff Valerie O'Sullivan, a private citizen, brought this action, alleging violation by the City of the 1931 statutorily-created public trust for the area know as Children's Pool in La Jolla. Plaintiff seeks a declaration of the meaning of the 1931 statutory grant to the City as trustee of the tidelands. [Exh. 20.] Plaintiff also alleges a violation by the City of the trust and seeks to compel the City's compliance with it, as well as other relief. The State of California has joined as an indispensable party, and has stipulated to be bound by any judgment entered by this court.

The first issue Plaintiff asks the court to resolve is what was the intent of the California Legislature in creating the trust and granting the tidelands to the City as trustee under Statute 937 of the laws of 1931.

Plaintiff then seeks a determination of whether the City has violated the trust, and if so, as trustee, has the City breached its fiduciary duty to the people of California.    Last, Plaintiff seeks injunctive relief in the event of findings in Plaintiff's favor.

## LEGISLATIVE INTENT OF THE TRUST

The legislative intent in enacting the 1931 Trust, when viewed in light of the factual history of the Children's Pool, as set forth above, is clear.  When the one-plus acre was entrusted to the City, it consisted of a breakwater and appurtenances that created a sheltered area of Pacific Ocean shoreline.  This sheltered area was created so that children could safely swim in the ocean without being subjected to crashing waves, undertow and rip currents, all of which pose a danger to children and neophyte swimmers.   The Trust was intended to convey to the City an artificial ocean water pool suitable for the use of children.  As the recipient of the Trust and the Pool, it became the obligation of the City to maintain the Trust property in a manner suitable for its intended uses and purposes.

Reference to the wording of the Trust further demonstrates the legislative intent.   The Trust conveys the land, with children's pool constructed thereon: "For the uses and purposes and upon the express conditions following, to wit: (a) That said land *shall be devoted exclusively to public park, bathing pool for children*, parkway, highway, playground and recreational purposes, and *to such other uses as may be incident to, or convenient for the full enjoyment of, such purposes*." [Emphasis added.]   Recognizing that a bathing pool for children existed on the land when the Trust was created and that the land was situated adjacent to a public park, and would be an extension of same, the legislative intent was clear.  The entrusted land *shall* be used *exclusively* for a public park

-19-

which includes a children's pool, and that the purpose of that use shall be recreational.

The City contends that the Trust should be read broadly and the Legislature must have vested the City with discretion as fee owner and trustee in its management of the Trust to determine the uses that are most compatible with changing conditions and public needs. The City asserts that extrinsic evidence, including the survey of the Trust boundaries and the historical information related to Ellen Browning Scripps' gift, confirms that the Legislature intended a broad reading of the Trust in which the Trust permits the use by both humans and seals. Other than the bald assertion, the City provides no evidence in support of its contention. Reading the Trust "broadly" or "narrowly" does not change the wording of the Trust, which is controlling.

A local entity that is the recipient of trust property must use the property in compliance with the terms of the Trust. The City is a trustee of the property and as such "assumes the same burdens and is subject to the same regulations that appertain to other trustees of such trusts." (Long Beach v. Morse (1947) 31 Cal. 2d 254, 256). The Trust is specific. It requires the Trust lands to be used for a children's pool. "Children's pool" is listed in the conjunctive with the other permitted purposes and uses set forth in the 1931 grant. Any discretionary use by the City must be "incident to, or convenient for the full enjoyment of, such *purposes* [plural]." If a use of the property is inconsistent with any of the *purposes*, it is not a permitted use.

The Trust is to be used exclusively for a public park and children's pool. The presence or absence of marine mammals, or other animals for that matter, does not change the use of the beach and tidelands specified by the Trust grant. The use by the City of the Children's Pool as a habitat, animal sanctuary, zoo or seal watching facility that precludes its being used as a bathing pool for children would be outside the scope of the Trust.

