1    Paul R. Kennerson, State Bar No. 45430
     **KENNERSON & GRANT**
2    101 West Broadway, Suite 1150
     San Diego, CA  92101
3    Telephone:    +1 619 236 1255
     Facsimile:    +1 619 236 0555
4    Email:        paul@kennersongrant.com

5    Attorneys for Proposed Intervenor
     VALERIE O'SULLIVAN
6

7

8                    UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10   ANIMAL PROTECTION AND RESCUE          Case No.  07 CV 2320 JM (AJB)
     LEAGUE a nonprofit corporation, and
11   DOROTA VALLI, an individual,          **EXHIBIT 2: NOTICE OF LODGMENT
                                           IN SUPPORT OF MOTION TO
12              Plaintiffs,                INTERVENE**

13         v.                             **DATE:   2/22/08
                                           TIME:   1:30 P.M.
14   THE STATE OF CALIFORNIA, THE CITY     CRTRM: 16**
     OF SAN DIEGO DEPARTMENT OF PARKS
15   AND RECREATION, MAYOR JERRY
     SANDERS, and DOES 1 to 100,
16
                Defendants.
17

18

19

20

21

22

23

24

25

26

27                                        **Exhibit _2_, Page 36**

28

SDODMS1/685283.1

F I L E D
Clerk of the Superior Court

OCT - 4 2005

By: C. LUNT, Deputy

1

2

3

4

5

6

7

8                        SUPERIOR COURT OF CALIFORNIA

9                            COUNTY OF SAN DIEGO

10

11   VALERIE O'SULLIVAN,              )    CASE NO. GIC 826918
                                      )
12          Plaintiff,                )    JUDGMENT
                                      )
13       v.                           )
                                      )
14   CITY OF SAN DIEGO, a municipal entity, )
15   and FOES 1 through 500, inclusive, )   Judge:    Hon. William C. Pate
                                      )    Dept.:    60
16          Defendants.               )
                                      )
17   ─────────────────────────────────)

18

19          This matter came on for trial in Department 60 before the Honorable

20   William C. Pate, sitting without a jury, on July 26, 2005 through August 1,

21   2005.  Plaintiff VALERIE O'SULLIVAN, a private citizen in her capacity as a

22   private attorney general under C.C.P. Section 1021.5, appeared by and through

23   her attorneys, Kennerson & Grant, LLP, by Paul Kennerson, Esq.  Defendant

24   CITY OF SAN DIEGO, a municipal entity, appeared by and through its

25   attorneys, the Office of the City Attorney, by Debbie Smith, Esq.  Defendant

26   STATE OF CALIFORNIA, acting by and through the STATE LANDS

27   COMMISSION, did not appear, having stipulated to be bound by any judgment

28   entered by this Court.

Exhibit 2, Page 37

-1-

Evidence was received, both testimonial and documentary. At the conclusion of trial, the Court requested counsel to submit statements of argument regarding the legal and factual issues raised during the course of the trial. Upon receipt of these statements, the Court took the matter under submission to consider the contents of each, together with the evidence received. On August 25, 2005, the Court issued its Tentative Statement of Decision and heard oral argument from counsel on August 26, 2005. Upon hearing oral argument, the Court issued its Final Statement of Decision.

The Court, having made its Statement of Decision, which has been signed and filed and which is attached to this judgment as Exhibit A, hereby orders that judgment be entered in favor of Plaintiff as follows:

1. Plaintiff shall have judgment against Defendant City of San Diego on her claim of breach of trust.

2. Plaintiff shall have judgment against Defendant City of San Diego on her claim for breach of fiduciary duty.

3. Plaintiff shall have judgment against Defendant City of San Diego on her request for declaratory relief as set forth in Exhibit A; and the Court orders the following injunctive relief:

4. Defendant City of San Diego is ordered to employ all reasonable means to restore the Children's Pool to its 1941 condition by removing the sand build-up and further to reduce the level of water contamination in the Children's Pool to levels certified by the County of San Diego as being safe for humans.

5. The Court will maintain jurisdiction to oversee compliance with this order. This order shall be fully complied with no later than six (6) months after the date this order is issued. The City is directed to file a report with the Court, no later than sixty (60) days following entry of this order, setting forth what steps it has undertaken and intends to undertake to comply with this order.

**Exhibit _2_, Page _38_**

1    Plaintiff is the prevailing party and shall receive her costs in the amount

2  of $_____.

3  Dated: _Oct. 4_, 2005

JUDGE WILLIAM C. PATE
Judge of the Superior Court

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

**Exhibit _2_, Page _39_**

F I L E D
Clerk of the Superior Court

AUG. 2 6 2005

By: K. LANTZ-JONES, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

VALERIE O'SULLIVAN,                    )    CASE NO. GIC 826918
                                       )
              Plaintiff,               )    FINAL STATEMENT OF DECISION
                                       )
         v.                            )
                                       )
CITY OF SAN DIEGO, a municipal entity, )
and FOES 1 through 500, inclusive,     )
                                       )
              Defendants.              )
                                       )
                                       )
                                       )
                                       )

The court, having heard the testimony at trial and the argument of counsel and having considered the pleadings, evidence and declarations filed herein, makes the following factual findings and conclusions of law.

**FACTUAL FINDINGS**

On June 21, 1930, Ellen Browning Scripps, through her Attorney in Fact, Dr. J. C. Harper (hereinafter "Harper") wrote the Mayor and City Council of San Diego for permission to construct a "concrete breakwater in the Pacific Ocean at La Jolla." The stated purpose for the breakwater was to "create a Bathing Zone adjacent to the City of San Diego's La Jolla Park and City

-1-

Exhibit 2, Page 40

Streets." The letter notes that the breakwater "will be outside the City of San Diego but adjacent to the park and streets." [Exh. 546.] On June 26, 1930, hydraulic engineer H. N. Savage (hereinafter "Savage") also wrote the City of San Diego (hereinafter "the City") on behalf of Ms. Scripps requesting permission to construct the breakwater. He enclosed with his letter plan drawings of the proposed breakwater. In this letter, Savage states the purpose of the breakwater "is to create a bathing pool" and the cost would be "in the vicinity of $50,000." [Exh. 547.] On June 30, 1930, the San Diego City Council passed Resolution No. 54177, granting permission to Ellen Browning Scripps to construct a "concrete breakwater in the Pacific Ocean at La Jolla, California . . ." [Exh. 11.]

Savage was the Engineer-in-Charge of the project and wrote a "Feature History" of the project, a copy of which can be found in the San Diego Public Library. Since there does not appear to be anyone alive who was in a position of authority with regard to the approval and construction of the breakwater feature, Savage's history provides the court with what appears to be the most accurate history of the children's pool project. [Exh. 32.] Based on that history, the following findings are made.

In 1922, Ms. Scripps and Harper invited Savage to determine the "practicality and feasibility of the accomplishment of a bathing pool for children in the Ocean at La Jolla, California." [Id. at 64.] For several months thereafter Mr. Savage conducted "world wide research" and on March 22, 1923, submitted a report to Ms. Scripps. The report contained recommendations for constructing a bathing pool in the ocean in front of the location of the Casa de Manana Hotel.

