

# EXHIBIT J

DISTRICT COURT OF APPEALS OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| VALERIE O'SULLIVAN, | ) |
| | ) |
| PLAINTIFF, RESPONDENT, | )FROM SAN DIEGO COUNTY |
| CROSS-APPELLANT, | )HON.WILLIAM C. PATE, |
| | )                    JUDGE |
| | ) |
| VS. | )NO. D047382 |
| | )CASE NO. GIC 826918 |
| CITY OF SAN DIEGO, | ) |
| | ) |
| DEFENDANT, APPELLANT, | ) |
| CROSS-RESPONDENT. | ) |
| | ) |
| | ) |

REPORTER'S TRANSCRIPT

OCTOBER 28, 2004

VOLUME 1

(PAGES 1 - 12)

A P P E A R A N C E S:

FOR THE PLAINTIFF:      KENNERSON & GRANT
                        BY:  PAUL R. KENNERSON
                             JOHN K. GRANT
                        101 W. BROADWAY, SUITE 1150
                        SAN DIEGO, CALIFORNIA 92101

FOR THE DEFENDANT:      MICHAEL J. AGUIRRE, CITY ATTORNEY
                        BY:  ROBERT MARTINEZ, DEPUTY
                        1200 THIRD AVENUE, SUITE 1100
                        SAN DIEGO, CALIFORNIA 92101

SHARON R. ROCKMAKER, CSR NO. 2813
OFFICIAL COURT REPORTER

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

DEPARTMENT NO. 60     HON. WILLIAM C. PATE, JUDGE

VALERIE O'SULLIVAN,                )
                                   )
                    PLAINTIFF,     )
                                   )
          VS.                      )
                                   ) CASE NO. GIC 826918
CITY OF SAN DIEGO, ET AL.,         )
                                   )
                    DEFENDANTS.)
_____)


REPORTER'S TRANSCRIPT

OCTOBER 28, 2004


A P P E A R A N C E S:

FOR THE PLAINTIFF:      KENNERSON & GRANT
                        BY:  PAUL R. KENNERSON

FOR THE DEFENDANT:      CASEY GWINN, CITY ATTORNEY
                        BY:  LESLIE FITZGERALD, DEPUTY

FOR THE INTERVENOR:     COAST LAW GROUP
                        BY:  MARCO GONZALEZ
                             GABRIEL SOLNER


SHARON R.ROCKMAKER, CSR NO. 2813
OFFICIAL REPORTER
SAN DIEGO SUPERIOR COURT
SAN DIEGO, CALIFORNIA 92101

1    SAN DIEGO, CALIFORNIA - THURSDAY, 10/28/04 - 10:30 A.M.

2                              --OOO--

3        **THE COURT:**  OKAY, MOVING ON RAPIDLY TO -- THAT WAS A

4    15-MINUTE -- O'SULLIVAN VERSUS CITY OF SAN DIEGO; NUMBER 4,

5    WHICH I'M SURE WILL BE QUICK.

6        **MR. GONZALEZ:**  MARCO GONZALEZ WITH COAST LAW GROUP FOR

7    INTERVENOR; WITH ME IS GABRIEL SOLNER ALSO.

8        **MS. FITZGERALD:**  LESLIE FITZGERALD ON BEHALF OF

9    DEFENDANT CITY.

10       **MR. KENNERSON:**  PAUL KENNERSON FOR THE PLAINTIFF.

11       **THE COURT:**  YOU MAY GO AHEAD AND ARGUE.

12       **MS. SOLNER:**  MORNING, YOUR HONOR; AGAIN, GABRIEL

13   SOLNER ON BEHALF OF INTERVENOR.

14           WE THINK THIS IS A SIMPLE CASE FOR INTERVENTION.

15   WE ARE SOMEWHAT CONFUSED AS TO WHY PLAINTIFFS ARE OPPOSING

16   OUR INTERVENTION.  IT DOESN'T MAKE SENSE.  WE HAVE A CASE

17   HERE WHERE WE DON'T DISAGREE WITH THE PLAINTIFF'S

18   INTERPRETATION OF THE TRUST.  WE DON'T KNOW WHERE THE CITY

19   IS GOING TO COME DOWN.  WE KNOW WE HAVE A STRONG ISSUE NOT

20   BEING ADDRESSED.

21       **THE COURT:**  WHAT IS YOUR INTEREST?

22       **MS. SOLNER:**  WELL, IN THE INTERESTS OF TIME, I'M HAPPY

23   TO JUMP DIRECTLY TO THAT.  WE HAVE AN INTEREST IN THE USE

24   OF THE BEACH, WHICH IS THE SUBJECT OF --

25       **THE COURT:**  HOW DO YOU HAVE AN INTEREST IN USE OF THE

26   BEACH?

27       **MS. SOLNER:**  SAN DIEGO BAYKEEPER IS AN

28   ADMINISTRATIONAL, SCIENTIFIC, RECREATIONAL -- OUR MEMBERS

1    RECREATE ON THE BEACH.

2        **THE COURT:**  YOUR MEMBERS ARE INTERESTED IN USING THE

3    BEACH.

4        **MS. SOLNER:**  ABSOLUTELY.

5        **THE COURT:**  BUT THEY DON'T HAVE AN INTEREST IN THE

6    BEACH.  THEY DON'T OWN THE BEACH.

7        **MS. SOLNER:**  WELL, THIS IS WHY WE'RE CONFUSED BY THE

8    PLAINTIFF'S OPPOSITION.  WE HAVE THE SAME INTEREST THAT THE

9    PLAINTIFF HAS.  IF YOU LOOK AT PARAGRAPH 13 OF THE

10   PLAINTIFF'S COMPLAINT, THEY ALLEGE THAT THEIR USE OF THE

11   BEACH UNDER THE TRUST HAS BEEN THWARTED.  THAT'S THE

12   ESSENTIAL PART OF THIS LAWSUIT.  SO THE SAME INTEREST,

13   RECREATIONAL USE, WAS SUFFICIENT FOR PLAINTIFF'S STANDING.

14   THAT'S WHY THIS INCONSISTENCY DOESN'T MAKE SENSE.  I FAIL

15   TO SEE WHY THE EXACT SAME REASON FOR PLAINTIFF'S STANDING

16   WOULD BE INSUFFICIENT FOR INTERVENOR'S INTERESTS.

17       **THE COURT:**  BECAUSE THE PLAINTIFF IS THE PEOPLE OF THE

18   STATE OF CALIFORNIA, THROUGH PRIVATE ATTORNEY GENERAL.  SO

19   THEY, MR. KENNERSON, THINKS HE REPRESENTS ALL THE PEOPLE OF

20   THE STATE WHO, AS A GROUP, I GUESS, HAVE SOME OWNERSHIP

21   INTEREST IN THE BEACH.  I PRESUME THAT'S THE WAY IT WORKS.

22           YOUR GROUP, WHO ALSO ARE REPRESENTED BY

23   MR. KENNERSON AS INDIVIDUALS IN THE SENSE OF A PRIVATE

24   ATTORNEY GENERAL, THEY DON'T HAVE AN OWNERSHIP INTEREST IN

25   THE BEACH.  THEY DON'T HAVE AN OWNERSHIP INTEREST IN THE

26   SEALS.  THEY DON'T HAVE AN OWNERSHIP INTEREST IN THE

27   STRUCTURE THAT'S THERE.  THEY DIDN'T OWN IT BEFORE; DIDN'T

28   DONATE IT.

```
 1          IN OTHER WORDS, IF YOU WERE REPRESENTING SCRIPPS,
 2   I THINK YOU WOULD HAVE AN INTEREST IN THE CASE, BUT IF YOU
 3   GO BACK TO THE REDWOOD CASE, SIMPSON, THEN THE COURT
 4   SPECIFICALLY STATES USING THE PROPERTY DOES NOT CREATE AN
 5   INTEREST.  YOU HAVE TO HAVE SOMETHING ELSE BESIDES JUST
 6   USE.  IN THAT CASE, OF COURSE, THEY'VE GONE OUT, RAISED
 7   MONEY, BOUGHT THE LAND, DONATED IT FOR A SPECIFIC PURPOSE,
 8   AND NOW THAT PURPOSE WAS GOING TO BE THWARTED IF THEY -- IF
 9   THE LAWSUIT WAS SUCCESSFUL.  SO THEY WERE ABLE TO INTERVENE
10   BECAUSE IT WOULD ADVERSELY AFFECT THEM AND THEIR ABILITY TO
11   DO THIS IN THE FUTURE CASE, WHICH IS GO OUT AND RAISE MONEY
12   TO GO OUT AND BUY LAND TO KEEP IT IN PRISTINE CONDITION FOR
13   RECREATIONAL USES OF A LIMITED SORT.
14          WE DON'T HAVE ANY OF THAT IN THIS CASE I CAN
15   TELL.  YOUR ORGANIZATION HAS AN INTEREST IN OVERSEEING THE
16   BEACHES, IN A SENSE, THE WATERWAYS AND THOSE KINDS OF
17   THINGS, AT LEAST WITH -- CONSISTENT WITH THE POINT OF VIEW
18   OF YOUR ORGANIZATION.  THERE ARE PROBABLY OTHER
19   ORGANIZATIONS WITH A DIFFERENT POINT OF VIEW ON USE OF THE
20   BEACHES, I DON'T KNOW.
21          REALLY, IF -- IT SEEMS TO ME THAT YOUR INTEREST
22   AS INTEREST, AS A LEGAL TERM, WOULD BE THE SAME AS ANY
23   OTHER CITIZEN OF THE COUNTY OF SAN DIEGO, ANY -- AND THAT
24   IF ANY TIME SOMEBODY DID ANYTHING THAT INVOLVED ANY PUBLIC
25   LAND, THAT ANYBODY THAT WANTED TO INTERVENE, COULD.  IN
26   OTHER WORDS, THEY WERE GOING TO BUILD A RESTAURANT IN THE
27   PARK.  THE LAWSUIT DEVELOPED OVER WHETHER OR NOT TO BUILD A
28   RESTAURANT IN BALBOA PARK.  THEN PEOPLE WHO USE BALBOA PARK
```

1    SAY, I'M INTERESTED IN BALBOA PARK; THEY COME INTO COURT.

2    WHERE DOES THE COURT DRAW THE LINE?

3            SO I THINK THAT'S WHERE THE LINE WAS DRAWN.  YOU

4    HAVE TO HAVE AN INTEREST MORE THAN JUST USE.  I DON'T FIND

5    ANYTHING THERE.  THE FACT YOUR PEOPLE IN YOUR ORGANIZATION

6    GO DOWN AND VIEW THE HARBOR SEALS AND THINGS LIKE THAT IS A

7    USE OF IT.

8        **MR. GONZALEZ:**  ACTUALLY, YOUR HONOR, I THINK YOU BRING

9    UP A GOOD POINT.

10       **THE COURT:**  I THINK I WAS SPEAKING, SIR.  I THOUGHT

11   SHE WAS HANDLING THE ARGUMENT.

12       **MS. SOLNER:**  COCOUNSEL.

13       **THE COURT:**  WE HAVE A ONE-BATTER RULE.

14       **MR. GONZALEZ:**  SINCE THIS WE'RE -- SOME OF THESE ARE

15   ARGUMENT AND REPLY.  SHE'S DOING THE APPEARING FOR THE

16   FIRST TIME.

17       **THE COURT:**  YOU WANT TO PINCH HIT?

18       **MS. SOLNER:**  WE DON'T GO OVER THE SAME THINGS.

19            I THINK YOU BROUGHT UP A GOOD POINT.

20       **THE COURT:**  WOULDN'T BE A FIRST.  GO AHEAD.

21       **MS. SOLNER:**  THE NOTION THAT INTERVENTION COULD BE

22   DONE BY ANY PERSON IS A GOOD POINT.  I THINK THE WAY THE

23   LAW READS, IF YOU'RE COMING AND PURPORTING TO REPRESENT THE

24   GENERAL PUBLIC, YOU HAVE TO REPRESENT THE INTERESTS OF THE

25   GENERAL PUBLIC.  IF ANOTHER PERSON COMES IN AND SAYS, WE'RE

26   THE GENERAL PUBLIC, THEY'RE NOT REPRESENTING ME, WE GO TO

27   THE OTHER ELEMENT.  ARE MY INTERESTS OR MY CONSTITUENCY'S

28   INTERESTS ADEQUATELY REPRESENTED BY THE PEOPLE WHO ARE

1   THERE; WE REPRESENT A SIGNIFICANT PORTION OF THE PUBLIC WHO

2   HAS AN INTEREST IN LAND RECREATIONAL USE BY A PUBLIC, OUR

3   INTEREST IN SEEING THAT RECREATION --

4        *THE COURT:*  YOUR PEOPLE HAVE AN OWNERSHIP INTEREST IN

5   THE BEACH?

6        *MR. GONZALEZ:*  ABSOLUTELY, AND WE'VE ALLEGED AS SUCH

7   IN OUR DECLARATION.

8        *THE COURT:*  WHAT'S THE BASIS?

9        *MR. GONZALEZ:*  THE EXACT SAME AS PLAINTIFFS.

10       *THE COURT:*  HE REPRESENTS THE PEOPLE OF THE STATE OF

11  CALIFORNIA. YOU REPRESENT INDIVIDUALS.

12       *MR. GONZALEZ:*  WHO ARE ALSO CITIZENS OF CALIFORNIA.

13       *THE COURT:*  THEY DON'T OWN THE BEACH.