## THE CITY'S BREACH OF THE TRUST

A comparison of photographs of the Pool when first constructed and today, well demonstrates that the City has failed to maintain the trust property in a condition similar to when the property was conveyed. Photos demonstrate that the Pool originally was a pool of water sheltered by the breakwater and adjacent to a relatively small strip of sand beach. Today the beach extends out almost to the end of the breakwater. In effect, the breakwater no longer serves to protect the swimmers and bathers in the water, but rather the sand beach has, over the years, filled in most of the Pool. [Exhs. 35 & 228.] In reality, Children's Pool is no longer a safe pool of ocean water for children to use.

There also exists another safety issue at Children's Pool, and that is pollution. The evidence is un-contradicted that the water inside the breakwater is polluted and the public has been advised, from 1997 to the present, not to enter the water at Children's Pool because it poses a health risk. The evidence is also un-contradicted that the beach itself is a repository for sufficient amounts of seal feces to potentially pose a health hazard to persons, and particularly children, using the beach at Children's Pool.

In its present condition, the land granted by the 1931 Trust is not suitable for the uses enumerated in the grant. Because of the unhealthy condition of the sand and water, the Children's Pool area is not suitable for use as a public park, bathing pool for children or a recreational area. That being the case, has the City breached the Trust by not restoring the trust lands to a usable state? The plaintiff contends that it has.

Plaintiff reads the trust grant as according the public, as its beneficiaries, access to and use of the Children's Pool, and argues this use by the public has been thwarted by the City's conduct and failure to act while trustee of the Children's Pool. Plaintiff's position is supported by the facts and the law. As a trustee, the City has an obligation to "administer the trust with reasonable care, skill, and caution under the circumstances then prevailing

that a prudent person acting in a like capacity would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument." (Cal Prob. Code § 16040.)

Plaintiff cites to the fact that since at least 1997, Hubbs-SeaWorld has been engaged in a rescue, rehabilitation and release program under the aegis of the National Oceanographic and Atmospheric Administration or its sub-agency, NMFS. [Exh. 245.] That program consists of retrieving injured or diseased animals, rehabilitating them at SeaWorld in San Diego, and, upon return to health, and after tagging, releasing them in Pacific waters. The release of harbor seals is accomplished generally in the kelp beds immediately outside the Children's Pool. Tagged harbor seals are routinely observed hauling-out at the Children's Pool. Once it was determined that the released seals were impacting the use of the Children's Pool, the City took no steps to protect the Pool from becoming a haul-out for such seals.

The number of seals at the Children's Pool was minimal, if any, at the time of the creation of the breakwater and the Trust grant. Starting in the early 1990's, seals came to reside in the general area of Children's Pool in growing numbers. During that time frame, the City undertook the designation of the ocean and reef immediately adjoining Seal Rock as a reserve in order to accommodate the seals in that area. The Reserve is within a hundred yards or less of the area granted as the Children' Pool. In such close proximity, the seals, based on counts, seem to prefer the Children's Pool to Seal Rock as a haul-out. Over time, the seal population at Children's Pool has grown to where it now exceeds 200 during portions of the year. Photographs show seals on the beach across the entire width of Children's Pool at the edge of the water. [Exh. 399.]

During the 1990's, seal feces came to pollute the beach and adjoining waters. The County of San Diego, Department of Environmental Health, regularly tests the waters along the San Diego coastline. In 1997, the County

determined the waters at Children's Pool were so polluted that the Pool was officially closed to public swimming in March, 1997. [Exhs. 628, 634.] It is undisputed that the cause of the contamination of the waters at Children's Pool is seal feces.

The County tests the water for three contaminants: total coloform, fecal coloform and enterococcis. These bacteria contain pathogens, which can produce serious illnesses. [Exhs. 163, 265.] In 1997, the waters at Children's Pool contained sufficient numbers of these pathogens that the Pool was unsafe. That contamination continues unabated to the present time.