Several years later, in May 1930, Ms. Scripps' representatives "invited [his] cooperation in the accomplishment of the projected splendid gratuity-bathing pool for children at La Jolla." [Id.] Savage, apparently having accepted the invitation, met on June 6, 1930 with a representative of the United States

-2-

1  War Department preliminary to applying to the War Department for permission
2  "to construct the breakwater feature of the projected bathing pool." [Id.]
3       On June 20, 1930, Ms. Scripps authorized construction of the pool as a
4  gift to children.   Savage's services on the project were also a gratuity to
5  children.  The next day, formal application was made to the War Department
6  requesting permission to construct the breakwater feature of the pool. [Id. at
7  64 – 65.]  At the same time, application for permission to construct the pool
8  was made to The State of California, Department of Public Works, and the City
9  of San Diego, Mayor and "Common council," as well as the City's Board of Park
10 Commissioners and Board of Playground Commissioners.
11      As noted above, permission from the City was granted on June 30, 1930.
12 [Id. at 16.]  The Board of Playground Commissioners took no action because
13 the pool was not being constructed on property "under the control of the
14 Playground  Commission."   However,  the  President  of  the  Playground
15 Commission stated "the Board will be happy . . . to cooperate with you in the
16 maintenance and construction of same after it is completed, in so far as our
17 jurisdiction will permit." The City Park Department approved the construction
18 on July 22, 1930.  [Id. at18.]  The War Department issued a construction
19 permit on September 2, 1930. [Id at 19.]
20      Savage wrote the Attorney General for California, U.S. Webb, to clarify
21 the legal requirements for approval of the pool project by the State of
22 California.  In that letter, Savage confirmed his understanding of the position
23 expressed by the Attorney General at a September 4, 1930 meeting.   In
24 summary, Savage concluded "that an Act of the California State Legislature
25 alone could legally authorize the gratuitous construction . . . of the breakwater
26 structure necessary to control Pacific Ocean water sufficient to provide a safe
27 bathing pool at the site selected, . . . until an Act of the California State
28 Legislature could be obtained, only the California State Attorney General could
   initiate the legal steps necessary to prevent the construction of the projected

Exhibit 2, Page 42

bathing pool breakwater, and . . . appreciating the gratuitous perpetual non-commercial character of the projected undertaking, . . . it would be entirely proper for the work to be immediately put under construction . . . having in mind the extreme age and failing health of Miss Scripps, and . . . out of . . . unprecedented official constructive cooperation gave me your assurance of further constructive cooperation to the extent you find proper . . . in advancing the accomplishment of an Act of the next Legislature, legally confirming the accomplishment of the gratuity." [Id. at 24.] On September 17, 1930, Attorney General Webb responded to Mr. Savage's letter and stated "approval is expressed to all said by you therein." [Id. at 23.]

With actual or tacit approvals in hand, on September 15, 1930, Ms. Scripps awarded the construction contract to W.M. Ledbetter & Company. Two days later, equipment arrived on site and construction commenced. [Id. at 78.]

According to Savage, "[t]he purpose of the project was to create a safe bathing pool for children, sheltered from the ocean surf and winds." [Id. at 5.] The project itself consisted of a "breakwater three hundred feet long with its top twelve feet above mean sea level. The breakwater extends from a bluff at the edge of the ocean out in a sweeping curve [from north to northeast] along a natural low barrier reef between the pool and the ocean."

"Access to the pool is provided for by the construction of concrete reinforced stairways from the top of the bluff down to the sand beach, also from the top of the bluff down to the wide walkway which extends along the top of the entire breakwater. The inside of the breakwater is terraced making access from the walkway along the entire length of the breakwater inside down to the sand beach."

"The park area on the bluff adjoining the pool was improved by grading and the construction of parapet walls, and curbs. Shrubs have been planted and benches provided." [Id at 4.]

-4-

Exhibit _2_, Page _43_

In addition to the above improvements, a cable was stretched across the open end of the pool, anchored on the far end of the breakwater and the cliff face on shore. Ropes hung from the cable approximately eight (8) feet apart. Drainage was also constructed to divert water from running over and down the face of the bluff and instead into the City's storm drain system. [Id. at 6.]

The construction proceeded relatively smoothly, with some unanticipated delays. The project was essentially completed on February 10, 1931. [Id. at 134.] On June 1, 1931, Ms. Scripps gave the Children's Pool to the City of San Diego. [Exh. 1.] On June 11, 1931, the Common Council of the City adopted Resolution 56609 whereby it "express[ed] to this generous friend of humanity its most cordial thanks, on behalf of the children and citizens generally of the City of San Diego, for the unprecedented tidal bathing pool for the younger generation which has recently been constructed in ocean water on the shores of La Jolla, . . . ." [Exh. 19.]

On June 15, 1931, the Governor of California signed Statute No. 937 of the laws of 1931, which granted to "the city of San Diego, . . . all right, title and interest of the State of California, . . . in and to all that portion of the tide and submerged lands bordering upon and situated below the ordinary high water mark of the Pacific ocean described as follows:

"Beginning at the intersection of the ordinary high water mark of the Pacific ocean with a line bearing S. 87° 40′ W. from the monument marking the intersection of Coast boulevard south and Jenner street as . . . shown on that certain map entitled 'Seaside subdivision number 1712' and filed June 23, 1920 . . . ; thence N. 350′, thence E. 300′, thence S. 185′ more or less to the ordinary high water mark of the Pacific ocean, thence in a generally southwesterly direction along the ordinary high water mark of the Pacific ocean to the point of beginning, all in the Pacific ocean, State of California, to be forever held by the city of San Diego and its successors in trust for the uses and purposes and upon the express conditions following, to wit:

-5-

Exhibit 2, Page 44

1    seal activity concentrated between the months of January and May." [Exh.
2    238.]
3        The issue of establishing a Marine Mammal Reserve in the Seal Rock
4    area of La Jolla came before the San Diego Park and Recreation Board in
5    October, 1992. This area was to begin about 100 yards east of the Children's
6    Pool. [Exh. 588.] The Director of the Board recommended posting signs in the
7    Seal Rock area advising it is unlawful to harass or disturb marine mammals
8    and signs to educate the public about marine mammals.    He also
9    recommended establishing a volunteer docent program and solicitation of
10    private funds to finance a two-year study of the uses of the Seal Rock area by
11    harbor seals. [Exh. 581.]
12        The subject of a marine mammal reserve (hereinafter "the Reserve") came
13    before the City Council Committee on Public Facilities and Recreation on
14    November 25, 1992, with a recommendation by the City Manager to essentially
15    adopt the Park and Recreation Board recommendations, with the exception
16    that the Reserve be established for a five-year period. [Exh. 588 at 1.] The City
17    Manager's recommendations were adopted. [Exh. 583.] The water and land
18    within the reserve would be "off-limits to human and pet intrusion." [Exh. 588
19    at 5.] In making these recommendations, the City recognized that marine
20    mammal populations in the area of Seal Rock, and harbor seals in particular,
21    had increased during the prior ten years. [Id. at 4.] The City Manager was
22    directed to meet with Ms. Bamburger to fix the boundaries of the Reserve.
    [Exh. 583 at 1.]
23        A Request for Council Action was sent to the City Attorney on December
24    3, 1992, recommending a reserve with a fixed boundary beginning 200 feet east
25    of the seaward entrance to the Children's Pool. [Exh. 584, attached map.] The
26    City Attorney approved the request, and the recommendation for the Reserve
27    came before the City Council on February 1, 1993. [Exh. 585.] It passed
28    unanimously after an amendment that extended the boundaries "to include the

-7-

Exhibit 2, Page 45

compromise area that goes practically to the beach that was presented by Barbara Bamburger. This discreet area shall be in effect for five years on a trial basis and is off limits to swimmers, divers and tourists. Access to the riptide is not affected because the divers can come in and go out through the Children's Pobl." [Exh. 586.] The ordinance was formally adopted on February 22, 1993. [Exh. 589.]

On or about October 25, 1993, Jane Sekelsky, Chief, Division of Land Management, State Lands Commission (hereinafter "SLC"), sent a letter to Carl Lind, a private citizen, copied to Robin Stribley, Natural Resources Manager, Park and Recreation District, City of San Diego. The letter concerned the creation of a marine mammal preserve within an area encompassed within a statutory trust grant. The SLC, on behalf of the State of California, expressed its concern that the Reserve may prohibit activities specifically reserved to the people of the State of California. Such activities include "the absolute right to the public use of said tidelands and to fish in the waters thereof, with the right of access to said waters over tidelands for said purpose." [Exh. 67.] The Legislature has vested in the SLC: "All jurisdiction and authority remaining in the State as to tidelands and submerged lands as to which grants have been or may be made," and has given the commission exclusive administration and control of such lands. (Pub. Resources Code § 6301.)