14       *MR. GONZALEZ:*  TO THE EXTENT PLAINTIFF CAN ASSERT THEY

15  OWN THE BEACH, OURS IS A SUBSET OF THE PEOPLE WHO PURPORT

16  TO OWN THE BEACH.  WE ARE A PUBLIC INTEREST ORGANIZATION.

17  SO THE EXTENT HE CAN REPRESENT VARIOUS CITIZENS OF LA JOLLA

18  WHO ARE BENEFICIARIES AS CITIZENS OF THE STATE OF

19  CALIFORNIA, SIMILARLY, WE REPRESENT CITIZENS OF THE STATE

20  OF CALIFORNIA WHOSE INTEREST IN THE BEACH, OWNERSHIP

21  INTEREST, IS EQUAL BUT THE OUTCOME WILL AFFECT THEM

22  DIFFERENTLY.

23       *THE COURT:*  YOU HAVE TO DEFINE SUBSET WHICH IS THE

24  1500 PEOPLE WHO ARE IN YOUR ORGANIZATION.  HE REPRESENTS

25  THE DEFINED -- WHAT DID WE USED TO CALL THEM IN OUR

26  DIAGRAMS?  ANYWAY, HE REPRESENTS EVERYBODY, ALLEGEDLY.  I'M

27  JUST SAYING THAT'S WHY HE'S HERE, AND YOU GUYS HAVE TO

28  JUSTIFY YOUR APPEARANCE IN THE CASE.

1      *MR. GONZALEZ:* LET'S TALK ABOUT IF WE'RE OWNING A

2      PIECE OF REAL PROPERTY OWNED BY, SAY, FIVE DISTINCT

3      INDIVIDUALS.  IF ONE OF THE INDIVIDUALS WAS NOT A PART OF

4      THE LAWSUIT, THEY COULD BE --

5      *THE COURT:* OF COURSE.  IF YOU OWNED THIS PROPERTY,

6      YOU'D BE ABLE -- YOU'D BE IN HERE IN A MINUTE.

7      *MR. GONZALEZ:* THEREFORE, I'M STILL -- I GUESS, THEN,

8      I'M HAVING TROUBLE UNDERSTANDING WHY, BECAUSE THEY BROUGHT

9      AN ACTION UNDER 1021.5 AS PRIVATE ATTORNEY GENERAL, A

10     STATUTE THAT OUR ORGANIZATION USES TIME AND AGAIN TO BRING

11     ALL OF OUR MATTERS, WHY THAT WOULD NOT ENTITLE US TO

12     UTILIZE THE SAME STATUTE IN DEFENSE OF OUR INTERESTS?  IT

13     DOESN'T MAKE COMMON SENSE.  IT DOESN'T MAKE LEGAL SENSE.

14     BECAUSE AN OWNERSHIP INTEREST IS NO DIFFERENT TO A CITIZEN

15     REGARDLESS OF THEIR PARTICIPATION IN AN ENVIRONMENTAL

16     GROUP.  THEY LOOK TO US TO REPRESENT THEIR PERCEPTION OF

17     WHAT THAT OWNERSHIP INTEREST RESULTS IN; IN PARTICULAR, IN

18     THIS CASE, WHERE WE HAVE THE CITY WHO HAS TAKEN A POSITION

19     WHICH HAS BEEN CONTRARY TO OUR CITIZENS' POSITION ON THE

20     CITY COUNCIL LEVEL, AND THE PLAINTIFFS ARE ASKING FOR

21     SOMETHING THAT LOOKS VERY SIMILAR TO WHAT THE CITY HAS

22     CONCEPTUALLY PROVED.  IT'S OUR SUBSET OF CITIZENS WHO ARE

23     GOING TO BE AFFECTED WHO HAVE NO REPRESENTATION IN THIS

24     LAWSUIT.  SO I THINK THAT ASPECT OF REPRESENTATION IS THE

25     MOST IMPORTANT PART OF THE INTERVENTION EQUATION HERE.

26     *THE COURT:* BUT YOU HAVEN'T DEMONSTRATED AN INTEREST

27     IN THE TRANSACTION OTHER THAN YOU'RE INTERESTED IN THE

28     CONSEQUENCES OF THE TRANSACTION AS IT MAY AFFECT THE

1   ABILITY OF PEOPLE TO GO DOWN TO THE BEACH AND WATCH SEALS,

2   WHICH IS FINE, BUT THAT'S THE ESSENCE.  AND THE COURTS HAVE

3   DEFINED THAT CONSEQUENTIAL INTEREST IS NOT A SUFFICIENT

4   BASIS FOR INTERVENTION, A LACK OF INTEREST IN THE

5   TRANSACTION, A LACK OF -- OF INTEREST IN THE PROPERTY.

6   NOW, I KNOW YOU TALKED ABOUT THE SEALS AS BEING PROPERTY

7   BUT THEY'RE NOT PROPERTY.

8       *MR. GONZALEZ:*  WE'RE NOT GOING THERE NOW.  BUT YOUR

9   HONOR, IN ALL THOSE CASES --

10      *THE COURT:*  THE MARINE MAMMAL ACT IS FEDERAL

11  LEGISLATION THAT CAN BE ENFORCED BY ANY FEDERAL AGENCY WHO

12  OBVIOUSLY HAS PREEMPTIVE AUTHORITY OVER STATE AGENCIES.

13  AND THERE'S NO -- SO THOSE ARE SELF-EXECUTING ACTS IN THE

14  SENSE THEY'RE AGENCIES THAT OVERSEE IT TO DETERMINE WHETHER

15  THE ACT HAS BEEN COMPLIED WITH OR NOT.  CLEARLY, THE CITY

16  WOULD HAVE TO COMPLY.  THIS CITY WOULD NOT ISSUE AN ORDER

17  UNDERSTOOD TO BE VIOLATION OF THE ACT IF I WERE TO ISSUE

18  ORDERS IN THE CASE.  THE ISSUE, IT SEEMS TO ME, IS OVER --

19  AS THE PLAINTIFF PUTS IT -- IS OVER THE TERMS OF THE TRUST

20  AGREEMENT.  WE HAVEN'T GOTTEN INTO ANY OF THE MERITS.  ALL

21  WE'VE DONE IS JUST KIND OF DANCE AROUND THE CASE A LITTLE

22  BIT NOW.

23      BUT IT DOESN'T TELL ME THAT YOU'RE PRECLUDED FROM

24  BRINGING YOUR OWN CASE AGAINST THE CITY IF THEY ARE

25  ENTERING INTO AGREEMENTS THAT YOU THINK ARE CONTRARY TO THE

26  LAW OR FOR VIOLATING THE LAW IN SOME WAY.  THEN YOU COULD

27  REPRESENT ALL THE PEOPLE IN THAT INSTANCE AND THEN THE CITY

28  WOULD BE WHIPSAWED, I GUESS, BETWEEN THE TWO OF THEM.

8

1        TECHNICALLY, FOR INTERVENTION PURPOSES, YOU DON'T

2   MEET THE REQUIREMENTS OF THE CASES.

3        *MR. GONZALEZ:*  IF I COULD MAKE TWO POINTS.  IF YOU

4   LOOK AT CASE LAW, YOU DO NOT FIND A SINGLE SITUATION WHERE

5   THE ORIGINAL PLAINTIFF AND THE PROPOSED INTERVENOR HAVE

6   SUCH SIMILAR INTERESTS IN THE SENSE THAT, TYPICALLY, SUCH

7   AS IN THE SIMPSON REDWOOD CASE, THEIR PLAINTIFF HAS A MORE

8   DIRECT PECUNIARY TYPE INTEREST IN IT AND THEN THE

9   ENVIRONMENTAL GROUP WAS COMING IN ALLEGING THIS ESTHETIC

10  ENVIRONMENTAL INTEREST.  WHAT I'M POSITING, AND WHAT YOU

11  DON'T SEEM TO BE BUYING, IS THEIR INTEREST REPRESENTING THE

12  PEOPLE IS ABSOLUTELY IDENTICAL TO THE INTERESTS IN OUR

13  REPRESENTING THE PEOPLE WE'RE BRINGING BEFORE YOU.  WHAT'S

14  MOST IMPORTANT IS WHAT YOU'VE IDENTIFIED AS, WELL, WE WILL

15  HAVE THE OPPORTUNITY TO SUE LATER ON.  THAT WILL BE MORE

16  APPROPRIATE ONCE WE GO THROUGH ENVIRONMENTAL REVIEW AND --

17  AND THE CITY TAKES AFFIRMATIVE ACTION FOLLOWING

18  ADMINISTRATIVE PROCEDURES TO DO SOMETHING THERE.

19        THE PROBLEM IS IF THIS CASE GOES FORWARD

20  INDEPENDENT OF THAT PROCESS AND WE REACH A SITUATION WHERE

21  YOU TELL PLAINTIFF, YOU'RE CORRECT; CITY, THIS HAS TO BE

22  MAINTAINED AS A CHILDREN'S POOL, YOU PREJUDICE THAT

23  PROCESS.  SO TO SAY THAT WE CAN COME LATER ON AND FILE A

24  SUIT, NO, WE CAN'T.  WE CAN'T DO IT NOW BECAUSE THEY

25  HAVEN'T QUALIFIED THEIR ACTION AS A FINAL ACTION BUT THE

26  PROCESS CAN STILL BE PREJUDICED BY THE OUTCOME OF THIS

27  SUIT.

28        THAT'S WHY WE CAME -- BROUGHT OUR ACTION TO

1    INTERVENE.  WE DIDN'T BRING THAT UNTIL THE CITY TOOK THAT

2    ACTION.  THE CITY TOOK AN ACTION THAT GOES IN THE WAY THEY

3    WANT THEM TO.  THEY CAN TAKE PLACE --

4        **THE COURT:**  BUT YOU'RE IN THE WRONG ARENA BECAUSE

5    THE -- THE CITY HAS OBLIGATIONS UNDER THE LAW.  IF THEY

6    COMPLY WITH THE LAW, THEY CAN DO -- THEY CAN MAKE THEIR

7    JUDGMENT CALLS AS THEY WANT TO MAKE THEM BECAUSE THEY ARE

8    THE ELECTED OFFICIALS OF THE PEOPLE OF THE CITY OF SAN

9    DIEGO.  THE COURT IS NOT GOING TO JUMP IN AND TELL THE

10   CITY, YOU'RE MAKING A BAD CALL.  COURTS DON'T DO THAT.

11   THEY'LL JUMP IN AND TELL THEM YOU'RE NOT FOLLOWING THE LAW

12   AND YOU MUST GO BACK AND DO ANY ARGUING YOU DO OR WHATEVER.

13   THAT'S WHAT THE LAW SAYS.  THE LEGISLATURE MAKES THE LAW;

14   WE JUST TRY TO MAKE SURE THE PEOPLE FOLLOW IT IF IT'S

15   BROUGHT TO OUR ATTENTION.

16        SO THERE'S NOTHING THIS COURT'S GOING TO DO THAT

17   WOULD RESTRICT YOUR ABILITY TO BRING AN ACTION AGAINST THE

18   CITY IF THEY FAIL TO FOLLOW THE LAW, OR AT LEAST AS YOU

19   PERCEIVE THE LAW.

20        IF THEY DO FOLLOW THE LAW, THEY CAN MAKE WHATEVER

21   JUDGMENT THEY WANT TO MAKE.  ALL THE COURT'S GOING TO DO IS

22   TRY TO APPLY THE LAW TO THE FACTS IN THIS CASE WHENEVER IT

23   GETS TO THE COURT, AND THOSE INTERESTS -- YOU DON'T -- YOU

24   DON'T HAVE AN INTEREST IN THAT IN A LEGAL SENSE THAT I CAN

25   SEE, THAT'S -- THAT IS GOING TO BE IMPACTED.  YOUR IMPACT

26   IS -- AND WHAT YOUR EXPRESSED CONCERN IS -- THE CITY'S

27   GOING TO ENTER INTO SOME KIND OF DEAL WITH THE PLAINTIFF

28   AND DO SOMETHING YOU THINK IS WRONG.  IF THEY DO, YOU CAN

1   OBVIOUSLY BRING A CLAIM AGAINST THE CITY.

2       **MR. GONZALEZ:**  I'VE NEVER SEEN A CLAIM AGAINST THE

3   CITY FOR FAILING TO -- VIGOROUSLY FAILING TO REPRESENT A

4   PORTION OF THE PUBLIC.  THAT'S WHY WE'RE HERE.  WE ARE

5   REPRESENTING A PORTION OF THE PUBLIC.

6       **THE COURT:**  THAT'S TRUE.  THEY DON'T HAVE TO.  THEY

7   GET TO MAKE JUDGMENT CALLS; THAT'S THEIR RIGHT.  AS A

8   JUDGE, I CAN'T SIT HERE AND LET SOMEBODY COME IN AND SAY

9   THE CITY'S NOT VIGOROUSLY REPRESENTING THE PEOPLE SO

10  THEREFORE I'M GOING TO FIND AGAINST THE CITY OR SOMETHING

11  LIKE THAT.  THEY HAVE A RIGHT TO MAKE JUDGMENT CALLS AND

12  THE COURT CAN'T INTERFERE WITH THAT.  THEY HAVE AN

13  OBLIGATION TO FOLLOW THE LAW AND THE COURT CAN INTERFERE IN

14  THAT AREA.  IT'S A BIG DISTINCTION, I THINK.  SO YOU'RE ON

15  THE JUDGMENT CALL SIDE OF THINGS AS OPPOSED TO THE LEGAL

16  CASE.

17      **MR. GONZALEZ:**  THE DIFFERENCE IS WE THINK THEY'RE

18  FOLLOWING THE LAW NOW, THE PLAINTIFFS DON'T.  THEY DON'T

19  CARE.  WE'RE SAYING, WE NEED THE OPPORTUNITY TO ARGUE TO

20  YOU THEY ARE DOING -- WHAT THEY'RE DOING NOW IS OKAY, THAT

21  THEY'RE NOT RESTRICTED FROM CONTINUING WHAT'S CURRENTLY OUT

22  THERE; THAT THEY HAVE THE FLEXIBILITY TO DO THAT.

23      IT MAY SERVE THE CITY COUNCIL'S PURPOSE TO SAY,

24  HEY, WE CAN BACK IN SEQUA, WE CAN BACK IN ALL THESE THINGS

25  AND THERE WILL BE NO PROCESS WITHIN WHICH WE CAN DEFEND

26  OURSELVES.  IF THEY GO FORWARD IN SEQUA, AND ONE OF THEIR

27  PURPOSES OF THEIR PROJECT, THE COURT ORDERED THIS HAS TO BE

28  USED AS A CHILDREN'S POOL, WELL, UNDER SEQUA WE CAN'T GO

1    BACK AND OVERTURN THE PRIOR DECISION.  THAT'S WHY THIS

2    FORUM, BECAUSE OF THE TIMING OF THIS PLAINTIFF'S SUIT,

3    ABSOLUTELY PREEMPTS US HAVING A FAIR SHAKEDOWN WHEN THE

4    ACTUAL PROCESS GOES FORWARD.  IT'S THE DISCUSSION THEY'RE

5    GOING TO HAVE OVER WHAT IS LEGAL RIGHT NOW THAT IS GOING TO

6    AFFECT OUR INTERESTS ALL THE WAY ALONG, OUR INTERESTS BEING

7    THE EXACT SAME PUBLIC'S RIGHT OF OWNERSHIP TO THIS BEACH

8    THAT IS EXPRESSED BY THE PLAINTIFFS RIGHT NOW.

9        *THE COURT:*  WELL, WHEN YOU INTERVENE IN A CASE, YOU

10   HAVE A TREMENDOUS IMPACT ON THE CASE BECAUSE YOU NOW HAVE

11   THE ABILITY TO DO DISCOVERY, PRESENT WITNESSES, PARTICIPATE

12   IN THE TRIAL, TO DO ALL THOSE KINDS OF THINGS.  AND THAT

13   HAS A POTENTIALLY DISRUPTIVE ASPECT TO THESE PARTIES WHO

14   ARE IN THE LAWSUIT ALREADY.  AND IT CAN DRAG IT OUT, MAKE

15   IT A LOT MORE EXPENSIVE.  YOU CAN COMPLICATE IT.  YOU COULD

16   PRECLUDE THE ABILITY FOR THEM TO REACH A RESOLUTION, WHICH

17   IS CONTRARY TO WHAT THE COURTS ENCOURAGE IS THAT PARTIES

18   REACH A RESOLUTION.  AND SO I THINK IN ORDER FOR YOU TO

19   PARTICIPATE IN THOSE THINGS, YOU'VE GOT TO HAVE A LEGAL

20   INTEREST IN THE LITIGATION THAT'S GOING ON AND I SEE THAT

21   YOU DON'T.

22       IF YOU WANTED TO FILE AN AMICUS BRIEF ON SOME

23   ISSUES, YOU COULD REQUEST THE COURT TO DO THAT.  THAT'S A

24   WHOLE 'NOTHER MATTER.  THE COURT WOULD GIVE SERIOUS

25   CONSIDERATION TO THAT.  I'M GIVING SERIOUS CONSIDERATION TO

26   THIS ALSO.  BUT I THINK, LEGALLY, YOU'RE NOT ENTITLED TO,

27   AS A MATTER OF RIGHT OR AS A MATTER OF THE COURT'S

28   DISCRETION, ABLE TO INTERVENE INTO THIS CASE BETWEEN THESE

1  PARTIES.  THERE IS A LIMIT TO THE PEOPLE THAT CAN

2  INTERVENE.  OTHERWISE, SOMEBODY CAN COME DOWN HERE AND

3  INTERVENE IN EVERY CASE BECAUSE THEY'RE INTERESTED IN WHAT

4  HAPPENS.

5      MR. GONZALEZ:  IF THEY CAN IDENTIFY AN ADEQUATE

6  REPRESENTATION.

7          WE'LL SUBMIT ON YOUR RULING.  I WOULD JUST LIKE

8  TO SAY WE'LL DECIDE WHETHER TO APPEAL OR COME BACK WITH A

9  REQUEST FOR AMICUS.  THANK YOU FOR YOUR TIME.

10                  --OOO--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                              CERTIFICATE