Until 1999, the County, by statute, could only post a beach with polluted water as "Closed." In 1999, the Legislature enacted AB 411. It provided for two categories of warning: "Closed" and "Advisory." The distinction between these warnings is principally the source of the contamination. Contamination from human sewage requires a "Closed" warning. Contamination from non-human sources, such a seal feces, requires an "Advisory" warning.

In 1997, the County posted signs warning that the beach was closed for water activities. Despite the fact that in 1999, with a change in the law, "Advisory" signs should have been posted, the "Closed" signs remained up until 2003. [Exh. 417.]

Since the source and level of the pollution remains constant most of the time at the Children's Pool, the County put the Pool on a chronic advisory status. The County has classified the Children's Pool as being polluted 365 days per year, from 1997 to the present. The next most contaminated beach, in terms of days of closure or advisory, has been the Tijuana River Slough, which is polluted on average 149 days a year. [Exhs. 197, 198, 199.]

As the number of seals increased at Children's Pool, and with the constantly polluted condition of the Pool, the number of swimmers using the Pool since the early 1990's has decreased significantly. Public use of the

Children's Pool has been severely restricted because of the presence of the seals and the resulting pollution.

The next biggest cause of actual or constructive closure of the Children's Pool was the City's decision to erect a rope barrier cutting off public access to the Pool. On March 29, 1999, the City Council rejected the City Manager's recommendation to dredge the Pool and restore the Pool to the uses set forth in the Grant, and instead voted to rope off the Pool. In doing so, the City breached its obligations under the Trust, as trustee of the Children's Pool. Instead of returning the Pool to its original and safer configuration and also rectifying the unhealthy condition of the water and sand at the Pool, the City barred the use of the Children's Pool as a "public park, bathing pool for children, . . . and [use for] playground and recreational purposes," as expressly required by the 1931 Trust. The rope remained up from March 1999 until September 17, 2004.

Besides the official barrier established by the City to deny public access to the Children's Pool, the general condition of the Pool area, with seal feces in the sand, the occasional dead seal rotting on the beach until washed out to sea by a high tide, and the presence of warning signs, all served to deter the public, beneficiaries of the trust grant, from using the beach. To this day, numerous signs are posted in and about the area of the Children's Pool, warning the public that bacteria levels exceed safety standards and that swimming is allowed but not recommended. [Exh. 410.] All of these factors, when taken together, conclusively establish that practically, as well as constructively, access to the beach has been denied to the intended beneficiaries of the trust grant, including children, swimmers, fishermen and the public generally.

The City has taken the position that it has fulfilled its duties as the trustee of the Children's Pool, which it admits is a unique piece of property. The City argues that it has attempted to reasonably and delicately balance the competing interests of its citizens and its legal duties in light of all the available

information.  The City contends that Plaintiff merely wishes to impose her own personal opinion upon the discretion of the City as trustee, to the detriment of a broader range of unspecified recreational purposes.    The City further contends that Plaintiff is merely the representative of a "small, elite special interest group" and that the Plaintiff seeks a result which is contrary to the Legislature's intent of preserving a broad range of permissible recreational and other purposes for the property.  The City also argues that Plaintiff's requested relief, to order the City to remove the seals from their "natural habitat," is prohibited by the Marine Mammal Protection Act (hereinafter "MMPA") and the doctrine of separation of powers.

The City's position is refuted by its own evidence.  As pointed out above, the City Manager has repeatedly advised the City that the 1931 grant of the Children's Pool is for the public to have use of a unique sheltered pool in the ocean, with particular emphasis on its being used by children.  Further the City has been repeatedly advised by its City Manager and NMFS that the City can take appropriate action to remediate the safety and health situation at Children's Pool without violating the MMPA.