The SLC then followed up with a clarifying letter dated November 15, 1993, addressed to Ms. Stribley and Barbara Bamburger. In that letter, SLC more thoroughly advised the City of its rights and obligations in regard to lands over which it is the trustee. The State stated that "[t]he proposed ordinance is clearly inconsistent with the provisions of Chapter 937, Statutes of 1931. To ban public recreational uses as proposed would violate the specific provisions of the statute and the City's responsibility as Trustee." [Exh. 70.] The court recognizes that the Reserve is situated within the broader tidelands grant of 1933 and not the much more narrowly and specifically worded grant of 1931.

-8-

Exhibit 2, Page 46

1    However, the court finds that the letter from the SLC placed the City on notice,
2    as of November 1993, of its legal obligations under the 1931 statutory grant of
3    public trust land.

4        On November 18, 1993, the California Coastal Commission approved the
5    establishment of the Reserve in the vicinity of Seal Rock.  [Exh. 606.]  The
6    approval was conditioned on the City obtaining approval of the SLC and the
7    boundaries of the Reserve not including any "sandy beach area."  The
8    requirement to obtain SLC approval apparently prompted the City to obtain a
9    legal opinion from the City Attorney and to survey the areas of the Children's
10   Pool grant and the 1933 grant.  In a memorandum dated December 17, 1993,
11   the City Attorney opined that the SLC erroneously concluded that the Reserve
12   area was within the 1931 grant, when it was really within the 1933 grant.
13   Since the City surveyed the area and found the Reserve did not lay within the
14   1931 grant, the City Attorney concluded the designation of "a small preserve
15   for marine mammals is clearly consistent with the uses of tidelands" under the
16   1933 grant.  The issues involving the Reserve are relevant as notice to the City
17   of its rights and obligations under the 1931 grant as contrasted with the 1933
18   grant.

19       On January 25, 1994, the SLC, upon further review, concluded the
20   Reserve did not violate the conditions of the 1933 grant, which granted to San
21   Diego trust rights over all "[s]tate owned Public Trust Lands within the Pacific
22   Ocean and the City limits (not already granted-such as the Children's Pool) to
23   the City of San Diego."  The SLC distinguished the broad provisions of the 1933
24   grant and the "restrictive provisions" of the 1931 grant which "impact[s] the
25   area of the Children's Pool."  [Exh. 597.]

26       The California Fish and Game Commission (hereinafter "Fish and Game")
27   declined to take any action in regard to the Reserve.  However, in its March 30,
28   1994 letter to the City, Fish and Game cautioned the City about interfering
     with "the public's right to fish in State waters."  [Exh.598.]  On July 25, 1994,

Exhibit 2, Page 47

the City Council amended the ordinance establishing the Reserve to comply
with the requirements of the Coastal Commission and to permit fishing
pursuant to the request of Fish and Game. [Exhs. 599, 600 & 601.]

On September 30, 1996, the City Council accepted donations for
improvements to the Children's Pool. [Exh. 608 & 609.]

The Natural Resources and Culture Committee (hereinafter "Natural
Resources"), on October 1, 1997, received an informational report from the City
Manager about the "Closure of Children's Pool." The report noted that the Pool
had been closed to "water contact since September 4, 1997 due to continuously
high fecal coliform counts." Obvious forms of contamination had been ruled
out and it was believed that the source was harbor seal feces. This had not yet
been confirmed, but laboratory tests were being conducted. [Exh. 611.]

The City Manager then discussed the City's lack of understanding of the
reasons for "this unusual contamination level." The City did know that
"[h]arbor seal populations have steadily increased off the west coast over recent
years. This is evidenced at Children's Pool by an increased number of seals
using the area." The City noted that a potential cause of the increase in the
number of harbor seals at the Children's Pool was the nearby Reserve, which
was three years into its five-year trial. Another potential cause was that "for
the last year and a half, [City] lifeguards have erected barriers between seals
hauled-out on the sand at Children's pool and the public." The barrier was to
protect the public "from being bitten by a wild animal" or being fined for
disturbing the seals.

The City Manager took the position that "[i]f the high contamination level
both proves to be due to seals, and continues, it is the City's intent to find a
solution which allows the peaceful co-existence of humans and seals at
Children's Pool, to the extent the public health can be protected." He also
recognized "[s]ince public health is potentially at risk, the federal Marine
Mammal Act allows the City to take non-injurious actions which would reduce

-10-

1  or eliminate seal usage of Children's Pool." He then described various non-
2  injurious methods that could be used and declared that "permanent closure of
3  Children's Pool to the public is not being considered." [Id.]

4     The following month, on November 18, 1997, representatives of various
5  agencies and organizations met to discuss seals at Children's Pool.
6  Representatives from National Marine Fisheries Service (hereinafter "NMFS"),
7  Fish and Game, Scripps Institute, Sea World, The Zoo, Park and Recreation,
8  Lifeguards, and Council District 1 attended. [Exh. 613.] Apparently the
9  meeting did not result in any action to address the seal situation at Children's
10 Pool.

11    On December 10, 1997, the NMFS, an agency of the United States
12 Department of Commerce, advised the City that "[w]hen Seal Rock was
13 designated as a temporary reserve in 1994, a small number of harbor seals
14 were utilizing the rock as a haul-out, while no animals were hauling out at
15 Children's Pool Beach (CPB). According to [a] report, in 1996 the maximum
16 number (62) of animals observed hauling out, on the rock occurred in April,
17 while the maximum number (120) of animals observed hauling out at CPB
18 occurred in June. Based on these data it appears that animals are preferring
19 CPB over Seal Rock as their major haul-out site. This trend will most likely
20 continue into the near future as the local seal population continues to increase
21 in size." [Exh. 203.]

22    NMFS also concluded that the seals at Children's Pool appear to be
23 acclimating to humans and the effectiveness of the Reserve as a seal sanctuary
24 is questionable. "Because, the harbor seal population both locally and
25 statewide is healthy and increasing," removing Seal Rock as a Reserve will have
26 no adverse effect on the seals. [Id.]

27    In January 1998, Hubbs-Sea World Research Institute published a
28 report of seal activity at the Reserve and Children's Pool. The report was based
   on photographs taken of each location every 30 minutes from November 1995

Exhibit 2, Page 49

through September 1997. In most months, the peak count was significantly higher for the Children's Pool than the Reserve. [Exh. 245.]

In February, the City Manager updated Natural Resources on the Children's Pool closure. The report confirmed that the contamination was the result of "a seal excrement overload for Children's Pool." For fifteen years before 1994, the water quality in the Children's Pool met safe standards except on rare occasions. The report seemed to reasonably reject scaring away the seals from the beach or Pool, relocating them or physically preventing their entering Children's Pool. The "action plan" proposed was to discontinue placing barricades on the beach in the hope the seals will use the beach less if there were more human interaction and to hire a consultant to develop a plan for opening the sluiceways in the breakwater. It was believed the open sluiceways would increase the amount of water in the Pool and reduce the size of the beach. The increase in water would further dilute the concentration of feces in the water and a smaller beach might discourage some of the seals from hauling out at Children's Pool and thereby reduce the number of seals at the Pool. [Exh. 111.] The Committee approved the Report recommending the hiring of a consultant in regard to re-opening the sluiceways. [Exh. 617.]

Prior to the May 6, 1998 meeting of Natural Resources, the City Manager provided another report. This time the City Manager recommended returning the barricades to separate the seals from the public. The removal of the barricades did not have the desired effect of reducing the seal population at the Pool. Also, complaints by public members of interactions between humans and seals were distracting the lifeguards from their public safety duties. For these reasons, the City Manager recommended the barricades be returned to the Pool. [Exh. 112.]