3

4    STATE OF CALIFORNIA)
                         : SS.
5    COUNTY OF SAN DIEGO)

6                O'SULLIVAN VS. CITY OF SAN DIEGO

7                      CASE NO. GIC 826918

8

9           I, SHARON R. ROCKMAKER, CERTIFIED SHORTHAND

10   REPORTER, AN OFFICIAL REPORTER OF THE SUPERIOR COURT

11   OF THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, DO

12   HEREBY  CERTIFY:

13          THAT I REPORTED IN SHORTHAND THE PROCEEDINGS

14   HELD IN THE FOREGOING CAUSE; THAT MY NOTES WERE LATER

15   TRANSCRIBED INTO TYPEWRITING UNDER MY DIRECTION; AND

16   THE FOREGOING PAGES CONTAIN A CORRECT TRANSCRIPTION OF

17   THE PROCEEDINGS.

18          DATED THIS 19TH DAY OF APRIL, 2006.

19

20

21   SHARON R. ROCKMAKER, CSR NO. 2813
     OFFICIAL REPORTER

22

23

24

25

26

27

28



# EXHIBIT K

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

VALERIE O'SULLIVAN                    )
                                      )
                                      )
        PLAINTIFF;                    )
        RESPONDENT AND                )
        CROSS-APPELLANT,              )
                                      )    CASE NO. GIC826918
        VS.                           )    DO NO. 47382
                                      )
                                      )
CITY OF SAN DIEGO,                    )
                                      )
                                      )
        DEFENDANT;                    )
        APPELLANT AND                 )
        CROSS-RESPONDENT.             )
_____)

REPORTER'S APPEAL TRANSCRIPT
JULY 26, 2005
VOLUME 3
(PAGES 51 - 148)


A P P E A R A N C E S


FOR THE PLAINTIFF:    KENNERSON & GRANT, LLP
                      BY:  PAUL R. KENNERSON, ESQ.
                      101 WEST BROADWAY
                      SUITE 1150
                      SAN DIEGO, CA 92101


FOR THE DEFENDANT:    OFFICE OF THE CITY ATTORNEY
                      BY:  DEBORAH M. SMITH, ESQ.
                      1200 THIRD AVENUE
                      SUITE 700
                      SAN DIEGO, CA 92101

                      LORI OZBUN, CSR NO. 12838
                      OFFICIAL COURT REPORTER

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

DEPARTMENT 60; HON. WILLIAM C. PATE, JUDGE


VALERIE O'SULLIVAN,                    )
                                       )
                    PLAINTIFF,         )
                                       )
           VS.                         )    CASE NO. GIC826918
                                       )
CITY OF SAN DIEGO,                     )
                                       )
                    DEFENDANT.         )
                                       )
_____)



REPORTER'S TRANSCRIPT

TUESDAY, JULY 26, 2005



APPEARANCES:


FOR THE PLAINTIFF:   KENNERSON & GRANT, LLP
                     BY:   PAUL R. KENNERSON, ESQ.
                     101 WEST BROADWAY
                     SUITE 1150
                     SAN DIEGO, CA 92101


FOR THE DEFENDANTS:  OFFICE OF THE CITY ATTORNEY
                     BY:   DEBORAH M. SMITH, ESQ.
                     1200 THIRD AVENUE
                     SUITE 700
                     SAN DIEGO, CA 92101



                     LORI OZBUN, CSR NO. 12838
                     OFFICIAL REPORTER

1    THE STIPULATION.  THE SURVEY IS WRONG.  WE DIDN'T HAVE THE

2    MONEY TO GET IT SURVEYED RIGHT, AND I COULD SHOW YOU IN A

3    HEARTBEAT HOW THE SURVEY IS WRONG.  AND IT'S WRONGNESS IS

4    CALLED INTO QUESTION BY THIS MIDNIGHT LETTER FROM CURTIS

5    FOSSUM SENT 33 MINUTES AFTER HE'S FAXED A LETTER ASKING IF

6    HE'S REALLY SERIOUS ABOUT HIS OPINION OF FIVE YEARS AGO.

7         SO, YOUR HONOR, THAT'S WHAT'S BEFORE YOU.  THIS

8    TRUST, IN OUR VIEW, WAS -- ITS MEANING WAS KNOWN TO THE

9    CITY, ITS MEANING WAS ACKNOWLEDGED BY THE CITY.  THIS

10   BEACH IS DIRTY, ROTTEN, POLLUTED.  IT IS NOT USABLE BY ANY

11   SELF-RESPECTING HUMAN BEING.  IT IS POLLUTED.  AND WITH

12   THE ROPE DOWN, THERE IS ANTAGONISM, THERE IS VIOLENCE.

13   ONE OF THE PEOPLE, DON RILEY, WHO WAS UNDER SUBPOENA TO

14   COME TO THIS COURTROOM, HAS HAD THREE RESTRAINING ORDERS

15   ISSUED BY THIS COURTHOUSE AGAINST HIM FOR CONDUCT OVER THE

16   CHILDREN'S POOL.  THE BEACH MUST BE RETURNED TO ITS

17   INTENDED, PROPER, APPROPRIATE, CONSECRATED, IF YOU WILL,

18   USE INTENDED FROM THE GET-GO.  AND WE BELIEVE THAT EVERY

19   LICK OF EVIDENCE WILL -- THAT YOU WILL HEAR WILL BE IN

20   SUPPORT OF WHAT I HAVE JUST TOLD YOU OR A POINT OTHERWISE

21   TO BE MADE, BUT THAT IN BROAD BRUSH -- AND AGAIN, I

22   APOLOGIZE FOR TAKING SO LONG.  I BELIEVE IT NECESSARY TO

23   TELL THE STORY.  WE BELIEVE THE EVIDENCE WILL SHOW WITH

24   OVERWHELMING CLARITY AND COMPELLING PERSUASION THAT YOU

25   MUST MANDATORILY COMPEL THE CITY TO ENFORCE THE LAW AND TO

26   RID THAT BEACH OF THIS PESTILENCE THAT THESE SEALS HAVE

27   BECOME.

28        THE SEALS, BY THE WAY, YOUR HONOR, I NEGLECTED

```
 1   TO MENTION THIS AT THE EXACTLY RIGHT MOMENT -- THE SEALS
 2   ARE NOT A THREATENED SPECIES.  THEY ARE NOT ENDANGERED.
 3   THEY ARE IN NO WAY VULNERABLE TO IMPAIRMENT OR EXTINCTION.
 4   THEIR NUMBERS ARE ESTIMATED TO BE 30,000 ON THE WEST COAST
 5   OF CALIFORNIA AND GROWING, LIKE THE DEER IN MAINE, SO
 6   THERE'S NO HARM IN GETTING RID OF THEM.  AND JIM ANTRIM,
 7   OUR EXPERT, WILL TESTIFY TO THAT EFFECT.
 8           SO THAT, YOUR HONOR, IS THE LONG AND SHORT OF
 9   OUR CASE.  THERE'S A LOT OF EXHIBITS BECAUSE THE STORY IS
10   A LONG ONE, BUT I THINK WE CAN FORESHORTEN THEM IF WE GET
11   RATIONALITY BETWEEN COUNSEL IN AGREEING TO WHAT COMES IN.
12   AND I HOPE WE CAN CARVE IT SURGICALLY SO THAT YOU CAN BE
13   WELL INFORMED AND MAKE THE CORRECT DECISION.  THANK YOU.
14           THE COURT:  THANK YOU.  ALL RIGHT, WE'LL TAKE A
15   15-MINUTE BREAK, AND WE'LL COME BACK AND HEAR THE
16   DEFENSE'S OPENING STATEMENT.
17                    (RECESS TAKEN)
18           THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT
19   COUNSEL IS PRESENT.  AND MS. SMITH, YOU MAY ADDRESS THE
20   COURT.
21           MS. SMITH:  THANK YOU, YOUR HONOR.
22           MAY IT PLEASE THE COURT, MY NAME IS DEBBIE
23   SMITH.  I AM REPRESENTING THE CITY IN THIS CASE.  AND WHAT
24   THIS CASE PRESENTS IS A SIMPLE ISSUE OF STATUTORY
25   CONSTRUCTION IN WHICH, IN 1931, THE STATE LEGISLATURE
26   GRANTED TO THE CITY OF SAN DIEGO ALL THE RIGHTS, TITLE AND
27   INTEREST AND THE WIDE DISCRETION TO MANAGE AND USE THE
28   POOL WITHIN MANY DIFFERENT USES.  AND THE EVIDENCE WILL
```

SAN DIEGO, CALIFORNIA)
                     )  SS.
COUNTY OF SAN DIEGO  )

I, LORI R. OZBUN, CERTIFIED SHORTHAND REPORTER OF THE
SUPERIOR COURT, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA,
DO HEREBY CERTIFY:

THAT I REPORTED IN SHORTHAND THE PROCEEDINGS HELD IN
THE FOREGOING CAUSE ON JULY 26, 2005; THAT MY NOTES WERE
LATER TRANSCRIBED INTO TYPEWRITING UNDER MY DIRECTION;
THAT THE FOREGOING 98 PAGES CONTAINS A CORRECT STATEMENT
OF THE PROCEEDINGS.

DATED MARCH 17, 2006

LORI R. OZBUN
CERTIFIED SHORTHAND REPORTER #12838

# EXHIBIT L

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| VALERIE O'SULLIVAN | ) |
| | ) |
| | ) |
| PLAINTIFF; | ) |
| RESPONDENT AND | ) |
| CROSS-APPELLANT, | ) |
| | ) CASE NO. GIC826918 |
| VS. | ) D0 NO. 47382 |
| | ) |
| | ) |
| CITY OF SAN DIEGO, | ) |
| | ) |
| | ) |
| DEFENDANT; | ) |
| APPELLANT AND | ) |
| CROSS-RESPONDENT. | ) |

COPY

**REPORTER'S APPEAL TRANSCRIPT**
JULY 27, 2005
VOLUME 4
(PAGES 149 - 335)

A P P E A R A N C E S

FOR THE PLAINTIFF:   KENNERSON & GRANT, LLP
                     BY:   PAUL R. KENNERSON, ESQ.
                     101 WEST BROADWAY
                     SUITE 1150
                     SAN DIEGO, CA 92101


FOR THE DEFENDANTS:  OFFICE OF THE CITY ATTORNEY
                     BY:   DEBORAH M. SMITH, ESQ.
                     1200 THIRD AVENUE
                     SUITE 700
                     SAN DIEGO, CA 92101

                     LORI OZBUN, CSR NO. 12838
                     OFFICIAL COURT REPORTER

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

DEPARTMENT 60; HON. WILLIAM C. PATE, JUDGE


VALERIE O'SULLIVAN,                  )
                                     )
                  PLAINTIFF,         )
                                     )
        VS.                          )     CASE NO. GIC826918
                                     )
CITY OF SAN DIEGO,                   )
                                     )
                  DEFENDANT.         )
                                     )
_____)



REPORTER'S TRANSCRIPT

WEDNESDAY, JULY 27, 2005


APPEARANCES:


FOR THE PLAINTIFF:   KENNERSON & GRANT, LLP
                     BY:   PAUL R. KENNERSON, ESQ.
                     101 WEST BROADWAY
                     SUITE 1150
                     SAN DIEGO, CA 92101


FOR THE DEFENDANTS:  OFFICE OF THE CITY ATTORNEY
                     BY:   DEBORAH M. SMITH, ESQ.
                     1200 THIRD AVENUE
                     SUITE 700
                     SAN DIEGO, CA 92101