The MMPA outlaws the "taking" of marine mammals, which can consist (under Section B harassment) of an act of pursuit, torment or annoyance, which has the effect of disrupting a marine mammal in the wild from its natural environment.    Exceptions exist under §109(h), which permit such taking, even without a permit from the Department of Commerce, in the case of damage to public or private property, or threats to public health or safety by the animals or by non-lethal measures, should the marine mammals constitute a nuisance.  The City knew as early as 1997 that under these exceptions it could deter the seals at the Children's Pool. [Exh. 634.]  The City voted to take no action to protect the Children's Pool.

As early as 1999, the West Coast Administrator of NOAA, James Lecky, wrote Terry Williams at the City to advise the City that provisions existed in the

federal law that permitted the City to address human health and safety issues posed by marine mammals. [Exh. 205.] Mr. Lecky repeated this advice to the City on numerous subsequent occasions. The City has elected not to avail itself of the applicable provisions of federal law that would permit it to address the health and safety issues presented at Children's Pool. To this date, those conditions persist unabated.

Plaintiff also contends that "Pro-seal activists" have been permitted by the City to conduct themselves in a manner that effectively denies access to the Children's Pool to swimmers, fishermen and other users of the Pool, beach and adjoining areas. The evidence shows that certain individuals have engaged in uncivil, and on occasion, illegal conduct. They have stalked intended users of the Pool with cameras and other devices in order to heckle and harass them. [Exh. 403.] There have been instances of verbal and physical abuse and violence. On several occasions, the San Diego Police have been called to the scene. One person, in attempting to discourage people from using the Children's Pool, has been arrested at least twice and is the subject of three restraining orders from this court. Private parties requested two of them and City lifeguards on duty at the Pool requested the other. That restraining order was issued in July 2005.

It is clear that these activities do discourage people from using the Children's Pool. However, the evidence is that the San Diego Police and Lifeguards are responding to complaints of harassment and are enforcing city and state laws when violations occur. Based on the record before this court, a restraining order will not be issued imposing any requirements or restrictions on City law enforcement personnel or directing the City to take any additional steps or refrain from any particular conduct in regard to members of the public expressing their opinions at the Children's Pool.

## BREACH OF FIDUCIARY DUTY

Plaintiff next contends that the City as trustee, has knowingly and willfully violated its fiduciary obligations to its beneficiaries. As a basis for this claim, Plaintiff cites to the City closing the beach in 1997, which it claims it has never reopened. The lifeguards have not been kept current on the official status of the Children's Pool. The City knew of the release of harbor seals near the Children's Pool by Hubbs-SeaWorld and did nothing about the build-up of seals at the Pool. The City violated the right of the public to have access to the beach by roping off the beach to the public. The City kept the rope in place from 1999 until late 2004. [Exh. 321.] The City failed to prosecute violations of its own municipal codes, ordinances and regulations that would regulate the presence and activities of activists at the beach, including use and placement of signs, harassment of the public and other similar activities.

As further evidence of breach, Plaintiff contends that the City failed to place wordage required by San Diego County on signs it posted at Children's Pool. The City assured the County in 2003 it would incorporate the required wordage on the new signs posted at the Children's Pool. The County also left approximately 12 copies of the new required County sign with the City, with the understanding the signs would be installed at the Children's Pool. The signs were not installed as promised. Also, the sign created by the City did not contain the warning information required by the County. The County had to personally install the correct signs at Children's Pool. [Exh. 409.]

The City responds to Plaintiff's contentions by arguing that "[a]s trustee, the City is held to administer the Trust with reasonable care, skill, and caution under the circumstances then prevailing. The evidence has clearly shown that the City has and continues to draw from all the available resources in determining the best way in which to manage the trust property." [City's Written Argument at 10.] To the contrary, the evidence is that the City has taken no steps to manage the property so as to preserve the Children's Pool for

the purpose and uses for which its was constructed and granted to the City as trustee for the people of California.