The report also concludes that re-opening the sluiceways was feasible, but three-quarters of the sand on the beach would need to be removed, in order to return the beach to its 1931 configuration. The City Manager

Exhibit 2, Page 50

1    recommended the sand removal.    [Id.]    The Committee's action was to
2    recommend that the City Council direct the City Manager to apply for a Coastal
3    Development Permit to remove the sand and re-open the sluiceways.    [Exh.
4    619.]

5          In August, 1998, the City was advised by the Center for Disease Control
6    that seals can transmit diseases to humans.    "Some seals can carry
7    tuberculosis and Giardia.  Fecal contaminant bacteria and viruses would also
8    be a potential concern." [Exh. 165.]

9          On December 22, 1998, the City requested authorization from the NMFS
10    to remove sand from the beach.    Dredging sand from the beach could
11    constitute an "incidental harassment" of the seals. [Exh. 255.] In justifying its
12    request, the City represented that the breakwater was constructed to provide a
13    sheltered swimming area for children; that the Pool has consistently been a
14    popular attraction with a broad range of users who have come to rely on the
15    Pool for beach recreation and water access; that skin and SCUBA divers
16    depend on the Pool in order to safely enter and exit the water; that the beach
17    behind the breakwater has gradually widened as sand accumulated in the Pool.
18    By 1998, the shoreline at the Pool had advanced to near the end of the
19    breakwater, at the mouth of the Pool. This resulted in very little protected area
20    for recreational swimming.  In addition, the swimming area had moved to
21    within a close proximity to dangerous rip currents and their attendant safety
22    concerns.    Lifeguard rescues had increased because of this dangerous
23    condition. [Exh. 623.]

24          The City stated that it could restore the Pool as "a safe swimming area
25    and [achieve] acceptable water quality [at] the Pool by reducing the beach
26    width."    The requested excavation would return the Pool to its early 1940's
27    condition, with an enlarged area "available for recreational swimming and a
28    safe region for the public to enjoy away from the dangerous rip currents." [Id.]

-13-

Exhibit 2, Page 51

1   The recommendation of Natural Resources to remove sand from the
2   Children's Pool came before the City Council on March 22, 1999. The
3   recommendation received four yeas and four nays, so the matter was tabled
4   until March 29, 1999. [Exh. 627.] On that date, the City Council voted "to not
5   dredge, not shoo the seals, instead put up a barrier to protect the humans from
6   the seals and the seals from the humans and send it back to the Natural
7   Resources Committee for an indepth (sic) review of all the issues including the
8   legality and how it was left in the will."[1] Following the vote, the City withdrew
9   its request for a coastal development permit from the California Coastal
10  Commission. [Exh. 88.] The next day, the rope barrier went up. (Exh. 133.)

11  On August 4, 1999, Natural Resources considered the issue of letting the
12  Reserve designation lapse. The City Manager, in his July 26 report,
13  recommended letting the Reserve lapse as of its sunset date of September 16,
14  1999.

15  In his report, the City Manager discussed the potential impact on
16  Children's Pool. He noted that the NMFS was considering whether to declare
17  Children's Pool a "natural haul-out and rookery." Such a designation would
18  impose a no-human-interference policy at the Children's Pool beach. NMFS
19  had held off on such a designation because the City was pursuing a "shared-
20  use-by-people-and-seals policy" and was working on a proposal to "address the
21  pollution at the Pool by reducing the size of the beach and thus the available
22  haul-out space for the seals." Since the City had "abandoned the shared use
23  concept and did not pursue the project to address the pollution, [NMFS]
24  assumes the City plans to maintain Children's Pool beach as a seals-only
25  beach. Therefore, the Service believes the next logical step would be to manage
26  Children's Pool beach as a permanent harbor seal haul-out and rookery." The
27  net effect would be that the public could not use the beach set aside for the
28  seals, nor could fishing occur in that area. [Exh. 643.] Natural Resources

---

[1] Ms. Scripps' gift was made during her lifetime and thus the Children's Pool is not subject to any will provisions.

Exhibit 2, Page 52

1  rejected the City Manager's recommendation and voted to recommend the
2  Reserve be continued for another five-year term. [Exh. 634.] On November 1,
3  1999, the City Council voted to make the Reserve permanent with a five-year
4  review. [Exh. 642.]

5      On October 19, 1999, NMFS advised the City that it did not favor public
6  beaches being closed to the general public due to harbor seals expanding their
7  range and colonizing mainland beaches. Further, NMFS did not agree with a
8  shared-use of Children's Pool by humans and seals. NMFS believed the City
9  should decide if the Children's Pool is to be used by humans or seals, not both.
10 [Exh. 205.)

11     On November 4, 1999, the City Attorney wrote the SLC inquiring whether
12 the SLC considered the closure of the Children's Pool, or usage of the Pool for
13 viewing seals, a violation of the 1931 Grant of Public Trust over the area of the
14 Children's Pool. [Exh. 73.]

15     In February 2000, the NMFS notified the City that it had decided to
16 manage the Children's Pool as a harbor seal natural haul-out and rookery.
17 NMFS based this decision on their understanding that harbor seals first began
18 hauling-out at Children's Pool in 1995, with ever increasing numbers and the
19 fact that in 1999, for the first time, seal pup births were documented at the
   Pool. [Exh. 655.]

20     On March 15, 2000, Fish and Game advised the City that the City did
21 not have the authority to create a seal reserve on public trust tidelands. Fish
22 and Game cited several bases for this opinion, including violation of the State
23 Constitution, preemption by Federal law and State law, and violation of the
24 1933 trust itself. [Exh. 75.]

25     On August 15, 2000, the SLC responded to the City's request for an
26 opinion. The SLC stood by their 1994 opinion that a small temporary seal
27 reserve would not violate the 1933 trust and urged the City "to exercise its
28 responsibilities in a flexible, balanced and thoughtful manner." However, the

-15-

Exhibit _2_, Page _53_

1  SLC did not address the City's inquiry concerning seals at the Children's Pool.

2  [Exh. 76.]

3      By letter of February 11, 2003, the NMFS advised the City that it could

4  not intentionally harass the seals at Children's Pool in order to remove them.

5  However, it could undertake activities that might temporarily displace the

6  seals. An example would be a dredging project intended to improve the water

7  quality at Children's Pool. [Exh. 668.]

8      On March 13, 2003, the California Coastal Commission advised the City

9  that the rope barrier the City had erected closing off most of the beach at

10  Children's Pool and access to the water at the Pool, needed a Coastal Permit.

11  The Commission was concerned that a supposed temporary situation had been

12  in place for four years and appeared to be permanent. [Exh. 98.]

13      On March 21, the County of San Diego informed the City that with the

14  adoption of AB 411 by the Legislature, the status of the Children's Pool had

15  changed from "closed" to "advisory", since the water contamination was not

16  due to a sewage spill. [Exh. 149.]

17      The City Council on April 1, 2003 considered the request of the Coastal

18  Commission to modify the permanent status of the Reserve. The City Manager

19  recommended that the City accept the permit with the special conditions. The

20  City Council declined to follow the recommendation and did not accept the

21  coastal permit with its special conditions. The Council directed that the

22  signage and the docent program continue and further directed the City

23  Manager to make a presentation before California's Marine Life Protection

24  Working Group, seeking advice on the "appropriate status for the area." Also,

25  the City Manager was directed to once again return to Natural Resources with

26  a report on "how, in compliance with federal law, to reduce pollution levels and

27  to return the Children's Pool to recreational use for children." [Exh. 672.]