LORI OZBUN, CSR NO. 12838
OFFICIAL REPORTER

1              THE CLERK:  WOULD YOU PLEASE STATE YOUR FULL

2     NAME FOR THE RECORD AND THEN SPELL YOUR LAST NAME.

3              THE WITNESS:  MY NAME IS VALERIE RENEE

4     O'SULLIVAN, AND IT'S SPELLED O, APOSTROPHE,

5     S-U-L-L-I-V-A-N.

6              THE CLERK:  WOULD YOU SPELL RENEE FOR ME?

7              THE WITNESS:  R-E-N, DOUBLE E.

8              THE CLERK:  THANK YOU.

9              THE COURT:  YOU MAY HAVE A SEAT.

10                        DIRECT EXAMINATION

11    BY MR. KENNERSON:

12         Q    DO YOU LIVE IN LA JOLLA, MS. O'SULLIVAN?

13         A    YES, I DO.

14         Q    CAN YOU PULL THE MICROPHONE A LITTLE BIT CLOSER

15    TO YOU OR SIT CLOSER TO IT A TOUCH, SO WE CAN ALL HEAR

16    YOU NICE AND CLEARLY?

17         A    YES, I DO LIVE IN LA JOLLA.

18         Q    THANK YOU.  DO YOU WORK IN LA JOLLA, AS WELL?

19         A    YES.

20         Q    WHAT IS YOUR OCCUPATION?

21         A    I OWN A SMALL DAY SPA.

22              THE COURT:  SMALL WHAT?

23              THE WITNESS:  SPA, DAY SPA.

24              THE COURT:  I THOUGHT YOU SAID A BASEBALL.

25    BY MR. KENNERSON:

26         Q    YOU DON'T WANT TO MENTION BASEBALL IN THIS

27    DEPARTMENT, IF YOU CAN AVOID IT.  YOU'RE NOT A BASEBALL

28    PLAYER, ARE YOU?

1       A    YES.

2       Q    OKAY.  AND LIKE THE ONE BELOW IT, WERE THOSE PUT

3    UP -- WAS THE TOPMOST SIGN PUT UP, AS WELL, AFTER THE

4    YELLOWISH SIGN WAS TAKEN DOWN?

5       A    YES.

6       Q    OKAY.  NOW, YOU YOURSELF HAVE SWUM AT THE

7    CHILDREN'S POOL; IS THAT RIGHT?

8       A    YES.

9       Q    HAVE YOU DISCONTINUED SWIMMING THERE REGULARLY,

10   AT SOME POINT?

11          MS. SMITH:  OBJECTION.  VAGUE.

12          THE COURT:  OVERRULED.

13          THE WITNESS:  I STOPPED SWIMMING THERE AFTER I

14   GOT THE CITATION FROM NOAA.

15   BY MR. KENNERSON:

16      Q    OKAY.  AND WHEN WAS THAT?

17      A    THAT WAS IN 2003.

18      Q    OKAY.  AND WAS THAT THE FAMOUS LA JOLLA NINE

19   SWIM INTO CHILDREN'S POOL THAT'S FEATURED, SOMEWHAT

20   IMPORTANTLY, IN THE CASE?

21          MS. SMITH:  YOUR HONOR, I'D OBJECT TO HIS

22   CHARACTERIZATION.

23          MR. KENNERSON:  WELL, I'LL REPHRASE IT.

24          THE COURT:  PLEASE.

25   BY MR. KENNERSON:

26      Q    WAS THERE A GROUP THAT SWAM TO THE CHILDREN'S

27   POOL IN CONNECTION WITH WHICH YOU GOT THIS TICKET?

28      A    YES, THERE WERE OTHERS.

1    Q    HOW MANY WERE THERE?

2    A    THERE WERE NINE OF US THAT ARRIVED.

3    Q    WAS THERE SOME OCCASION OR EVENT OR HAPPENING

4    THAT WAS THE OCCASION OR THE TRIGGER FOR THIS SWIMMING OF

5    THIS GROUP TO CHILDREN'S POOL?

6    A    WE SWAM TOGETHER TO BRING ATTENTION TO THE FACT

7    THAT THERE WAS SOME AMBIGUITY AS TO WHETHER YOU CAN SWIM

8    ON THE BEACH OR NOT.

9    Q    OKAY.  AND DO YOU REMEMBER THE EVENT?  IS THE

10   EVENT PRETTY CLEAR IN YOUR MIND?

11   A    YES, I REMEMBER.

12   Q    WERE PEOPLE CITED WHEN THEY ARRIVE AT THE

13   CHILDREN'S POOL BY NOAA, THE FEDERAL BUNCH?

14   A    YES.  I WAS ALSO CITED, AND I DIDN'T KNOW THAT

15   THE PEOPLE GIVING CITATIONS WOULD BE THERE GIVING

16   CITATIONS OR THAT WHAT WE WERE DOING WAS ILLEGAL, AND I

17   BELIEVE NONE OF US KNEW THAT.  AND WE DIDN'T KNOW THEY

18   WERE FEDERAL AGENTS.

19   Q    WHEN DID THIS EVENT TAKE PLACE?

20   A    IT WAS FREEZING COLD.  IT WAS AROUND MARCH OR

21   FEBRUARY.  THE WATER WAS VERY COLD.

22   Q    OF WHAT YEAR, DO YOU REMEMBER?

23   A    2003.

24   Q    OKAY.  AND YOU YOURSELF GOT A TICKET, RIGHT?

25   A    YES.

26   Q    AND THEN YOU HIRED ME AND WE FOUGHT THE TICKET,

27   RIGHT?

28   A    RIGHT.

1    A    YES.

2    Q    -- WERE PEOPLE ACTUALLY ARRESTED?  WAS ANYBODY

3    ACTUALLY ARRESTED?

4    A    YES.  THERE WAS A MAN NAMED OTIS BENTON WHO

5    WAS -- HE CAME IN JUST AFTER I DID.  AND HE WAS SMASHED

6    TO THE GROUND BY SOMEBODY IN A DARK BLUE JACKET AND

7    HANDCUFFED WHEN HE TRIED TO GO UP THE STEPS.

8    Q    CAN YOU LOOK, IS THERE A FILE UP THERE?

9    A    YES.

10    Q    IS IT 423?

11    A    YES.

12        (WHEREUPON, EXHIBIT NO. 423 WAS IDENTIFIED)

13    BY MR. KENNERSON:

14    Q    DO YOU RECOGNIZE IT?

15    A    OH, YES.

16    Q    WHAT IS IT?

17    A    IT'S OTIS BENTON BEING ARRESTED.

18    Q    OKAY.  IS IT THE DAY OF THE SWIM-IN TO THE

19    CHILDREN'S POOL?

20    A    YES.

21        MR. KENNERSON:  I'D OFFER 423, YOUR HONOR.

22        MS. SMITH:  YOUR HONOR, MAY I HAVE A CHANCE TO

23    LOOK AT THAT REAL QUICK, IF I MAY?

24        THE COURT:  GO AHEAD.

25        MS. SMITH:  I DON'T BELIEVE THERE HAS BEEN

26    SUFFICIENT FOUNDATION FOR THIS ONE, YOUR HONOR.

27        THE COURT:  WELL, SHE SAID SHE OBSERVED THIS

28    EVENT AND THIS WAS A PHOTO DEPICTING IN WHICH SHE

```
 1  SAN DIEGO, CALIFORNIA)
                         )  SS.
 2  COUNTY OF SAN DIEGO  )

 3

 4

 5

 6          I, LORI R. OZBUN, CERTIFIED SHORTHAND REPORTER

 7  OF THE SUPERIOR COURT, COUNTY OF SAN DIEGO, STATE OF

 8  CALIFORNIA, DO HEREBY CERTIFY:

 9

10

11

12          THAT I REPORTED IN SHORTHAND THE PROCEEDINGS

13  HELD IN THE FOREGOING CAUSE ON JULY 27, 2005; THAT MY

14  NOTES WERE LATER TRANSCRIBED INTO TYPEWRITING UNDER MY

15  DIRECTION; THAT THE FOREGOING 187 PAGES CONTAINS A

16  CORRECT STATEMENT OF THE PROCEEDINGS.

17

18

19

20          DATED MARCH 17, 2006

21

22

23

24          _____
            LORI R. OZBUN
25          CERTIFIED SHORTHAND REPORTER #22838

26

27

28
```

# EXHIBIT M

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

VALERIE O'SULLIVAN              )
                               )
                               )
        PLAINTIFF;             )
        RESPONDENT AND         )
        CROSS-APPELLANT,       )
                               )   CASE NO. GIC826918
        VS.                    )   DO NO. 47382
                               )
                               )
CITY OF SAN DIEGO,             )
                               )
                               )
        DEFENDANT;             )   COPY
        APPELLANT AND          )
        CROSS-RESPONDENT.      )
_____)

REPORTER'S APPEAL TRANSCRIPT
JULY 28, 2005
VOLUME 5
(PAGES 336 - 519)


A P P E A R A N C E S


FOR THE PLAINTIFF:    KENNERSON & GRANT, LLP
                      BY:   PAUL R. KENNERSON, ESQ.
                      101 WEST BROADWAY
                      SUITE 1150
                      SAN DIEGO, CA 92101


FOR THE DEFENDANT:    OFFICE OF THE CITY ATTORNEY
                      BY:   DEBORAH M. SMITH, ESQ.
                      1200 THIRD AVENUE
                      SUITE 700
                      SAN DIEGO, CA 92101

                      LORI OZBUN, CSR NO. 12838
                      OFFICIAL COURT REPORTER

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

DEPARTMENT 60; HON. WILLIAM C. PATE, JUDGE


VALERIE O'SULLIVAN,                )
                                   )
                    PLAINTIFF,     )
                                   )
          VS.                      )    CASE NO. GIC826918
                                   )
CITY OF SAN DIEGO,                 )
                                   )
                    DEFENDANTS.    )
                                   )
_____)


REPORTER'S TRANSCRIPT

THURSDAY, JULY 28, 2005


APPEARANCES:


FOR THE PLAINTIFF:   KENNERSON & GRANT, LLP
                     BY:   PAUL R. KENNERSON, ESQ.
                     101 WEST BROADWAY
                     SUITE 1150
                     SAN DIEGO, CA 92101


FOR THE DEFENDANTS:  OFFICE OF THE CITY ATTORNEY
                     BY:   DEBORAH M. SMITH, ESQ.
                     1200 THIRD AVENUE
                     SUITE 700
                     SAN DIEGO, CA 92101


LORI OZBUN, CSR NO. 12838
OFFICIAL REPORTER

1

2                        ANNE CLEVELAND,

3        CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF,

4              HAVING BEEN DULY SWORN, TESTIFIED

5                      AS FOLLOWS:

6

7         THE CLERK:  PLEASE STATE YOUR FULL NAME AND

8    SPELL YOUR LAST NAME FOR THE RECORD.

9         THE WITNESS:  ANNE CLEVELAND, C-L-E-V-E-L-A-N-D.

10        THE CLERK:  HOW DO YOU SPELL ANNE?

11        THE WITNESS:  ANNE, A-N-N-E.

12

13                    DIRECT EXAMINATION

14   BY MR. KENNERSON:

15        Q    MS. CLEVELAND, WHAT IS YOUR OCCUPATION?

16        A    I'M A YOGA TEACHER, A SWIMMING INSTRUCTOR, A

17   HAIR COLORIST, AND A CHANNEL SWIMMER.

18        Q    YOU LIVE IN LA JOLLA?

19        A    YES, I DO.

20        Q    HAVE YOU EVER SWUM AT CHILDREN'S POOL?

21        A    YES, I HAVE.

22        Q    OKAY.  WHEN HAVE YOU SWUM AT THE CHILDREN'S

23   POOL?

24        A    WHEN I WAS A CHILD, I AM SWAM THERE REGULARLY.

25   MY MOTHER WOULD TAKE ME AND MY BROTHER AND SISTER THERE TO

26   SWIM IN THE OCEAN.

27        Q    AND HAVE YOU GONE ON IN YOUR ADULT LIFE TO

28   BECOME A SWIMMER OF SOME CONSIDERABLE ACHIEVEMENT?

```
1        A     YES.

2        Q     CAN YOU TELL THE COURT VERY BRIEFLY WHAT THAT

3    IS?

4        A     LAST SUMMER, I SWAM THE ENGLISH CHANNEL BOTH

5    WAYS.  I BECAME THE 17TH AND OLDEST PERSON EVER TO DO

6    THAT, AND ONE OF TWO AMERICAN WOMEN TO HAVE DONE THAT.

7    AND I'VE SWUM THE ENGLISH CHANNEL ONE WAY, AND THE

8    CATALINA CHANNEL AND OTHERS.

9        Q     IS THERE SUCH A THING AS THE SWIMMING HALL OF

10   FAME?

11       A     THE INTERNATIONAL MARATHON SWIMMING HALL OF FAME

12   AWARDED ME THE GERTRUDE EDERLE AWARD FOR THE MOST

13   MERITORIOUS SWIM BY A WOMAN IN 2004 FOR MY TWO-WAY ENGLISH

14   CHANNEL SWIM.

15       Q     DID YOU PARTICIPATE IN THE SWIM-IN, SO TO SPEAK,

16   IN MARCH OF 2003 WHEN THE CHILDREN'S POOL WAS REOPENED?

17       A     YES, I DID.

18       Q     AND DID YOU GET A TICKET --

19       A     YES.

20       Q     -- FROM THE FEDERAL AUTHORITIES?

21       A     I RECEIVED ONE OF THOSE CITATIONS.

22       Q     HAVE YOU SWUM AT THE CHILDREN'S POOL SINCE THAT

23   TIME?

24       A     NO, I HAVE NOT.

25       Q     OKAY.  DID YOU -- ARE YOU FAMILIAR GENERALLY

26   WITH THE PRESENCE OF SEALS AND THE GROWING PRESENCE OF

27   SEALS AT THE CHILDREN'S POOL?

28       A     YES.
```

1    SAN DIEGO, CALIFORNIA)
                         )    SS.
2    COUNTY OF SAN DIEGO )

3

4

5

6        I, LORI R. OZBUN, CERTIFIED SHORTHAND REPORTER OF THE

7    SUPERIOR COURT, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA,

8    DO HEREBY CERTIFY:

9

10

11

12        THAT I REPORTED IN SHORTHAND THE PROCEEDINGS HELD IN

13    THE FOREGOING CAUSE ON JULY 28, 2005; THAT MY NOTES WERE

14    LATER TRANSCRIBED INTO TYPEWRITING UNDER MY DIRECTION;

15    THAT THE FOREGOING 184 PAGES CONTAINS A CORRECT STATEMENT

16    OF THE PROCEEDINGS.

17

18

19

20        DATED MARCH 17, 2006

21

22

23

24
      _____
25    LORI R. OZBUN
      CERTIFIED SHORTHAND REPORTER #12838

26

27

28

# EXHIBIT N

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

VALERIE O'SULLIVAN )
)
)
PLAINTIFF; )
RESPONDENT AND )
CROSS-APPELLANT, )
)   CASE NO. GIC826918
VS. )   DO NO. 47382
)
)
CITY OF SAN DIEGO, )
)
)
)
DEFENDANT; )
APPELLANT AND )   COPY
CROSS-RESPONDENT. )
_____ )

REPORTER'S APPEAL TRANSCRIPT
JULY 28, 2005
VOLUME 5
(PAGES 336 - 519)

A P P E A R A N C E S

FOR THE PLAINTIFF:    KENNERSON & GRANT, LLP
                      BY:   PAUL R. KENNERSON, ESQ.
                      101 WEST BROADWAY
                      SUITE 1150
                      SAN DIEGO, CA 92101


FOR THE DEFENDANT:    OFFICE OF THE CITY ATTORNEY
                      BY:   DEBORAH M. SMITH, ESQ.
                      1200 THIRD AVENUE
                      SUITE 700
                      SAN DIEGO, CA 92101

                      LORI OZBUN, CSR NO. 12838
                      OFFICIAL COURT REPORTER

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

DEPARTMENT 60; HON. WILLIAM C. PATE, JUDGE

VALERIE O'SULLIVAN,                )
                                   )
                  PLAINTIFF,       )
                                   )
         VS.                       )     CASE NO. GIC826918
                                   )
CITY OF SAN DIEGO,                 )
                                   )
                  DEFENDANTS.      )
                                   )
_____)

REPORTER'S TRANSCRIPT

THURSDAY, JULY 28, 2005

APPEARANCES:

FOR THE PLAINTIFF:     KENNERSON & GRANT, LLP
                       BY:  PAUL R. KENNERSON, ESQ.
                       101 WEST BROADWAY
                       SUITE 1150
                       SAN DIEGO, CA 92101

FOR THE DEFENDANTS: OFFICE OF THE CITY ATTORNEY
                       BY:  DEBORAH M. SMITH, ESQ.
                       1200 THIRD AVENUE
                       SUITE 700
                       SAN DIEGO, CA 92101