The City attributes the "current condition" at the Children's Pool as "merely a result of the natural evolution of undisturbed conditions in the area, including the seals' natural behavior to haul out on the beach. . . . Therefore, the City has taken and continues to take all reasonable steps available under these unique circumstances to address the difficult and delicate issue of how to manage the Trust area." [Id at 11.]

As shown in some detail in the first portion of this decision, the Children's Pool is not a "natural condition." It is a man-made, artificial condition that transformed a very small portion of the Pacific Ocean shoreline from open-ocean conditions, subject to significant wave action, undertow and rip currents, to an enclosed area protected from such ocean conditions. The former condition can present a danger to novice swimmers, especially small children, while the latter creates an ocean swimming experience but with the safety attributes similar to a municipal swimming pool.

As to the City's contention that it has taken "all reasonable steps" to manage the Trust, this contention is not supported by the evidence. As discussed above, the Children's Pool is no longer a pool, since most of the area for the Pool is now filled with beach sand. What water there is in the Pool is toward the end of the Pool and is subject to rip currents and other ocean-water dangers. It is no longer the sheltered Pool that was created by the breakwater in 1931. "[T]he public interest in the [San Diego] tidelands--which the City holds in trust for the people of the State of California--necessarily includes their protection and preservation." (State of California ex rel. California State Lands Comm'n v. City of Long Beach (2005) 125 Cal. App. 4th 767, 779.) The City has failed to preserve and protect the tidelands subject to the 1931 grant, to wit: the Children's Pool.

There is no evidence the City has ever removed the sand build-up in the Pool since it has "managed" the trust area. Likewise, since the Pool water became unsafe for human use in 1997, the City has taken no steps to eliminate the pollution in the Pool. There is no evidence before this court that removing the sand build-up or reducing the pollution level of the Pool water is impossible, or unreasonably difficult or expensive. To the contrary, the City Manager has recommended on numerous occasions that the City undertake these very steps of reasonable management, which the City has failed to do.

Therefore the court concludes that the 1931 Grant requires, at a minimum, the Children's Pool be reasonably available for the purposes and uses specified by the State of California in the Grant. This requires the City to manage and maintain the granted lands for the use of the people of California, the beneficiaries of the Grant. This includes swimming, fishing and related recreational pursuits. The Pool has not been available for such uses since 1997. The City has failed to restore the property for such uses despite the fact it has had the means and ability to do so. The City has breached its obligations as trustee under the 1931 Trust.

Plaintiff asks this court to order the City to remove a surveillance camera, which had been installed at the Pool. The camera is intended to assist the City in policing the Children's Pool and the surrounding area. Plaintiff contends that photographing people making recreational use of a public recreational facility is unwarranted and poses an additional and significant deterrent to the free, open and public-recreational use of the property. The use of such a camera in a public facility, for which the City is obligated to provide police protection, rests within the sound discretion of the City. No evidence of abuse or improper use of the camera has been show. Based on the record before the court, no restrictions on the use of the camera will be imposed.

### REMEDIES

As stated above, the court will not order the City to modify its law enforcement activities at the Children's Pool or remove the surveillance camera located at the Pool. The City argues this court does not have the authority to order it to take any action in regard to the Pool, because such actions would be discretionary. If the Children's Pool were a "natural" beach, as argued by the City, such a position might have merit. This court probably would not order the City to clean up a dirty or contaminated "natural" beach where the City was not the direct cause of the contamination.

However, the Children's Pool is not a "natural" condition. It is a man-made, artificial condition, which was entrusted to the City for specific uses and purposes. The City has knowingly declined to remove sand from the Pool, even though the sand has reached the point where the Pool in reality cannot be used for its intended purpose. Although the City has approved requests to study the removal of the sand, even as recently as September of 2004, it has consistently failed to remove the sand that has been building-up for the last 70 years.