28      On July 29, 2003, the Children's Pool Technical Advisory Committee met

to discuss ways to accomplish the directive of the City Council, for an

Exhibit 2, Page 54

1   unpolluted Children's Pool and a joint use of the beach at the Pool.    The
2   members of the Committee included representatives from the NMFS, Coastal
3   Commission, Fish and Game, County Environmental Health, Hubbs-Sea
4   World, Park and Recreation, lifeguards and other City representatives.  They
5   went over most of the proposed "solutions" that had been enumerated over the
6   years.  They concluded the most viable options were "1.  Dredge the beach in
7   conjunction with floating platforms; 2.   Close beach to public use; and 3.
8   Create a new Children's Pool and leave current Children's Pool for seal use."
9   [Exh. 285.]

10        On June 17, 2004, the City Manager provided Natural Resources with
11  another report on seals at Children's Pool.    This report laid out a
12  comprehensive plan for restoring the Children's Pool to an unpolluted and safe
13  condition. The plan was centered on dredging a substantial portion of the sand
14  at the Pool. It was believed this would restore the water quality in the Pool to
15  an acceptable level and relocate the water in the Pool further into the
16  breakwater area away from the open sea and dangerous rip currents.  The
17  estimated cost of dredging the Pool ranged from $250,000 to $500,000.
18  Another $50,000 would need to be budgeted annually to pay for anticipated
    dredging every three to five years. [Exh. 703.]

19        On June 23, 2004, Natural Resources considered the recommendations
20  of the City Manager.  The Committee voted to refer the matter to the full City
21  Council "with no recommendation." [Exh. 696.]

22        On or about August 13, 2004, the City posted new signs at the Pool
23  explaining that the rope was a "guideline to avoid disturbing the seals" and
24  that swimming was "not recommended" because of excessive bacteria levels.
25  [Exh. 215.]

26        On September 14, 2004, the City Council once again held hearings on
27  the Children's Pool.  Addressing the Council that day was James Lecky of the
28  NMFS.  He advised the Council that harbor seals are a healthy species which

-17-

**Exhibit 2, Page 55**

1  are growing in population and not in anyway endangered or threatened as a

2  species. In fact, as the population of harbor seals expands "[t]hey are causing

3  problems . . . up and down the coast in terms of invading harbors, causing

4  property damage and limiting access to beaches that are important for other

5  public uses." He then told the Council: "The tools that are available to the City

6  and other local governments agencies really reside in [Marine Mammal

7  Protection Act] §109(h)." He said "animals can be moved out of an area if they

8  are either presenting a public nuisance or they're causing a public health

9  hazard." It was his position that the seals at Children's Pool were a local issue

10 for the City to resolve. [Exh 129.] At the end of the meeting, the Council voted

11 "to design and permit the sand removal project and open the pool for year-

12 round use. Direct that the opening of the sluiceways in the Children's Pool be

13 evaluated as an alternative method to obtain the sand removal and tidal

14 flushing as part of this effort. Direct that the rope barriers and sign posts be

15 immediately removed to restore public access to the area and that new signs be

16 placed."

17     The City has not undertaken any meaningful steps to return the

18 Children's Pool to an unpolluted, safe and usable state since the meeting of

   September 14, 2004.

19                            CONCLUSIONS

20     In response to the conditions at Children's Pool, Plaintiff Valerie

21 O'Sullivan, a private citizen, brought this action, alleging violation by the City

22 of the 1931 statutorily-created public trust for the area know as Children's Pool

23 in La Jolla. Plaintiff seeks a declaration of the meaning of the 1931 statutory

24 grant to the City as trustee of the tidelands. [Exh. 20.] Plaintiff also alleges a

25 violation by the City of the trust and seeks to compel the City's compliance

26 with it, as well as other relief. The State of California has joined as an

27 indispensable party, and has stipulated to be bound by any judgment entered

28 by this court.

Exhibit 2, Page 56

-18-

The first issue Plaintiff asks the court to resolve is what was the intent of the California Legislature in creating the trust and granting the tidelands to the City as trustee under Statute 937 of the laws of 1931.

Plaintiff then seeks a determination of whether the City has violated the trust, and if so, as trustee, has the City breached its fiduciary duty to the people of California.    Last, Plaintiff seeks injunctive relief in the event of findings in Plaintiff's favor.

## LEGISLATIVE INTENT OF THE TRUST

The legislative intent in enacting the 1931 Trust, when viewed in light of the factual history of the Children's Pool, as set forth above, is clear.  When the one-plus acre was entrusted to the City, it consisted of a breakwater and appurtenances that created a sheltered area of Pacific Ocean shoreline.  This sheltered area was created so that children could safely swim in the ocean without being subjected to crashing waves, undertow and rip currents, all of which pose a danger to children and neophyte swimmers.  The Trust was intended to convey to the City an artificial ocean water pool suitable for the use of children.  As the recipient of the Trust and the Pool, it became the obligation of the City to maintain the Trust property in a manner suitable for its intended uses and purposes.

Reference to the wording of the Trust further demonstrates the legislative intent.  The Trust conveys the land, with children's pool constructed thereon: "For the uses and purposes and upon the express conditions following, to wit: (a) That said land *shall be devoted exclusively to public park, bathing pool for children*, parkway, highway, playground and recreational purposes, and *to such other uses as may be incident to, or convenient for the full enjoyment of, such purposes*." [Emphasis added.]  Recognizing that a bathing pool for children existed on the land when the Trust was created and that the land was situated adjacent to a public park, and would be an extension of same, the legislative intent was clear.  The entrusted land *shall* be used *exclusively* for a public park

Exhibit 2, Page 57

1  which includes a children's pool, and that the purpose of that use shall be
2  recreational.

3      The City contends that the Trust should be read broadly and the
4  Legislature must have vested the City with discretion as fee owner and trustee
5  in its management of the Trust to determine the uses that are most compatible
6  with changing conditions and public needs.  The City asserts that extrinsic
7  evidence, including the survey of the Trust boundaries and the historical
8  information related to Ellen Browning Scripps' gift, confirms that the
9  Legislature intended a broad reading of the Trust in which the Trust permits
10  the use by both humans and seals.  Other than the bald assertion, the City
11  provides no evidence in support of its contention.  Reading the Trust "broadly"
12  or "narrowly" does not change the wording of the Trust, which is controlling.

13      A local entity that is the recipient of trust property must use the property
14  in compliance with the terms of the Trust.  The City is a trustee of the property
15  and as such "assumes the same burdens and is subject to the same
16  regulations that appertain to other trustees of such trusts." (Long Beach v.
17  Morse (1947) 31 Cal. 2d 254, 256).  The Trust is specific.  It requires the Trust
18  lands to be used for a children's pool.  "Children's pool" is listed in the
19  conjunctive with the other permitted purposes and uses set forth in the 1931
20  grant.  Any discretionary use by the City must be "incident to, or convenient for
21  the full enjoyment of, such *purposes* [plural]."  If a use of the property is
22  inconsistent with any of the *purposes*, it is not a permitted use.

23      The Trust is to be used exclusively for a public park and children's pool.
24  The presence or absence of marine mammals, or other animals for that matter,
25  does not change the use of the beach and tidelands specified by the Trust
26  grant.  The use by the City of the Children's Pool as a habitat, animal
27  sanctuary, zoo or seal watching facility that precludes its being used as a
28  bathing pool for children would be outside the scope of the Trust.

-20-

Exhibit _2_, Page _58_

## THE CITY'S BREACH OF THE TRUST

A comparison of photographs of the Pool when first constructed and today, well demonstrates that the City has failed to maintain the trust property in a condition similar to when the property was conveyed. Photos demonstrate that the Pool originally was a pool of water sheltered by the breakwater and adjacent to a relatively small strip of sand beach. Today the beach extends out almost to the end of the breakwater. In effect, the breakwater no longer serves to protect the swimmers and bathers in the water, but rather the sand beach has, over the years, filled in most of the Pool. [Exhs. 35 & 228.] In reality, Children's Pool is no longer a safe pool of ocean water for children to use.