LORI OZBUN, CSR NO. 12838
OFFICIAL REPORTER

1  BY MR. KENNERSON:

2       Q    DID YOU LOOK AT THE SAVAGE REPORT AT ALL --

3       A    I DID NOT, SIR.

4       Q    -- WITH YOUR WORK?

5       A    NOT THAT I'M AWARE OF.  I DON'T RECALL RECEIVING

6  A DOCUMENT OF THIS VOLUME.

7       Q    OKAY.

8       A    IF I RECEIVED ANY EXCERPTS FROM IT OR COPIES, I

9  DIDN'T RELY ON IT FOR DEVELOPING THE EXHIBITS IN FRONT OF

10  US.

11       MR. KENNERSON:  I CAN REPRESENT TO THE COURT,

12  YOUR HONOR, THAT WHEN WE WENT TO THE PUBLIC LIBRARY AND

13  ASKED FOR IT -- ASKED IF IT WAS IN EXISTENCE, THE

14  CUSTODIAN OF IT AT THE SAN DIEGO PUBLIC LIBRARY MADE IT

15  AVAILABLE TO US TO COPY AS THE DOCUMENT, SO HE OBVIOUSLY

16  CONSIDERED IT ACCURATE AND AUTHENTIC, AND TO THAT EXTENT

17  RELIED IT.  SO I DON'T THINK WE NEED TO HAVE -- I DON'T

18  KNOW, YOU KNOW BETTER THAN I DO, YOU'RE THE JUDGE.  BUT I

19  DON'T THINK WE NEED TESTIMONY THAT SOMEBODY ACTUALLY

20  RELIED ON IT AS ONE WOULD RELY ON AN EXPERT OPINION IN

21  ORDER TO AUTHENTICATE IT.  THERE MAY BE OTHER PROBLEMS,

22  BUT I DON'T THINK IT'S THAT ONE.

23       THE COURT:  DID YOU CHECK OUT ITS HISTORY OF

24  BEING CHECKED OUT?

25       MR. KENNERSON:  WE DIDN'T -- WE COPIED IT RIGHT

26  THERE, YOUR HONOR.

27       THE COURT:  WHAT I MEANT WAS --

28       MR. KENNERSON:  WE HAD TO COPY.

1   SAN DIEGO, CALIFORNIA)
                         )   SS.
2   COUNTY OF SAN DIEGO  )

3

4

5

6       I, LORI R. OZBUN, CERTIFIED SHORTHAND REPORTER OF THE

7   SUPERIOR COURT, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA,

8   DO HEREBY CERTIFY:

9

10

11

12      THAT I REPORTED IN SHORTHAND THE PROCEEDINGS HELD IN

13  THE FOREGOING CAUSE ON JULY 28, 2005; THAT MY NOTES WERE

14  LATER TRANSCRIBED INTO TYPEWRITING UNDER MY DIRECTION;

15  THAT THE FOREGOING 184 PAGES CONTAINS A CORRECT STATEMENT

16  OF THE PROCEEDINGS.

17

18

19

20      DATED MARCH 17, 2006

21

22

23

24  _____
    LORI R. OZBUN
25  CERTIFIED SHORTHAND REPORTER #12838

26

27

28

# EXHIBIT O

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

---

VALERIE O'SULLIVAN )
)
   PLAINTIFF; RESPONDENT )    CASE NO.    GIC826918
   AND CROSS-APPELLANT, )
)
 VS. )    COURT OF APPEAL
) NO. D047382
CITY OF SAN DIEGO )
)
   DEFENDANT; APPELLANT )
   AND CROSS-RESPONDENT. )

---

FROM SAN DIEGO COUNTY
HON. WILLIAM C. PATE, JUDGE

REPORTER'S TRANSCRIPT ON APPEAL
NOVEMBER 8, 2005
VOLUME 8
PAGES 684 THRU 693

APPEARANCES:

FOR THE PLAINTIFF              KENNERSON & GRANT
AND RESPONDENT:               BY:   PAUL KENNERSON
                              110 WEST BROADWAY, SUITE 1150
                              SAN DIEGO, CA  92101


FOR THE DEFENDANT             OFFICE  OF THE CITY ATTORNEY
AND APPELLANT:                BY: ROBERT MARTINEZ
                              1200 THIRD AVENUE, SUITE 1100
                              SAN DIEGO, CA  92101



BOBBIE J. HIBBLER, CSR
CSR CERTIFICATE NO. 12475
OFFICIAL COURT REPORTER
SAN DIEGO, CALIFORNIA



IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

CENTRAL DIVISION

DEPARTMENT 60        HON. WILLIAM C. PATE, JUDGE

VALERIE O'SULLIVAN                    )
                                      )
            PLAINTIFF,                )    CASE NO. GIC826918
                                      )
    VS.                               )
                                      )
CITY OF SAN DIEGO,                    )
                                      )
            DEFENDANT.                )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

NOVEMBER 8, 2005

VOLUME 8

PAGES 684 THRU 693

APPEARANCES:

FOR THE PLAINTIFF:              PAUL KENNERSON
                                ATTORNEY AT LAW

FOR THE DEFENDANT:              ROBERT MARTINEZ
                                ATTORNEY AT LAW

BOBBIE J. HIBBLER, CSR
CSR CERTIFICATE NO. 12475
OFFICIAL COURT REPORTER
SAN DIEGO, CALIFORNIA

1    WORDS.  SO GO AHEAD, SIR.

2         MR. KENNERSON:  I DON'T WANT TO WASTE THE COURT'S

3    TIME EITHER, YOUR HONOR.  YOUR HONOR, WE HAVE RAISED THE

4    POINTS THAT APPEAR MOST PERTINENT TO US IN THE PAPERS, BUT I

5    THINK IT IS IMPORTANT JUST BRIEFLY TO UNDERSCORE A COUPLE OF

6    POINTS.  ONE IS THAT THE MATTER OF DREDGING AND THE MATTER

7    OF THE PRESENCE OR ABSENCE OF THE SEALS AT THE POOL.

8         IT SEEMS TO THE PLAINTIFF THEY ARE INDEPENDENT ISSUES

9    AND SHOULD BE APPROACHED AND RULED ON AS INDEPENDENT ISSUES.

10   THE COURT, I THINK, IS SQUARELY WITHIN THE CODE OF CIVIL

11   PROCEDURE SECTION WHERE IT SPEAKS OF NUISANCE.

12        I KNOW THAT THE COURT THINKS THAT THIS IS DIFFERENT

13   FROM DECLARING, FOR EXAMPLE, A SITE OR BUILDING, A NUISANCE

14   AND CLOSING DOWN IT'S USE, BUT IT SEEMS TO ME THAT IS A

15   DISTINCTION WITHOUT A DIFFERENCE, BUT WHAT REALLY COUNTS

16   HERE IS THAT THE PLACE IS A NUISANCE.  AND THAT THE REAL

17   STATUS QUO OF THE PLACE IS WHAT IT WAS ORIGINALLY.

18        THAT IS CLEAN WATER, SEA APPROACHABLE BATHING AREA

19   FOR CHILDREN, AND THE FACT THAT THE CITY BY ITS DERELICTIONS

20   AND BY WHAT THE COURT HAS FOUND ON BREACHES OF ITS DUTIES,

21   HASN'T KEPT IT THAT WAY, SHOULD NOT PENALIZE THE PLAINTIFF

22   WHO WANT IT RESTORED TO THE STATUS QUO.

23        I THINK FUNDAMENTALLY, WHICH I HAVE SAID ABOUT EIGHT

24   DIFFERENT WAYS IN THE PAPERS, THAT I THINK THE DISTINCTION

25   BETWEEN MANDATORY AND PROHIBITORY INJUNCTIONS WHILE A NICE,

26   NEAT, LINGUISTIC DISTINCTION REALLY BEGS FOR THE COURT TO

27   LOOK BEHIND THE WORDS TO WHAT IS REALLY HAPPENING.

28        I THINK WHAT THE COURT HAS ORDERED HERE IS THAT THE

1  BEACH SHOULD BE RESTORED TO WHAT IT WAS ORIGINALLY, AND IN

2  THAT SENSE THE REAL STATUS QUO IS NOT IN THE BAD CONDITION

3  THAT IT IS NOW, BUT THE PRISTINE CONDITION THAT WE HOPE TO

4  RETURN IT TO.  AND FOR THAT REASON I THINK AND FOR THE OTHER

5  REASONS THAT ARE IN THE PAPERS, I THINK THE SEALS TO BE

6  GOTTEN RID OF AS THE FEDERAL AUTHORITIES IN CHARGE OF THE

7  ISSUE PREFER, AND AS A GOOD MANY ARGUMENTS SUPPORT.

8         I UNDERSTAND I HAVE ARGUED IN THIS DEPARTMENT MANY

9  TIMES AND I KNOW THE CHANGING THE COURSE OF THIS RIVER IS A

10 VERY SLOW AND LABORED PROCESS.  THANK YOU, YOUR HONOR.

11        THE COURT:  I DON'T KNOW IF I'VE EVER BEEN CALLED A

12 RIVER BEFORE, BUT I PRESUME THAT IS A --

13        MR. KENNERSON:  A RIVER OF WISDOM, YOUR HONOR.

14        THE COURT:  ALL RIGHT.  MR. MARTINEZ, DO YOU HAVE

15 ANYTHING YOU WANT TO ADD?

16        MR. MARTINEZ:  BRIEFLY, YOUR HONOR.  I THINK THAT

17 PLAINTIFF IN HIS PAPERS CONCEDE THAT THE DREDGING REMOVAL OF

18 THE SAND IS A MANDATORY INJUNCTION AND THEREFORE STAYED BY

19 THE CITY FILING A MOTION OF APPEAL.  THE ISSUE IS TO REMOVE

20 THE CONTAMINATION OF THE AREA.  DESPITE THE PHRASING IN THE

21 COURT'S JUDGMENT WHAT THAT EFFECTIVELY MEANS IS THAT THE

22 SEALS HAVE TO BE REMOVED.

23        THAT IN ITSELF IS A PHYSICAL ACT AND CONSISTENT WITH

24 THE COURT'S RULING REGARDING THE DREDGING THAT BECAUSE IT'S

25 A PHYSICAL ACT, IT'S A MANDATORY INJUNCTION.  THEREFORE,

26 IT'S STAYED IN THIS COURT AS THE LAST JURISDICTION.  IN

27 ADDITION, THERE HAS BEEN NO FEDERAL AUTHORITY THAT HAS GIVEN

28 THE CITY OF SAN DIEGO PERMISSION TO REMOVE THE SEALS.

1    STATE OF CALIFORNIA )

2                       )

3    COUNTY OF SAN DIEGO )

4

5

6

7         I, BOBBIE J. HIBBLER, CSR 12475, AN OFFICIAL COURT

8    REPORTER IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA IN

9    AND FOR THE COUNTY OF SAN DIEGO, HEREBY CERTIFY THAT I MADE

10   A SHORTHAND RECORD OF THE PROCEEDINGS HAD IN THE WITHIN

11   CASE AND THAT THE FOREGOING TRANSCRIPT IS A FULL, TRUE AND

12   CORRECT TRANSCRIPTION OF THE PROCEEDINGS IN THIS CASE.

13        DATED THIS 7TH DAY OF APRIL, 2006.

14

15

16

17

18                                        _____

19                              BOBBIE J. HIBBLER, CSR 12475
                               OFFICIAL COURT REPORTER

20

21

22

23

24

25

26

27

28

# EXHIBIT P



Court's Ex.
Case #
Rec'd
Dept            Clk



**EXHIBIT Q**



UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Southwest Enforcement Division
501 West Ocean Blvd. Suite 4300
Long Beach, CA 90802 - 4213
April 12, 2004

Dr. John Steel
6357 Cardeno Dr.
La Jolla, CA 92037

Dear Dr. Steel:

This office represents the Law Enforcement Division of the National Marine Fisheries Service (NMFS), a part of the National Oceanic and Atmospheric Administration. As such, we are responsible for the enforcement of the Marine Mammal Protection Act (MMPA) (Title 16, United States Code, §1361 et seq.), and implementing regulations promulgated thereunder. This letter is to inform you that the NMFS is concerned about the possibility of a violation of the MMPA occurring as a result of interactions with marine mammals. The NMFS has received a report that you may have been involved in an unlawful interaction with marine mammals at the Children's Pool beach area of La Jolla, CA.

As you may know, the marine mammal haulout at Children's Pool beach is a unique environment and setting in Southern California. The NMFS is continually assessing effective and appropriate responses for this haulout and the approximately one million visitors it gets every year. Of particular concern to the NMFS is the potential harassment of harbor seals during the pupping season - January 1st through May 31st - when nursing newborns and recently weaned animals are at the greatest risk from behavioral disruption from by human activity. I have enclosed NMFS's marine mammal viewing guidelines for your review. The NMFS hopes that the use of educational letters such as this will provide you with relevant information about the haulout while conserving the agency's limited resources.

If you have any questions regarding this letter, please contact NMFS Special Agent Michelle Zetwo at 619-557-5494.

Sincerely,

Michael Gonzales
Special Agent in Charge

cc: Paul Ortiz - NOAA GCEL
    Case File SW040047

Court's Ex. _303_

Case # _____

Rec'd _____

Dept _____ Clk _____



NOAA Fisheries
Southwest Region
501 West Ocean Blvd.
Long Beach, CA  90802
562.980.4000



# Guidelines for Viewing Marine Mammals

## VIEWING MARINE MAMMALS FROM THE WATER

- Remain AT LEAST 100 yards from free-swimming whales

- Remain AT LEAST 100 yards from established pinniped rookeries or haulouts.

- Remain AT LEAST 50 yards from free-swimming dolphins, porpoise, and pinnipeds.

- Remain AT LEAST 50 yards from pinnipeds hauled out on man-made structures (bell buoys, breakwaters, docks, etc.)

## VIEWING MARINE MAMMALS FROM THE LAND

- Remain AT LEAST 100 yards from established pinniped rookeries or haulouts on offshore islands.

- Remain AT LEAST 100 feet from established pinniped rookeries or haulouts on the mainland.

- Remain AT LEAST 100 feet from stranded cetaceans and pinnipeds



**U.S. Department of Commerce**
NOAA, Office for Law Enforcement
Southwest Enforcement Division

# RICK HAWKINS
Enforcement Officer
Community Oriented Policing

501 W. Ocean Bl. Suite 4300
Long Beach, CA 90802
Rick.Hawkins@NOAA.GOV

(562) 980-4052
Cell (562) 547-2333
Fax (562) 980-4058

**NOAA Fisheries**
**Southwest Region**
501 West Ocean Blvd
Long Beach, CA 90802
562.980.4006



---

# Guidelines for Viewing Marine Mammals

## VIEWING MARINE MAMMALS FROM THE WATER

- Remain AT LEAST 100 yards from free-swimming whales

- Remain AT LEAST 100 yards from established pinniped rookeries or haulouts.

- Remain AT LEAST 50 yards from free-swimming dolphins, porpoise, and pinnipeds.

- Remain AT LEAST 50 yards from pinnipeds hauled out on man-made structures (bell buoys, breakwaters, docks, etc.)

## VIEWING MARINE MAMMALS FROM THE LAND

- Remain AT LEAST 100 yards from established pinniped rookeries or haulouts on offshore islands.

- Remain AT LEAST 100 feet from established pinniped rookeries or haulouts on the mainland.