The presence of unhealthy levels of bacteria from seal feces in the pool water has been consistently left un-addressed by the City. The substantial increase in the number of seals using the Children's Pool seems to have some relationship to the actions or inactions of the City. The creation of the Reserve in close proximity to the Children's Pool and the release by Sea World of rehabilitated harbor seals in the kelp beds off-shore of the Pool, seem to have contributed to an increasing number of seals using portions of the Children's Pool in the mid-1990's. The City's decision to separate the seals from humans and then closing off the Pool to humans, likewise appears to have encouraged the seals to occupy more and more of the beach with ever increasing numbers.

The occupation of the Children's Pool does not seem to be a "natural" phenomenon. According to the evidence at trial, Children's Pool is the only public beach in California that has been taken over by seals. The City was

warned in 1997 that if it did not discourage the seals from hauling-out at the Children's Pool, the number of seals present at the Pool would greatly increase. In response to the situation, the City put up barriers to keep the public out of the Pool area. To date, the City has taken no steps to reduce the level of pollution at Children's Pool.

Therefore, in order to protect the rights of the people of California to the full use and enjoyment of a unique asset, the Children's Pool, the City, as trustee of the Children's Pool, is hereby ordered to employ all reasonable means to restore the Pool to its 1941 condition by removing the sand build-up and further to reduce the level of water contamination in the Pool to levels certified by the County of San Diego as being safe for humans.

Nothing contained in this order shall be construed as requiring the City to violate any law, rule or regulation of any federal, state or county government. The court will maintain jurisdiction to oversee compliance with this order. This order shall be fully complied with no later than six (6) months after the date this order is issued. The City is directed to file a report with this court, no later than sixty (60) days following entry of this order, setting forth what steps it has undertaken and intends to undertake to comply with this order.

IT IS SO ORDERED.

Dated: _August 25_, 2005

JUDGE WILLIAM C. PATE
Judge of the Superior Court

-31-

Exhibit K



Proposed Excavation Area

200 ft.

Proposed New Shoreline

SITE PLAN

Exhibit L

## CHAPTER 937.

*An act granting certain tide and submerged lands of the State of California to the city of San Diego, San Diego county, in said state, upon certain trusts and conditions.*

[Approved by the Governor June 15, 1931.   In effect August 14, 1931.]

*The people of the State of California do enact as follows:*

SECTION 1.   There is hereby granted to the city of San Diego, county of San Diego, all the right, title and interest of the State of California, held by said state by virtue of its sovereignty, in and to all that portion of the tide and submerged lands bordering upon and situated below the ordinary high water mark of the Pacific ocean described as follows: — Grant of tidelands to city of San Diego.

Beginning at the intersection of the ordinary high water mark of the Pacific ocean with a line bearing S. 87° 40′ W. from the monument marking the intersection of Coast boulevard south with Jenner street as said monument, said Coast boulevard south and said Jenner street are designated and shown on that certain map entitled "Seaside subdivision number 1712" and filed June 23, 1920, in the office of the county recorder of San Diego county, State of California; thence N. 350′, thence E. 300′, thence S. 185′ more or less to the ordinary high water mark of the Pacific ocean, thence in a general southwesterly direction along the ordinary high water mark of the Pacific ocean to the point of beginning, all — Description.

in the Pacific ocean, State of California, to be forever held by said city of San Diego and its successors in trust for the uses and purposes and upon the express conditions following, to wit:

Uses.    (a) That said lands shall be devoted exclusively to public park, bathing pool for children, parkway, highway, playground and recreational purposes, and to such other uses as may be incident to, or convenient for the full enjoyment of, such purposes;

Fishing.    (b) The absolute right to fish in the waters of the Pacific ocean over said tidelands or submerged lands, with the right of convenient access to said waters over said lands for said purpose is hereby reserved to the people of the State of California.

Reservation of minerals, etc.    (c) That there is excepted and reserved to the State of California all deposits of minerals, including oil and gas, in said land, and to the State of California, or persons authorized by the State of California, the right to prospect for, mine and remove such deposits from said land.