There also exists another safety issue at Children's Pool, and that is pollution. The evidence is un-contradicted that the water inside the breakwater is polluted and the public has been advised, from 1997 to the present, not to enter the water at Children's Pool because it poses a health risk. The evidence is also un-contradicted that the beach itself is a repository for sufficient amounts of seal feces to potentially pose a health hazard to persons, and particularly children, using the beach at Children's Pool.

In its present condition, the land granted by the 1931 Trust is not suitable for the uses enumerated in the grant. Because of the unhealthy condition of the sand and water, the Children's Pool area is not suitable for use as a public park, bathing pool for children or a recreational area. That being the case, has the City breached the Trust by not restoring the trust lands to a usable state? The plaintiff contends that it has.

Plaintiff reads the trust grant as according the public, as its beneficiaries, access to and use of the Children's Pool, and argues this use by the public has been thwarted by the City's conduct and failure to act while trustee of the Children's Pool. Plaintiff's position is supported by the facts and the law. As a trustee, the City has an obligation to "administer the trust with reasonable care, skill, and caution under the circumstances then prevailing

-21-

Exhibit _2_, Page _59_

that a prudent person acting in a like capacity would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument." (Cal Prob. Code § 16040.)

Plaintiff cites to the fact that since at least 1997, Hubbs-SeaWorld has been engaged in a rescue, rehabilitation and release program under the aegis of the National Oceanographic and Atmospheric Administration or its sub-agency, NMFS. [Exh. 245.] That program consists of retrieving injured or diseased animals, rehabilitating them at SeaWorld in San Diego, and, upon return to health, and after tagging, releasing them in Pacific waters. The release of harbor seals is accomplished generally in the kelp beds immediately outside the Children's Pool. Tagged harbor seals are routinely observed hauling-out at the Children's Pool. Once it was determined that the released seals were impacting the use of the Children's Pool, the City took no steps to protect the Pool from becoming a haul-out for such seals.

The number of seals at the Children's Pool was minimal, if any, at the time of the creation of the breakwater and the Trust grant. Starting in the early 1990's, seals came to reside in the general area of Children's Pool in growing numbers. During that time frame, the City undertook the designation of the ocean and reef immediately adjoining Seal Rock as a reserve in order to accommodate the seals in that area. The Reserve is within a hundred yards or less of the area granted as the Children' Pool. In such close proximity, the seals, based on counts, seem to prefer the Children's Pool to Seal Rock as a haul-out. Over time, the seal population at Children's Pool has grown to where it now exceeds 200 during portions of the year. Photographs show seals on the beach across the entire width of Children's Pool at the edge of the water. [Exh. 399.]

During the 1990's, seal feces came to pollute the beach and adjoining waters. The County of San Diego, Department of Environmental Health, regularly tests the waters along the San Diego coastline. In 1997, the County

**Exhibit 2, Page 60**

determined the waters at Children's Pool were so polluted that the Pool was officially closed to public swimming in March, 1997. [Exhs. 628, 634.] It is undisputed that the cause of the contamination of the waters at Children's Pool is seal feces.

The County tests the water for three contaminants: total coloform, fecal coloform and enterococcis. These bacteria contain pathogens, which can produce serious illnesses. [Exhs. 163, 265.] In 1997, the waters at Children's Pool contained sufficient numbers of these pathogens that the Pool was unsafe. That contamination continues unabated to the present time.

Until 1999, the County, by statute, could only post a beach with polluted water as "Closed." In 1999, the Legislature enacted AB 411. It provided for two categories of warning: "Closed" and "Advisory." The distinction between these warnings is principally the source of the contamination. Contamination from human sewage requires a "Closed" warning. Contamination from non-human sources, such a seal feces, requires an "Advisory" warning.

In 1997, the County posted signs warning that the beach was closed for water activities. Despite the fact that in 1999, with a change in the law, "Advisory" signs should have been posted, the "Closed" signs remained up until 2003. [Exh. 417.]

Since the source and level of the pollution remains constant most of the time at the Children's Pool, the County put the Pool on a chronic advisory status. The County has classified the Children's Pool as being polluted 365 days per year, from 1997 to the present. The next most contaminated beach, in terms of days of closure or advisory, has been the Tijuana River Slough, which is polluted on average 149 days a year. [Exhs. 197, 198, 199.]

As the number of seals increased at Children's Pool, and with the constantly polluted condition of the Pool, the number of swimmers using the Pool since the early 1990's has decreased significantly. Public use of the

-23-

**Exhibit 2, Page 61**

1   Children's Pool has been severely restricted because of the presence of the
2   seals and the resulting pollution.
3       The next biggest cause of actual or constructive closure of the Children's
4   Pool was the City's decision to erect a rope barrier cutting off public access to
5   the Pool.  On March 29, 1999, the City Council rejected the City Manager's
6   recommendation to dredge the Pool and restore the Pool to the uses set forth in
7   the Grant, and instead voted to rope off the Pool.  In doing so, the City
8   breached its obligations under the Trust, as trustee of the Children's Pool.
9   Instead of returning the Pool to its original and safer configuration and also
10  rectifying the unhealthy condition of the water and sand at the Pool, the City
11  barred the use of the Children's Pool as a "public park, bathing pool for
12  children, . . . and [use for] playground and recreational purposes," as expressly
13  required by the 1931 Trust.  The rope remained up from March 1999 until
14  September 17, 2004.
15      Besides the official barrier established by the City to deny public access
16  to the Children's Pool, the general condition of the Pool area, with seal feces in
17  the sand, the occasional dead seal rotting on the beach until washed out to sea
18  by a high tide, and the presence of warning signs, all served to deter the public,
19  beneficiaries of the trust grant, from using the beach.  To this day, numerous
20  signs are posted in and about the area of the Children's Pool, warning the
21  public that bacteria levels exceed safety standards and that swimming is
22  allowed but not recommended.  [Exh. 410.]  All of these factors, when taken
23  together, conclusively establish that practically, as well as constructively,
24  access to the beach has been denied to the intended beneficiaries of the trust
25  grant, including children, swimmers, fishermen and the public generally.
26      The City has taken the position that it has fulfilled its duties as the
27  trustee of the Children's Pool, which it admits is a unique piece of property.
28  The City argues that it has attempted to reasonably and delicately balance the
    competing interests of its citizens and its legal duties in light of all the available

-24-

Exhibit 2, Page 62

1  Children's Pool has been severely restricted because of the presence of the

2  seals and the resulting pollution.

3     The next biggest cause of actual or constructive closure of the Children's

4  Pool was the City's decision to erect a rope barrier cutting off public access to

5  the Pool. On March 29, 1999, the City Council rejected the City Manager's

6  recommendation to dredge the Pool and restore the Pool to the uses set forth in

7  the Grant, and instead voted to rope off the Pool. In doing so, the City

8  breached its obligations under the Trust, as trustee of the Children's Pool.

9  Instead of returning the Pool to its original and safer configuration and also

10  rectifying the unhealthy condition of the water and sand at the Pool, the City

11  barred the use of the Children's Pool as a "public park, bathing pool for

12  children, . . . and [use for] playground and recreational purposes," as expressly

13  required by the 1931 Trust. The rope remained up from March 1999 until

14  September 17, 2004.

15     Besides the official barrier established by the City to deny public access

16  to the Children's Pool, the general condition of the Pool area, with seal feces in

17  the sand, the occasional dead seal rotting on the beach until washed out to sea

18  by a high tide, and the presence of warning signs, all served to deter the public,

19  beneficiaries of the trust grant, from using the beach. To this day, numerous

20  signs are posted in and about the area of the Children's Pool, warning the

21  public that bacteria levels exceed safety standards and that swimming is

22  allowed but not recommended. [Exh. 410.] All of these factors, when taken

23  together, conclusively establish that practically, as well as constructively,

24  access to the beach has been denied to the intended beneficiaries of the trust

25  grant, including children, swimmers, fishermen and the public generally.