- Remain AT LEAST 100 feet from stranded cetaceans and pinnipeds

# EXHIBIT R

STATE OF CALIFORNIA

CALIFORNIA STATE LANDS COMMISSION
100 Howe Avenue, Suite 100-South
Sacramento, CA 95825-8202

ARNOLD SCHWARZENEGGER, *Governor*

**PAUL D. THAYER**, *Executive Officer*
(916) 574-1800    FAX (916) 574-1810
California Relay Service From TDD Phone 1-800-735-2922
from Voice Phone 1-800-735-2929

Contact Phone: 916-574-1828
Contact FAX: 916-574-1855
Contact Email: *fossumc@slc.ca.gov*



March 4, 2005

File Ref: G-10-07

Michael J. Aguirre
City Attorney
City of San Diego
1200 Third Avenue, Suite 1100
San Diego, CA 92101-4100

Subject:     **Chapter 937, Statutes of 1931**

Dear Mr. Aguirre:

You have requested that the staff of the California State Lands Commission (CSLC) provide any clarification deemed appropriate involving correspondence dated August 15, 2000 from CSLC staff regarding the subject.   The August 2000 letter requested this office's opinion on whether we believed that the terms of the statutory grant in trust to the city had been violated.

We did not conclude that any such violation had occurred, nor did we intend to imply that it was mandatory that the city provide each of the listed authorized uses in the trust grant. The statutory grant under which the City holds title to the Children's pool area (Chapter 937) authorizes a number of permissible activities, including a public park, bathing pool for children, parkway, highway, playground and recreational purposes. The uses listed in the trust grant are alternative permissive uses, not cumulatively mandatory. Although the area's use as a bathing place may have been the use that initially motivated the grant, the Legislature authorized a number of alternative uses to which the tide and submerged lands might be put. If these uses were all mandatory, the City would be required to fill the Children's Pool area to and construct a highway. Instead, the Legislature provided the City with the flexibility to choose among a narrow range of permissive public trust uses.

Thank you for the opportunity to clarify any misunderstanding regarding this office's position regarding Chapter 937.

Sincerely,

Curtis L. Fossum
Senior Staff Counsel

01030

# EXHIBIT S

Court's Ex. 542

Case # GIC 826918

Rec'd

Dept 60 Clk

50 CFR S 216.3
50 C.F.R. § 216.3
C

CODE OF FEDERAL REGULATIONS
TITLE 50--WILDLIFE AND FISHERIES
CHAPTER II--NATIONAL MARINE FISHERIES
SERVICE, NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION,
DEPARTMENT OF COMMERCE
SUBCHAPTER C--MARINE MAMMALS
PART 216--REGULATIONS GOVERNING THE
TAKING AND IMPORTING OF MARINE
MAMMALS
SUBPART A--INTRODUCTION
Current through March 12, 2004; 69 FR 11996

§ 216.3 Definitions.

In addition to definitions contained in the MMPA, and unless the context otherwise requires, in this part 216:

Acts means, collectively, the Marine Mammal Protection Act of 1972, as amended, 16 U.S.C. 1361 et seq., the Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 et seq., and the Fur Seal Act of 1966, as amended, 16 U.S.C. 1151 et seq.

Active sportfishing means paying passengers have their terminal fishing gear (lures, hooks, etc.) in the water in an attempt to catch fish or, in the case of fishing involving chumming, fishing is considered to be in progress from the instant fish have been sighted taking bait (boiling) during that chumming process.

< Text of definition effective until June 30, 2004. >

Administrator, Northeast Region means Administrator, Northeast Region, National Marine Fisheries Service, One Blackburn Drive, Gloucester, MA 01930- 2298

< Text of definition effective until Sept. 30, 2004. >

Administrator, Southeast Region means Administrator, Southeast Region, National Marine Fisheries Service, 9721 Executive Center Drive, St. Petersburg, FL 33702-2432.

Administrator, Southwest Region means the Regional Administrator, Southwest Region, National Marine Fisheries Service, 501 W. Ocean Blvd., Suite 4200, Long Beach, CA 90802-4213, or his or her designee.

Agreement on the International Dolphin Conservation Program (Agreement on the IDCP) means the Agreement establishing the formal binding IDCP that was signed in Washington, DC on May 21, 1998.

Alaskan Native means a person defined in the Alaska Native Claims Settlement Act (43 U.S.C. 1602(b)) (85 Stat. 588) as a citizen of the United States who is of one-fourth degree or more Alaska Indian (including Tsimishian Indians enrolled or not enrolled in the Metlaktla Indian Community), Eskimo, or Aleut blood or combination thereof. The term includes any Native, as so defined, either or both of whose adoptive parents are not Natives. It also includes, in the absence of proof of a minimum blood quantum, any citizen of the United States who is regarded as an Alaska Native by the Native village or group, of which he claims to be a member and whose father or mother is (or, if deceased, was) regarded as Native by any Native village or Native group. Any such citizen enrolled by the Secretary of the Interior pursuant to section 5 of the Alaska Native Claims Settlement Act shall be conclusively presumed to be an Alaskan Native for purposes of this part.

Article of handicraft means items made by an Indian, Aleut or Eskimo from the nonedible byproducts of fur seals taken for personal or family consumption which--

(1) Were commonly produced by Alaskan Natives on or before October 14, 1983;

(2) Are composed wholly or in some significant respect of natural materials, and;

(3) Are significantly altered from their natural form and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or similar mass copying devices. Improved methods of production utilizing modern implements such as sewing machines or modern tanning techniques at a tannery registered pursuant to § 216.23(c) may be used so long as no large scale mass production

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

industry results. Traditional native handicrafts include, but are not limited to, weaving, carving, stitching, sewing, lacing, beading, drawing, and painting. The formation of traditional native groups, such as a cooperative, is permitted so long as no large scale mass production results.

Assistant Administrator means the Assistant Administrator for Fisheries, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Silver Spring, MD 20910, or his/her designee.

Authentic native articles of handicrafts and clothing means items made by an Indian, Aleut or Eskimo which (a) were commonly produced on or before December 21, 1972, and (b) are composed wholly or in some significant respect of natural materials, and (c) are significantly altered from their natural form and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or similar mass copying devices. Improved methods of production utilizing modern implements such as sewing machines or modern tanning techniques at a tannery registered pursuant to § 216.23(c) may be used so long as no large scale mass production industry results. Traditional native handicrafts include, but are not limited to, weaving, carving, stitching, sewing, lacing, beading, drawing, and painting. The formation of traditional native groups, such as a cooperative, is permitted so long as no large scale mass production results.

Bona fide scientific research:

(1) Means scientific research on marine mammals conducted by qualified personnel, the results of which:

(i) Likely would be accepted for publication in a refereed scientific journal;

(ii) Are likely to contribute to the basic knowledge of marine mammal biology or ecology. (Note: This includes, for example, marine mammal parts in a properly curated, professionally accredited scientific collection); or

(iii) Are likely to identify, evaluate, or resolve conservation problems.

(2) Research that is not on marine mammals, but that may incidentally take marine mammals, is not included in this definition (see sections 101(a)(3)(A), 101(a)(5)(A), and 101(a)(5)(D) of the MMPA, and sections 7(b)(4) and 10(a)(1)(B) of the ESA).

Carrying capacity means the Regional Director's determination of the maximum amount of fish that a vessel can carry in short tons based on the greater of the amount indicated by the builder of the vessel, a marine surveyor's report, or the highest amount reported landed from any one trip.

Certified charter vessel means a fishing vessel of a non-U.S. flag nation, which is operating under the jurisdiction of the marine mammal laws and regulations of another, harvesting, nation by a formal declaration entered into by mutual agreement of the nations.

Co-investigator means the on-site representative of a principal investigator.

Commercial fishing operation means the lawful harvesting of fish from the marine environment for profit as part of an ongoing business enterprise. Such terms may include licensed commercial passenger fishing vessel (as defined) activities, but no other sportfishing activities, whether or not the fish so caught are subsequently sold.

Commercial passenger fishing vessel means any vessel licensed for commercial passenger fishing purposes within the State out of which it is operating and from which, while under charter or hire, persons are legally permitted to conduct sportfishing activities.

Custody means holding a live marine mammal pursuant to the conditional authority granted under the MMPA, and the responsibility therein for captive maintenance of the marine mammal.

Declaration of Panama means the declaration signed in Panama City, Republic of Panama, on October 4, 1995.

Director, Office of Protected Resources means Director, Office of Protected Resources, National Marine Fisheries Service, 1315 East-West Highway, Silver Spring, MD 20910.

Dolphin Mortality Limit (DML) means the maximum allowable number of incidental dolphin

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

mortalities per calendar year assigned to a vessel, unless a shorter time period is specified.

Endangered Species means a species or subspecies of marine mammal listed as "endangered" pursuant to the Endangered Species Act of 1973, 87 Stat. 884, Pub.L. 93-205 (see part 17 of this title).

ESA means the Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 et seq.

ETP means the eastern tropical Pacific Ocean which includes the Pacific Ocean area bounded by 40 < <degrees> > N. latitude, 40 < <degrees> > S. latitude, 160 < <degrees> > W. longitude and the coastlines of North, Central and South America.

Facility means, in the context specific to captive marine mammals,:

(1) One or more permanent primary enclosures used to hold marine mammals captive (i.e., pools, lagoons) and associated infrastructure (i.e., equipment and supplies necessary for the care and maintenance of marine mammals) where these enclosures are either located within the boundaries of a single contiguous parcel of land and water, or are grouped together within the same general area within which enclosure-to-enclosure transport is expected to be completed in less than one hour; or

(2) A traveling display/exhibit, where the enclosure(s) and associated infrastructure is transported together with the marine mammals.

Feeding is offering, giving, or attempting to give food or non-food items to marine mammals in the wild. It includes operating a vessel or providing other platforms from which feeding is conducted or supported. It does not include the routine discard of bycatch during fishing operations or the routine discharge of waste or fish byproducts from fish processing plants or other platforms if the discharge is otherwise legal and is incidental to operation of the activity.

First exporter means the person or company that first exports the fish or fish product, or, in the case of shipments that are subject to the labeling requirements of 50 CFR part 247 and that only contain fish harvested by vessels of the United States, the first seller of the fish or fish product.

Fisheries Certificate of Origin means NOAA Form 370, as described in § 216.24(f)(5).

Force majeure means forces outside the vessel operator's or vessel owner's control that could not be avoided by the exercise of due care.

FSA means the Fur Seal Act of 1966, as amended, 16 U.S.C. 1151 et seq.

Fur seal means North Pacific fur seal, scientifically known as Callorhinus ursinus.

Hard part means any bone, tooth, baleen, treated pelt, or other part of a marine mammal that is relatively solid or durable.

Harvesting nation means the country under whose flag one or more fishing vessels are documented, or which has by formal declaration agreed to assert jurisdiction over one or more certified charter vessels, from which vessel(s) fish are caught that are a part of any cargo or shipment of fish to be imported into the United States, regardless of any intervening transshipments.

Humane means the method of taking, import, export, or other activity which involves the least possible degree of pain and suffering practicable to the animal involved.

Import means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the Customs laws of the United States; except that, for the purpose of any ban issued under 16 U.S.C. 1371(a)(2) on the importation of fish or fish products, the definition of "import" in § 216.24(f)(1)(ii) shall apply.

Incidental catch means the taking of a marine mammal (1) because it is directly interfering with commercial fishing operations, or (2) as a consequence of the steps used to secure the fish in connection with commercial fishing operations: Provided, That a marine mammal so taken must immediately be returned to the sea with a minimum of injury and further, that the taking of a marine mammal, which otherwise meets the requirements of this definition shall not be considered an incidental catch of that mammal if it is used subsequently to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

assist in commercial fishing operations.

International Dolphin Conservation Program (IDCP) means the international program established by the agreement signed in La Jolla, California, in June 1992, as formalized, modified, and enhanced in accordance with the Declaration of Panama and the Agreement on the IDCP.

International Dolphin Conservation Program Act (IDCPA) means Public Law 105-42, enacted into law on August 15, 1997.

International Review Panel (IRP) means the International Review Panel established by the Agreement on the IDCP.

Intentional purse seine set means that a tuna purse seine vessel or associated vessels chase marine mammals and subsequently make a purse seine set.

Intrusive research means a procedure conducted for bona fide scientific research involving: A break in or cutting of the skin or equivalent, insertion of an instrument or material into an orifice, introduction of a substance or object into the animal's immediate environment that is likely either to be ingested or to contact and directly affect animal tissues (i.e., chemical substances), or a stimulus directed at animals that may involve a risk to health or welfare or that may have an impact on normal function or behavior (i.e., audio broadcasts directed at animals that may affect behavior). For captive animals, this definition does not include:

(1) A procedure conducted by the professional staff of the holding facility or an attending veterinarian for purposes of animal husbandry, care, maintenance, or treatment, or a routine medical procedure that, in the reasonable judgment of the attending veterinarian, would not constitute a risk to the health or welfare of the captive animal; or

(2) A procedure involving either the introduction of a substance or object (i.e., as described in this definition) or a stimulus directed at animals that, in the reasonable judgment of the attending veterinarian, would not involve a risk to the health or welfare of the captive animal.

Label means a display of written, printed, or graphic matter on or affixed to the immediate container of any article.

Land or landing means to begin offloading any fish, to arrive in port with the intention of offloading fish, or to cause any fish to be offloaded.

Large-scale driftnet means a gillnet that is composed of a panel or panels of webbing, or a series of such gillnets, with a total length of 2.5 kilometers or more that is used on the high seas and allowed to drift with the currents and winds for the purpose of harvesting fish by entangling the fish in the webbing of the net.

Level A Harassment means any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild.

Level B Harassment means any act of pursuit, torment, or annoyance which has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering but which does not have the potential to injure a marine mammal or marine mammal stock in the wild.

Marine environment means the oceans and the seas, including estuarine and brackish waters.

Marine mammal means those specimens of the following orders, which are morphologically adapted to the marine environment, and whether alive or dead, and any part thereof, including but not limited to, any raw, dressed or dyed fur or skin: Cetacea (whales, dolphins, and porpoises) and Pinnipedia, other than walrus (seals and sea lions).

MMPA means the Marine Mammal Protection Act of 1972, as amended, 16 U.S.C. 1361 et seq.

Native village or town means any community, association, tribe, band, clan or group.

Optimum sustainable population is a population size which falls within a range from the population level of a given species or stock which is the largest supportable within the ecosystem to the population level that results in maximum net productivity. Maximum net productivity is the greatest net annual increment in population numbers or biomass resulting from additions to the population due to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

50 CFR S 216.3                                                      Page 37

reproduction and/or growth less losses due to natural mortality.

Per-stock per-year dolphin mortality limit means the maximum allowable number of incidental dolphin mortalities and serious injuries from a specified stock per calendar year, as established under the IDCP.

Pregnant means pregnant near term.

Pribilovians means Indians, Aleuts, and Eskimos who live on the Pribilof Islands.

Principal investigator means the individual primarily responsible for the taking, importation, export, and any related activities conducted under a permit issued for scientific research or enhancement purposes.

Public display means an activity that provides opportunities for the public to view living marine mammals at a facility holding marine mammals captive.

Regional Director means the Regional Administrator, Northeast Regional Office, NMFS, One Blackburn Drive, Gloucester, MA 01930; or Regional Administrator, Northwest Regional Office, NMFS, 7600 Sandpoint Way, N.E., Building 1, Seattle, WA 98115; or Regional Administrator, Southeast Regional Office, NMFS, 9721 Executive Center Drive North, St. Petersburg, FL 33702; or Regional Administrator, Southwest Regional Office, NMFS, 501 West Ocean Boulevard, Suite 4200, Long Beach, CA 90802; or Regional Administrator, Pacific Islands Regional Office, NMFS, 1601 Kapiolani Boulevard, Suite 1110, Honolulu, HI 96814; or Regional Administrator, Alaska Regional Office, NMFS, PO Box 21668, Juneau, AK 99802.