26     The City has taken the position that it has fulfilled its duties as the

27  trustee of the Children's Pool, which it admits is a unique piece of property.

28  The City argues that it has attempted to reasonably and delicately balance the

    competing interests of its citizens and its legal duties in light of all the available

-24-

Exhibit 2, Page 63

information. The City contends that Plaintiff merely wishes to impose her own personal opinion upon the discretion of the City as trustee, to the detriment of a broader range of unspecified recreational purposes. The City further contends that Plaintiff is merely the representative of a "small, elite special interest group" and that the Plaintiff seeks a result which is contrary to the Legislature's intent of preserving a broad range of permissible recreational and other purposes for the property. The City also argues that Plaintiff's requested relief, to order the City to remove the seals from their "natural habitat," is prohibited by the Marine Mammal Protection Act (hereinafter "MMPA") and the doctrine of separation of powers.

The City's position is refuted by its own evidence. As pointed out above, the City Manager has repeatedly advised the City that the 1931 grant of the Children's Pool is for the public to have use of a unique sheltered pool in the ocean, with particular emphasis on its being used by children. Further the City has been repeatedly advised by its City Manager and NMFS that the City can take appropriate action to remediate the safety and health situation at Children's Pool without violating the MMPA.

The MMPA outlaws the "taking" of marine mammals, which can consist (under Section B harassment) of an act of pursuit, torment or annoyance, which has the effect of disrupting a marine mammal in the wild from its natural environment. Exceptions exist under §109(h), which permit such taking, even without a permit from the Department of Commerce, in the case of damage to public or private property, or threats to public health or safety by the animals or by non-lethal measures, should the marine mammals constitute a nuisance. The City knew as early as 1997 that under these exceptions it could deter the seals at the Children's Pool. [Exh. 634.] The City voted to take no action to protect the Children's Pool.

As early as 1999, the West Coast Administrator of NOAA, James Lecky, wrote Terry Williams at the City to advise the City that provisions existed in the

Exhibit _2_, Page _64_

1   federal law that permitted the City to address human health and safety issues
2   posed by marine mammals. [Exh. 205.] Mr. Lecky repeated this advice to the
3   City on numerous subsequent occasions. The City has elected not to avail
4   itself of the applicable provisions of federal law that would permit it to address
5   the health and safety issues presented at Children's Pool. To this date, those
6   conditions persist unabated.

7        Plaintiff also contends that "Pro-seal activists" have been permitted by
8   the City to conduct themselves in a manner that effectively denies access to the
9   Children's Pool to swimmers, fishermen and other users of the Pool, beach and
10  adjoining areas. The evidence shows that certain individuals have engaged in
11  uncivil, and on occasion, illegal conduct. They have stalked intended users of
12  the Pool with cameras and other devices in order to heckle and harass them.
13  [Exh. 403.] There have been instances of verbal and physical abuse and
14  violence. On several occasions, the San Diego Police have been called to the
15  scene. One person, in attempting to discourage people from using the
16  Children's Pool, has been arrested at least twice and is the subject of three
17  restraining orders from this court. Private parties requested two of them and
18  City lifeguards on duty at the Pool requested the other. That restraining order
19  was issued in July 2005.

20       It is clear that these activities do discourage people from using the
21  Children's Pool. However, the evidence is that the San Diego Police and
22  Lifeguards are responding to complaints of harassment and are enforcing city
23  and state laws when violations occur. Based on the record before this court, a
24  restraining order will not be issued imposing any requirements or restrictions
25  on City law enforcement personnel or directing the City to take any additional
26  steps or refrain from any particular conduct in regard to members of the public
27  expressing their opinions at the Children's Pool.
28

Exhibit 2, Page 65

## BREACH OF FIDUCIARY DUTY

Plaintiff next contends that the City as trustee has knowingly and willfully violated its fiduciary obligations to its beneficiaries. As a basis for this claim, Plaintiff cites to the City closing the beach in 1997, which it claims it has never reopened. The lifeguards have not been kept current on the official status of the Children's Pool. The City knew of the release of harbor seals near the Children's Pool by Hubbs-SeaWorld and did nothing about the build-up of seals at the Pool. The City violated the right of the public to have access to the beach by roping off the beach to the public. The City kept the rope in place from 1999 until late 2004. [Exh. 321.] The City failed to prosecute violations of its own municipal codes, ordinances and regulations that would regulate the presence and activities of activists at the beach, including use and placement of signs, harassment of the public and other similar activities.

As further evidence of breach, Plaintiff contends that the City failed to place wordage required by San Diego County on signs it posted at Children's Pool. The City assured the County in 2003 it would incorporate the required wordage on the new signs posted at the Children's Pool. The County also left approximately 12 copies of the new required County sign with the City, with the understanding the signs would be installed at the Children's Pool. The signs were not installed as promised. Also, the sign created by the City did not contain the warning information required by the County. The County had to personally install the correct signs at Children's Pool. [Exh. 409.]

The City responds to Plaintiff's contentions by arguing that "[a]s trustee, the City is held to administer the Trust with reasonable care, skill, and caution under the circumstances then prevailing. The evidence has clearly shown that the City has and continues to draw from all the available resources in determining the best way in which to manage the trust property." [City's Written Argument at 10.] To the contrary, the evidence is that the City has taken no steps to manage the property so as to preserve the Children's Pool for

Exhibit 2, Page 66

1  the purpose and uses for which its was constructed and granted to the City as

2  trustee for the people of California.

3      The City attributes the "current condition" at the Children's Pool as

4  "merely a result of the natural evolution of undisturbed conditions in the area,

5  including the seals' natural behavior to haul out on the beach. . . . Therefore,

6  the City has taken and continues to take all reasonable steps available under

7  these unique circumstances to address the difficult and delicate issue of how to

8  manage the Trust area." [Id at 11.]

9      As shown in some detail in the first portion of this decision, the

10  Children's Pool is not a "natural condition." It is a man-made, artificial

11  condition that transformed a very small portion of the Pacific Ocean shoreline

12  from open-ocean conditions, subject to significant wave action, undertow and

13  rip currents, to an enclosed area protected from such ocean conditions. The

14  former condition can present a danger to novice swimmers, especially small

15  children, while the latter creates an ocean swimming experience but with the

16  safety attributes similar to a municipal swimming pool.

17      As to the City's contention that it has taken "all reasonable steps" to

18  manage the Trust, this contention is not supported by the evidence. As

19  discussed above, the Children's Pool is no longer a pool, since most of the area

20  for the Pool is now filled with beach sand. What water there is in the Pool is

21  toward the end of the Pool and is subject to rip currents and other ocean-water

22  dangers. It is no longer the sheltered Pool that was created by the breakwater

23  in 1931. "[T]he public interest in the [San Diego] tidelands--which the City

24  holds in trust for the people of the State of California--necessarily includes

25  their protection and preservation." (State of California ex rel. California State

26  Lands Comm'n v. City of Long Beach (2005) 125 Cal. App. 4th 767, 779.) The

27  City has failed to preserve and protect the tidelands subject to the 1931 grant,

28  to wit: the Children's Pool.

-28-

Exhibit 2, Page 67

1    There is no evidence the City has ever removed the sand build-up in the
2  Pool since it has "managed" the trust area.   Likewise, since the Pool water
3  became unsafe for human use in 1997, the City has taken no steps to
4  eliminate the pollution in the Pool.   There is no evidence before this court that
5  removing the sand build-up or reducing the pollution level of the Pool water is
6  impossible, or unreasonably difficult or expensive.   To the contrary, the City
7  Manager has recommended on numerous occasions that the City undertake
8  these very steps of reasonable management, which the City has failed to do.