Rehabilitation means treatment of beached and stranded marine mammals taken under section 109(h)(1) of the MMPA or imported under section 109(h)(2) of the MMPA, with the intent of restoring the marine mammal's health and, if necessary, behavioral patterns.

Secretary shall mean the Secretary of Commerce or his authorized representative.

Serious injury means any injury that will likely

result in mortality.

Sexual harassment means any unwelcome sexual advance, request for sexual favors, or other verbal and physical conduct of a sexual nature which has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Soft part means any marine mammal part that is not a hard part. Soft parts do not include urine or fecal material.

South Pacific Ocean means any waters of the Pacific Ocean that lie south of the equator.

Stranded or stranded marine mammal means a marine mammal specimen under the jurisdiction of the Secretary:

(1) If the specimen is dead, and is on a beach or shore, or is in the water within the Exclusive Economic Zone of the United States; or

(2) If the specimen is alive, and is on a beach or shore and is unable to return to the water, or is in the water within the Exclusive Economic Zone of the United States where the water is so shallow that the specimen is unable to return to its natural habitat under its own power.

Subsistence means the use of marine mammals taken by Alaskan Natives for food, clothing, shelter, heating, transportation, and other uses necessary to maintain the life of the taker or those who depend upon the taker to provide them with such subsistence.

Subsistence uses means the customary and traditional uses of fur seals taken by Pribilovians for direct personal or family consumption as food, shelter, fuel, clothing, tools or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fur seals taken for personal or family consumption; and for barter, or sharing for personal or family consumption. As used in this definition--

(1) Family means all persons related by blood, marriage, or adoption, or any person living within a household on a permanent basis.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(2) Barter means the exchange of fur seals or their parts, taken for subsistence uses--

(i) For other wildlife or fish or their parts, or

(ii) For other food or for nonedible items other than money if the exchange is of a limited and noncommercial nature.

Take means to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect, or kill any marine mammal. This includes, without limitation, any of the following: The collection of dead animals, or parts thereof; the restraint or detention of a marine mammal, no matter how temporary; tagging a marine mammal; the negligent or intentional operation of an aircraft or vessel, or the doing of any other negligent or intentional act which results in disturbing or molesting a marine mammal; and feeding or attempting to feed a marine mammal in the wild.

Threatened species means a species of marine mammal listed as "threatened" pursuant to the Endangered Species Act of 1973, 87 Stat. 884, Pub.L. 93-205.

Trip means a voyage starting when a vessel leaves port with all fish wells empty of fish and ending when a vessel unloads all of its fish.

Tuna product means any food product processed for retail sale and intended for human or animal consumption that contains an item listed in § 216.24(f)(2)(i) or (ii), but does not include perishable items with a shelf life of less than 3 days.

Wasteful manner means any taking or method of taking which is likely to result in the killing of marine mammals beyond those needed for subsistence, subsistence uses, or for the making of authentic native articles of handicrafts and clothing, or which results in the waste of a substantial portion of the marine mammal and includes, without limitation, the employment of a method of taking which is not likely to assure the capture or killing of a marine mammal, or which is not immediately followed by a reasonable effort to retrieve the marine mammal.

[39 FR 1852, Jan. 15, 1974, as amended at 41 FR 55536, Dec. 21, 1976; 50 FR 49700, Dec. 4, 1985; 53 FR 8918, March 18, 1988; 54 FR 7933, Feb. 24, 1989; 54 FR 9448, March 7, 1989; 54 FR 17741, April 25, 1989; 55 FR 11926, March 30, 1990; 55 FR 47882, Nov. 16, 1990; 56 FR 11697, March 20, 1991; 56 FR 41307, Aug. 20, 1991; 56 FR 47422, Sept. 19, 1991; 56 FR 50676, Oct. 8, 1991; 57 FR 41702, Sept. 11, 1992; 58 FR 29130, May 19, 1993; 59 FR 16145, April 6, 1994; 59 FR 35865, July 14, 1994; 59 FR 50375, Oct. 3, 1994; 59 FR 63062, Dec. 7, 1994; 61 FR 7429, Feb. 28, 1996; 61 FR 11750, March 22, 1996; 61 FR 15887, April 10, 1996; 61 FR 21933, May 10, 1996; 61 FR 27794, June 3, 1996; 63 FR 66076, Dec. 1, 1998; 64 FR 28120, 28121, May 25, 1999; 65 FR 48, Jan. 3, 2000; 69 FR 9760, March 2, 2004]

< General Materials (GM) - References, Annotations, or Tables >

50 C. F. R. § 216.3

50 CFR § 216.3

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT T

Minutes of the Council of the City of San Diego
for the Regular Meeting of Monday, March 29, 1999                                    Page 53

ITEM-211:    In the matter of "Sufficient Assurances" concerning the Ball Park Project.

    FILE LOCATION:            MEET (64)

    COUNCIL ACTION:          (Tape location: D306-G148.)

    MOTION BY STALLINGS TO ACCEPT STAFF'S REPORT.  Second by Kehoe.
    Passed by the following vote: Mathis-yea, Wear-yea, Kehoe-yea, Stevens-yea,
    Warden-yea, Stallings-not present, McCarty-yea, Vargas-yea, Mayor Golding-yea.

ITEM-S400:   Two actions related to La Jolla Children's Pool Beach Management and Water
    Quality Improvement Project and Certifying Mitigated Negative Declaration
    LDR-98-0671.

    (Continued by Common Consent from the meeting of March 22, 1999, Item 151,
    due to lack of five affirmative votes.)

    (See City Manager Reports CMR-98-99 and CMR-98-29. La Jolla and  La Jolla
    Shores Community Areas.  District-1.)

**TODAY'S ACTION ARE:**          REFERRED TO NATURAL RESOURCES AND
    CULTURE COMMITTEE AND DIRECTIONS TO CITY
    MANAGER

    Adoption of the following resolutions:

    Subitem-A:  (R-99-958 Cor. Copy)

    Authorizing the City Manager to proceed with the project to restore the beach
    width in La Jolla Children's Pool to that present in 1941 by removing
    approximately 3,000 cubic yards of sand for disposal at either Marine Street or
    north La Jolla Shores beach;

    Authorizing the City Auditor and Comptroller to expend an amount not to exceed
    $40,000 from General Fund 100, Department 442, Park and Recreation Coastal
    Division.

**Minutes of the Council of the City of San Diego**
**for the Regular Meeting of Monday, March 29, 1999**                              Page 54

Subitem-B:  (R-99-962 Cor. Copy)

Certifying that the information contained in Mitigated Negative Declaration LDR-98-0671, La Jolla Children's Pool Dredging (Project), has been completed in compliance with the California Environmental Quality Act of 1970, as amended, and State guidelines, and that said declaration reflects the independent judgement of the City, and that said report has been reviewed and considered by the Council.

## NATURAL RESOURCES AND CULTURE COMMITTEE'S RECOMMENDATION:

On 5/6/98, NR&C voted 4-1 to approve directing the City Manager to apply for a Coastal Development Permit to remove sand and open the sluiceways at the Children's Pool beach, and to deposit the sand at La Jolla Shores beach.  (Councilmembers Mathis, Wear, Kehoe, Warden voted yea.  Councilmember Stallings voted nay.)

## CITY MANAGER SUPPORTING INFORMATION:

On May 6, 1998, the Natural Resources and Culture Committee considered City Manager's Report No. 98-88 and voted 4:1 to recommend the City Council approve directing the City Manager to apply for a Coastal development permit to remove sand and open the sluiceways at Children's Pool beach, and to deposit the sand at La Jolla Shores beach.  Subsequently, environmental analyses have been conducted and a final Mitigated Negative Declaration prepared. The objective of this action is to restore the shared use of Children's Pool by people and harbor seals.  Approximately three thousand cubic yards of sand will be removed from Children's Pool beach and deposited either on Marine Street beach or on north La Jolla Shores.  This will restore the Children's Pool beach width to its design configuration consisting of a large "pool" of water. The water entry point for public use will be set back from a rip current located at the end of the breakwater making the use of Children's Pool by swimmers safer.  The reduced beach width will also increase competition for space between humans and harbor seals which may decrease the number of seals hauling out on Children's Pool beach which could result in sufficiently reducing fecal coliform counts to the point that the prohibition on human contact with the pool waters can be lifted.  Consistent with Committee direction, permit applications are in process with the California Coastal Commission, Army Corps of Engineers, and the National Marine Fisheries Service.  Work is targeted to be completed by the start of the summer season.

Aud. Cert. 9900942.

FILE LOCATION:            MEET

Minutes of the Council of the City of San Diego
for the Regular Meeting of Monday, March 29, 1999

Page 55

COUNCIL ACTION:        (Tape location: B316-C504.)

MOTION BY VARGAS TO NOT DREDGE, NOT SHOO THE SEALS, INSTEAD TO
PUT UP A BARRIER TO PROTECT THE HUMANS FROM THE SEALS AND THE
SEALS FROM THE HUMANS AND TO SEND IT BACK TO THE NATURAL
RESOURCES COMMITTEE FOR AN INDEPTH REVIEW OF ALL THE ISSUES
INCLUDING THE LEGALITY AND HOW IT WAS LEFT IN THE WILL.  Second by
Stallings.  Passed by the following vote: Mathis-nay, Wear-nay, Kehoe-yea, Stevens-yea,
Warden-yea, Stallings-yea, McCarty-nay, Vargas-yea, Mayor Golding-yea.

NON-DOCKET ITEMS:

None.

ADJOURNMENT:

The meeting was adjourned by Mayor Golding at 6:44 p.m. in honor of the memory of:

Dr. Philip Baldwin as requested by Council Member kehoe, and
Raye Sara Blumer as requested by Council Member McCarty.

FILE LOCATION:        AGENDA

COUNCIL ACTION:        (Tape location: G154-184).

I, CHARLES G. ABDELNOUR, Clerk of
the City of San Diego, California,
hereby certify that this is a true
copy of papers on file and of
record in the office of the Clerk
of said City.

CHARLES G. ABDELNOUR, City Clerk

By _____, Deputy

Dated _____4/16/04_____



# EXHIBIT U

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

F I L E D
Stephan M. Kelly, Clerk

MAY 1 6 2007

Court of Appeal Fourth District

|  |  |
|---|---|
| VALERIE O'SULLIVAN, | D047382 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. GIC826918) |
| CITY OF SAN DIEGO, | |
| Defendant and Appellant. | |

THE COURT:

The applications of (1) the California Coastal Commission; (2) the League of California Cities; (3) San Diego Animal Advocates, Institute for Animal Rights Law, and International Society for Animal Rights; (4) the Sierra Club; and (5) the Humane Society have been read and considered by Justices Huffman, McDonald and Irion. The applications are denied.

_____
HUFFMAN, Acting P. J.

Copies to:  All parties



# EXHIBIT V

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

VALERIE O'SULLIVAN,
Plaintiff and Respondent,
v.
CITY OF SAN DIEGO,
Defendant and Appellant.
**D047382**
**San Diego County No. GIC826918**

F I L E D
Stephen M. Kelly, Clerk

JUN 2 1 2007

Court of Appeal Fourth District

THE COURT:

    The application of La Jolla Friends of the Seals for leave to file amicus curiae brief on behalf of appellant, City of San Diego filed on June 19, 2007, is DENIED. The clerk of the court is directed to remove the brief from the application and return it along with the five copies of the combined application and brief to counsel for amicus curiae La Jolla Friends of the Seals.

_____
Acting Presiding Justice

cc: All Parties

## AFFIDAVIT OF TRANSMITTAL

I am a citizen of the United States, over 18 years of age, and not a party to the within action; that my business address is 750 B Street, Suite 300, San Diego, CA 92101; that I served a copy of the attached material in envelopes addressed to those persons noted below.

That said envelopes were sealed and shipping fees fully paid thereon, and thereafter were sent as indicated via the U.S. Postal System from San Diego, CA 92101.

I certify under penalty of perjury that the foregoing is true and correct.

Stephen M. Kelly, Clerk of the Court

Deputy Clerk

Date 6/21/07

CASE NUMBER: D047382

Office of the Clerk
San Diego County Superior Court  -  Main
P.O. Box 120128
San Diego, CA 92112

Material Sent YES: ____

Paul R. Kennerson
Kennerson & Grant
101 West Broadway, Suite 1150
San Diego, CA 92101

Material Sent YES: ____

George F. Schaefer
Office Of The City Attorney
1200 Third Avenue, Suite 1100
San Diego, CA 92101-4112

Material Sent YES: ____

Alicia I. Getchell, Esq.
Paul, Hastings, Janofsky & Walker LLP
3579 Valley Center Drive
San Diego, CA 92130

Material Sent YES: ____

CIVIL DIVISION

07 JUN 22 PM 1:31

CITY ATTORNEY

serv



# EXHIBIT W

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

San Diego County Superior Court  -  Main
P.O. Box 120128
San Diego, CA 92112

RE:   VALERIE O'SULLIVAN,
      Plaintiff and Respondent,
      v.
      CITY OF SAN DIEGO,
      Defendant and Appellant.

**D047382**
**San Diego County No. GIC826918**

# * * * REMITTITUR * * *

I, Stephen M. Kelly, Clerk of the Court of Appeal of the State of California, for the
Fourth Appellate District, certify the attached is a true and correct copy of the original opinion
or decision entered in the above-entitled case on September 07, 2007, and that this opinion or
decision has now become final.

_____ Appellant _____ Respondent to recover costs.
_____ Each party to bear own costs.
_____ Costs are not awarded in this proceeding.
___✓___ Other (See Below)

O'Sullivan is entitled to costs on appeal.

Witness my hand and the seal of the Court affixed this     DEC 3   2007

STEPHEN M. KELLY, Clerk

By: _____
        Deputy Clerk

cc:  All Parties (Copy of remittitur only, Cal. Rules of Court, rule 8.279(d))

## AFFIDAVIT OF TRANSMITTAL

I am a citizen of the United States, over 18 years of age, and not a party to the within action; that my business address is 750 B Street, Suite 300, San Diego, CA 92101; that I served a copy of the attached material in envelopes addressed to those persons noted below.

That said envelopes were sealed and shipping fees fully paid thereon, and thereafter were sent as indicated via the U.S. Postal System from San Diego, CA 92101.

I certify under penalty of perjury that the foregoing is true and correct.