9    Therefore the court concludes that the 1931 Grant requires, at a
10 minimum, the Children's Pool be reasonably available for the purposes and
11 uses specified by the State of California in the Grant.   This requires the City to
12 manage and maintain the granted lands for the use of the people of California,
13 the beneficiaries of the Grant.   This includes swimming, fishing and related
14 recreational pursuits.   The Pool has not been available for such uses since
15 1997. The City has failed to restore the property for such uses despite the fact
16 it has had the means and ability to do so.   The City has breached its
17 obligations as trustee under the 1931 Trust.

18    Plaintiff asks this court to order the City to remove a surveillance
19 camera, which had been installed at the Pool.  The camera is intended to assist
20 the City in policing the Children's Pool and the surrounding area.   Plaintiff
21 contends that photographing people making recreational use of a public
22 recreational facility is unwarranted and poses an additional and significant
23 deterrent to the free, open and public-recreational use of the property.  The use
24 of such a camera in a public facility, for which the City is obligated to provide
25 police protection, rests within the sound discretion of the City.  No evidence of
26 abuse or improper use of the camera has been show.  Based on the record
27 before the court, no restrictions on the use of the camera will be imposed.
28

Exhibit _2_, Page _68_

# REMEDIES

As stated above, the court will not order the City to modify its law enforcement activities at the Children's Pool or remove the surveillance camera located at the Pool. The City argues this court does not have the authority to order it to take any action in regard to the Pool, because such actions would be discretionary. If the Children's Pool were a "natural" beach, as argued by the City, such a position might have merit. This court probably would not order the City to clean up a dirty or contaminated "natural" beach where the City was not the direct cause of the contamination.

However, the Children's Pool is not a "natural" condition. It is a man-made, artificial condition, which was entrusted to the City for specific uses and purposes. The City has knowingly declined to remove sand from the Pool, even though the sand has reached the point where the Pool in reality cannot be used for its intended purpose. Although the City has approved requests to study the removal of the sand, even as recently as September of 2004, it has consistently failed to remove the sand that has been building-up for the last 70 years.

The presence of unhealthy levels of bacteria from seal feces in the pool water has been consistently left un-addressed by the City. The substantial increase in the number of seals using the Children's Pool seems to have some relationship to the actions or inactions of the City. The creation of the Reserve in close proximity to the Children's Pool and the release by Sea World of rehabilitated harbor seals in the kelp beds off-shore of the Pool, seem to have contributed to an increasing number of seals using portions of the Children's Pool in the mid-1990's. The City's decision to separate the seals from humans and then closing off the Pool to humans, likewise appears to have encouraged the seals to occupy more and more of the beach with ever increasing numbers.

The occupation of the Children's Pool does not seem to be a "natural" phenomenon. According to the evidence at trial, Children's Pool is the only public beach in California that has been taken over by seals. The City was

-30-

Exhibit 2, Page 69

1  warned in 1997 that if it did not discourage the seals from hauling-out at the
2  Children's Pool, the number of seals present at the Pool would greatly increase.
3  In response to the situation, the City put up barriers to keep the public out of
4  the Pool area.    To date, the City has taken no steps to reduce the level of
5  pollution at Children's Pool.

6  Therefore, in order to protect the rights of the people of California to the
7  full use and enjoyment of a unique asset, the Children's Pool, the City, as
8  trustee of the Children's Pool, is hereby ordered to employ all reasonable
9  means to restore the Pool to its 1941 condition by removing the sand build-up
10  and further to reduce the level of water contamination in the Pool to levels
11  certified by the County of San Diego as being safe for humans.  Likewise, the
12  City is ordered to maintain the beach sand so that it does not pose a health
13  hazard to humans.

14  Nothing contained in this order shall be construed as requiring the City
15  to violate any law, rule or regulation of any federal, state or county government.
16  The court will maintain jurisdiction to oversee compliance with this order.  This
17  order shall be fully complied with no later than six (6) months after the date
18  this order is issued.  The City is directed to file a report with this court, no later
19  than sixty (60) days following entry of this order, setting forth what steps it has
20  undertaken and intends to undertake to comply with this order.

IT IS SO ORDERED.

21
22  Dated: ___Aug 26___, 2005
23                                       JUDGE WILLIAM C. PATE
                                         Judge of the Superior Court
24
25
26
27
28

-31-                                    **Exhibit** 2, **Page** 70

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
☐ COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814
☒ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827
☐ FAMILY COURT, 1555 6TH AVE., SAN DIEGO, CA 92101-3296
☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105
☐ KEARNY MESA, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187
☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643
☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
☐ RAMONA, 1428 MONTECITO RD., RAMONA, CA 92065-5200
☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649
☐ JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123-2792

F I L E D
Clerk of the Superior Court

AUG 2 6 2005

By: K. LANTZ-JONES, Deputy

PLAINTIFF(S)/PETITIONER(S)
VALERIE O'SULLIVAN

DEFENDANT(S)/RESPONDENT(S)
CITY OF SAN DIEGO

Judge:    WILLLIAM C. PATE
Dept.:    60

CLERK'S CERTIFICATE OF SERVICE BY MAIL
(CCP 1013a(4))

CASE NUMBER
GIC 826918

I, **STEPHEN V. LOVE**, certify that: I am not a party to the above-entitled case; that on the date shown below, I served the following document(s):    FINAL STATEMENT OF DECISION

on the parties shown below by placing a true copy in a separate envelope, addressed as shown below; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at:
[X] San Diego   ☐ Vista   ☐ El Cajon   ☐ Chula Vista   ☐ Oceanside   ☐ Ramona,    California.

| NAME | ADDRESS |
|---|---|
| PAUL R. KENNERSON<br>KENNERSON & GRANT, LLP | 101 WEST BROADWAY, SUITE 1150<br>SAN DIEGO, CA 92101<br>(619) 236-8555 |
| DEBBIE M. SMITH &<br>LESLIE A. FITZGERALD | OFFICE OF THE CITY ATTORNEY<br>1200 THIRD AVENUE, SUITE 1100<br>SAN DIEGO, CA 92101-4100<br>(619) 533-5800 |

Exhibit _2_, Page _71_

STEPHEN V. LOVE
CLERK OF THE SUPERIOR COURT

Date:    AUGUST 26, 2005

By:    *Kristin Lantz-Jones* , Deputy
KRISTIN LANTZ-JONES

CLERK'S CERTIFICATE OF SERVICE BY MAIL

1

<u>PROOF OF SERVICE BY MAIL</u>

2

3    <u>O'SULLIVAN v.  CITY OF SAN DIEGO</u>
San Diego Superior Court Case No. GIC 826918

4

5    I, the undersigned, declare:  That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, California in which county the within-mentioned service occurred.  My business address is

6    101 West Broadway, Suite 1150, San Diego, California 92101.

7    I served the following documents:

8                            JUDGMENT

9

10   on the parties in said action by placing a true copy thereof in a separate sealed envelope for each addressee named hereafter, addressed to each such addressee respectively as follows:

11   Debbie Smith, Esq.                          Attorneys for Defendant
Office of the City Attorney                  CITY OF SAN DIEGO

12   1200 Third Avenue, Suite 1100
San Diego, CA  92101

13   Telephone:  (619) 533-5800
Facsimile:  (619) 533-5856

14

15   and I then sealed each envelope and, with the postage thereon fully prepaid, placed it for mailing in accord with our business' practice on August 31, 2005, at San Diego, California.

16

17   I am readily familiar with our business practice for collecting, processing, and mailing correspondence and pleadings with the United States Postal Service.  Such correspondence and pleadings are deposited with the United States Postal Service on the same day that it is placed for

18   mailing in the ordinary course of business.

19   I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

20   Executed September 9, 2005, at San Diego, California.

21

22

23                        Danna Duncan

24

25

26

27

28                                            Exhibit  2, Page 72