Stephen M. Kelly, Clerk of the Court

_____                    DEC 3   2007

Deputy Clerk                                        Date

CASE NUMBER: D047382

Office of the Clerk                                 Material Sent YES: _____
San Diego County Superior Court - Main
P.O. Box 120128
San Diego, CA 92112

Paul R. Kennerson                                   Material Sent YES: _____
Kennerson & Grant
101 West Broadway, Suite 1150
San Diego, CA 92101

George F. Schaefer                                  Material Sent YES: _____
Office Of The City Attorney
1200 Third Avenue, Suite 1100
San Diego, CA 92101-4112

CIVIL DIVISION

07 DEC -4 PM 12: 57

CITY ATTORNEY



LAW OFFICES OF BRYAN W. PEASE
302 Washington St. #404, San Diego, CA 92103
Ph. (619) 723-0369  |  Fax (619) 923-1001

November 5, 2007

Honorable Justices of the California Supreme Court
350 McAllister Street
San Francisco, California 94102-4783

**RE: Valerie O'Sullivan v. City of San Diego, No. S-157299**

Dear Honorable Justices of the California Supreme Court:

I am writing on behalf of the Animal Protection and Rescue League (APRL), a San Diego based nonprofit organization, to support the City of San Diego's petition for review of the above case. The 1931 tidelands grant from the State of California consisted of land only, and not money. It is entirely unreasonable and a violation of separation of powers for a judge to require the City to spend its own money to constantly remove sand in order to maintain an artificial and unnatural configuration of a beach.

Additionally, the federal Marine Mammal Protection Act, 50 CFR 216, makes it illegal to disturb the seals that now rest and give birth on the sand that the Court of Appeal has ordered the City to remove. Seal watching is a recreational activity that is equally permissible to swimming under the tidelands grant and current City policy, yet the Court of Appeal insists on favoring swimming as the favored use.

Enclosed please find the results of an independent, scientific opinion poll conducted by Zogby International that APRL sponsored. The poll results show with a 4% margin of error that over 80% of San Diegans want the beach in question to be used for seal watching and not swimming, and desire having a rope barrier to protect the seals. After asking if people "agree" with the above, the poll then asked if people "disagree" with dredging (removing sand), thus eliminating any positive response bias. Three in four disagree with dredging.

While the Zogby results were not part of the trial court record, I am providing them to the Court as context only, to illuminate the importance of this issue to the citizens of San Diego. The Court has discretion to depart from the restriction that amicus letters ordinarily must be confined to the issues raised in the petition and answer. See Fisher v. City of Berkeley (1984) 37 C3d 644, 709-713, 209 CR 682.

Thank you for your consideration of this matter.

Sincerely,

Bryan W. Pease
Pro bono general counsel
Animal Protection & Rescue League

Zogby International

**Z**

Polling/Market Research
Public Relations Services
Marketing Strategies

**Date:**  May 11, 2007

**To:**  Bryan Pease
bryan@aprl.org

**From:**  Rebecca Wittman
rebecca@zogby.com

**RE:**  **Results from San Diego poll**

**Survey Methodology: Survey of San Diego California, 5/9/07 through 5/11/07**

This is a telephone survey of adults, conducted by Zogby International. The target sample is 602 interviews with approximately 15 questions asked. Samples are randomly drawn from telephone CDs of national listed sample. Zogby International surveys employ sampling strategies in which selection probabilities are proportional to population size within area codes and exchanges. Up to six calls are made to reach a sampled phone number. Cooperation rates are calculated using one of AAPOR's approved methodologies[1] and are comparable to other professional public-opinion surveys conducted using similar sampling strategies.[2] Weighting by age, race, and gender is used to adjust for non-response.  The margin of error is +/- 4.1 percentage points. Margins of error are higher in sub-groups.

Zogby International's sampling and weighting procedures also have been validated through its political polling: more than 95% of the firm's polls have come within 1% of actual election-day outcomes.

---

[1] See COOP4 (p.38) in Standard *Definitions: Final Dispositions of Case Codes and Outcome Rates of Surveys.* The American Association for Public Opinion Research, (2000).

[2] *Cooperation Tracking Study: April 2003 Update*, Jane M. Sheppard and Shelly Haas. The Council for Marketing & Opinion Research (CMOR). Cincinnati, Ohio (2003).

901 Broad Street
Utica, New York, 13501
Phone: (315) 624-0200  Fax: (315) 624-0210
E-Mail: mail@zogby.com
Web Page: http://www.zogby.com

1600 K Street NW, Suite 600
Washington, DC 20006
Phone: (202) 429-0022

Zogby International

Polling/Market Research
Public Relations Services
Marketing Strategies

## Narrative Summary

*201. Do you strongly agree, somewhat agree, somewhat disagree or strongly disagree that wild animals should be protected?*

| | | | |
|---|---|---|---|
| Strongly agree | 77% | | |
| Somewhat agree | 15 | **Agree** | **92%** |
| Somewhat disagree | 3 | | |
| Strongly disagree | 3 | **Disagree** | **6** |
| Not sure | 2 | | |

Most every respondent (92%) agrees that wild animals should be protected, including over three-fourths (77%) who agree strongly. Only 6% disagree.

*202. A sea wall was built at the Children's Pool in La Jolla in 1931. It was built on top of what was previously called "seal rock" because harbor seals used it for resting. Since the early 1990's, harbor seals have come back to this area and now use the beach for resting, and they give birth to pups right on the sand every spring. Swimming at this beach can disturb the seals, sometimes causing mothers to become separated from their pups, and is not recommended due to the presence of seal fecal matter. Do you strongly agree, somewhat agree, somewhat disagree or strongly disagree that this beach should be reserved for educational seal watching, and not swimming?*

| | | | |
|---|---|---|---|
| Strongly agree | 68% | | |
| Somewhat agree | 13 | **Agree** | **81%** |
| Somewhat disagree | 4 | | |
| Strongly disagree | 14 | **Disagree** | **18** |
| Not sure | 1 | | |

San Diego adults are more than four times as likely to agree than disagree that the beach should be reserved for educational seal watching, and not swimming. Four out of five respondents (81%) agree, with two-thirds overall strongly agreeing. Just fewer than one in five (18%) disagree, with disagreement more likely to be "strong" (14%) than "somewhat" (4%).

901 Broad Street
Utica, New York, 13501
Phone: (315) 624-0200  Fax: (315) 624-0210
E-Mail: mail@zogby.com
Web Page: http://www.zogby.com

1600 K Street NW, Suite 600
Washington, DC 20006
Phone: (202) 429-0022

Zogby International

Polling/Market Research
Public Relations Services
Marketing Strategies

*203. The City currently maintains a rope barrier on the beach during pupping season, December 15 through May 15, to give the seals space from people. The rope is a guideline, instructing people to watch the seals from a respectful distance. Most people respect the rope even though it is not illegal to cross it. During seven months out of the year, there is no rope, and people often go right up to the seals and end up scaring them away. Do you strongly agree, somewhat agree, somewhat disagree or strongly disagree that the rope should be kept up year round?*

| | | | |
|---|---|---|---|
| Strongly agree | 64% | | |
| Somewhat agree | 16 | **Agree** | **80%** |
| Somewhat disagree | 8 | | |
| Strongly disagree | 10 | **Disagree** | **18** |
| Not sure | 2 | | |

A vast four-fifths majority (80%) agrees this rope should be kept up year round. This includes nearly two out of three overall (64%) who agree strongly. In contrast, less than one in five (18%) disagree that the rope should be kept up year round.

*204. Do you strongly agree, somewhat agree, somewhat disagree or strongly disagree that crossing the rope should be illegal during pupping season, which is Dec. 15 through May 15?*

| | | | |
|---|---|---|---|
| Strongly agree | 68% | | |
| Somewhat agree | 12 | **Agree** | **80%** |
| Somewhat disagree | 5 | | |
| Strongly disagree | 14 | **Disagree** | **19** |
| Not sure | 1 | | |

Respondents are four times as likely to agree than disagree that crossing this rope should be illegal during pupping season. Four in five (80%) agree, with two in three (68%) in strong agreement. One in five (19%) disagrees, with one in seven (14%) disagreeing strongly.

901 Broad Street
Utica, New York, 13501
Phone: (315) 624-0200  Fax: (315) 624-0210
E-Mail: mail@zogby.com
Web Page: http://.www.zogby.com

1600 K Street NW, Suite 600
Washington, DC 20006
Phone: (202) 429-0022

Zogby International

Polling/Market Research
Public Relations Services
Marketing Strategies

*203. The City currently maintains a rope barrier on the beach during pupping season, December 15 through May 15, to give the seals space from people. The rope is a guideline, instructing people to watch the seals from a respectful distance. Most people respect the rope even though it is not illegal to cross it. During seven months out of the year, there is no rope, and people often go right up to the seals and end up scaring them away. Do you strongly agree, somewhat agree, somewhat disagree or strongly disagree that the rope should be kept up year round?*

| | | | |
|---|---|---|---|
| Strongly agree | 64% | | |
| Somewhat agree | 16 | **Agree** | **80%** |
| Somewhat disagree | 8 | | |
| Strongly disagree | 10 | **Disagree** | **18** |
| Not sure | 2 | | |

A vast four-fifths majority (80%) agrees this rope should be kept up year round. This includes nearly two out of three overall (64%) who agree strongly. In contrast, less than one in five (18%) disagree that the rope should be kept up year round.

*204. Do you strongly agree, somewhat agree, somewhat disagree or strongly disagree that crossing the rope should be illegal during pupping season, which is Dec. 15 through May 15?*

| | | | |
|---|---|---|---|
| Strongly agree | 68% | | |
| Somewhat agree | 12 | **Agree** | **80%** |
| Somewhat disagree | 5 | | |
| Strongly disagree | 14 | **Disagree** | **19** |
| Not sure | 1 | | |

Respondents are four times as likely to agree than disagree that crossing this rope should be illegal during pupping season. Four in five (80%) agree, with two in three (68%) in strong agreement. One in five (19%) disagrees, with one in seven (14%) disagreeing strongly.

901 Broad Street
Utica, New York, 13501
Phone: (315) 624-0200  Fax: (315) 624-0210
E-Mail: mail@zogby.com
Web Page: http://www.zogby.com

1600 K Street NW, Suite 600
Washington, DC 20006
Phone: (202) 429-0022

Zogby International

Polling/Market Research
Public Relations Services
Marketing Strategies

*205. A Superior Court judge recently ordered the City to dredge much of the sand from Casa Beach to return the beach to a pool for swimming. This would give the seals less space to rest and could drive them away entirely. The dredging would cost the City roughly $500,000. The City is appealing the decision. Do you strongly agree, somewhat agree, somewhat disagree or strongly disagree that the beach should be dredged?*

| | | | |
|---|---|---|---|
| Strongly agree | 15% | | |
| Somewhat agree | 8 | **Agree** | **23%** |
| Somewhat disagree | 11 | | |
| Strongly disagree | 63 | **Disagree** | **74** |
| Not sure | 3 | | |

San Diego adults are more than three times as likely to disagree than agree that the sand from Casa Beach should be dredged. Three in four (74%) disagree, including nearly two-thirds (63%) who disagree strongly. In comparison, fewer than one in four (23%) agrees the beach should be dredged, with one in seven (15%) agreeing strongly.

901 Broad Street
Utica, New York, 13501
Phone: (315) 624-0200  Fax: (315) 624-0210
E-Mail: mail@zogby.com
Web Page: http//:www.zogby.com

1600 K Street NW, Suite 600
Washington, DC 20006
Phone: (202) 429-0022

# PROOF OF SERVICE BY MAIL

*Valerie O'Sullivan v. City of San Diego*
**Case No. S-157299**

     I, Bryan W. Pease, declare that I am, and was at the time of service of the papers herein referred to, over the age of eighteen years and not a party to the action; and I reside in the County of San Diego, California, in which county the within mentioned mailing occurred. My business address is 302 Washington St. #404, San Diego, CA 92103.

     I CAUSED TO BE SERVED, THE FOLLOWING DOCUMENTS:

**ANIMAL PROTECTION AND RESCUE LEAGUE AMICUS LETTER**

[X]    (BY MAIL) I served the individuals named by placing the documents in a sealed envelope. I then placed them for collection and mailing with the United States Postal Service this same day, at my address shown above, following ordinary business practices.

Deputy City Attorney George Schaefer
Office of The City Attorney
1200 Third Avenue, Suite 1100
San Diego, CA 92101-4112

Paul R. Kennerson, Esq.
Kennerson & Grant
101 West Broadway, Suite 1150
San Diego, CA 92101

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 5, 2007, San Diego, California.

Bryan W. Pease

# EXHIBIT Y

B6

The San Diego

# Union-Tribune

DAVID C. COPLEY *Chairman and Publisher*

**W. JEFF GATEWOOD**
*Founder: Oct. 10, 1868*

**JOHN D. SPRECKELS**
*Publisher: 1890-1926*

**COL. IRA C. COPLEY**
*Publisher: 1928-1947*

**JAMES S. COPLEY**
*Publisher: 1947-1973*

**HELEN K. COPLEY** *Publisher: 1973-2001*

ACOPLEY
NEWSPAPER

**KARIN E. WINNER**
*Editor*

**WILLIAM OSBORNE**
*Senior Editor/ Opinion*

**ROBERT A. KITTLE**
*Editor of the Editorial Page*

**EDITORIALS**

# Humans v. seals

## La Jolla rookery likely to outlast litigation

It's hard to fathom a more muddled mess than the legal tangle surrounding the colony of harbor seals at the Children's Pool in La Jolla. Once the plaintiff's lawyers intruded on the matter, there was little hope of an amicable resolution of the clash between humans and seals.

More than a decade ago, the seals began to haul out for rest on the Children's Pool beach, which is protected by a sea wall built in 1931. Eventually, the site became a rookery where 10 to 20 pups are born each year.

Not surpris-

ingly, tens of thousands of visitors a month flock to see the seals, which offer a rare opportunity to experience wild animals up close. The seal colony is popular with young children, especially during the birthing season from January to May, when captivating newborns join the adults lounging on the sand.

Some swimmers, however, do not find the seals to be so appealing. Because of the fecal waste left by the seals in the sheltered cove, the water's bacteria level exceeds state standards, making it potentially unhealthy for humans.

All it took was for one swimmer to file suit, and an endless legal embroglio erupted. Superior Court Judge William Pate ruled that, based on his reading of the 1931 trust agreement by which La Jolla philanthropist Ellen Browning Scripps conveyed the sea wall to the city, the beach must be maintained for children, not seals. Going even further, Pate decreed that the city must remove about one-third of the sand from the

beach in a bid to make it less hospitable to the seals. The judge's aim apparently is to improve the water quality by driving away the seals and making the Children's Pool more hospitable to humans.

Only problem with Pate's decision is that it ignores a key federal law, the Marine Mammal Protection Act, which makes it illegal to harass the seals without a permit from the National Marine Fisheries Service. Compounding the confusion, the National Marine Fisheries Service recently asked the city to reinstall a rope barrier to keep tourists from getting too close to the seals during the birthing season.

but also humans from protective, aggressive adult seals — would appear to violate Judge Pate's overly expansive ruling. On the other hand, failing to put up the rope could put the city in violation of the Marine Mammal Protection Act.

Similarly, any overt action to drive off the seals — such as removing a third of the beach — would appear to violate the federal law as well. Besides, such a rash move as denuding the beach of sand is not likely ever to win the necessary approval of the California Coastal Commission, which is dedicated to preserving, not destroying, beaches.

So, the plaintiff's lawyers have won thus far in the courtroom. But on the warm sand of the Children's Pool beach, the seals still are triumphant — and are likely to remain so through the multiple rounds of litigation ahead.

Erecting the rope barrier — which not only would protect the seal pups



UT